## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ETHEL AUSTIN-SPEARMAN, individually and on behalf of all others similarly situated, | Case No. |
| *Plaintiff*, | |
| *v.* | |
| AARP, a District of Columbia corporation, and AARP SERVICES INC., a Delaware corporation, | |
| *Defendants*. | |

### CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Ethel Austin-Spearman ("Plaintiff" or "Austin-Spearman") brings this Class Action Complaint and Demand for Jury Trial ("Complaint") against Defendants AARP and AARP Services Inc. (collectively referred to in the singular as "AARP") to put an end to, and obtain redress for, their unlawful practice of transmitting their members' sensitive and personally identifiable information to third parties. Plaintiff, for her Complaint, alleges as follows upon personal knowledge as to herself and her own acts and experiences and, as to all other matters, upon information and belief, including investigation conducted by her attorneys:

### NATURE OF THE ACTION

1.      Defendant AARP is one of largest organizations in the United States for people aged 50 years and over. Perhaps best known for its eponymous non-profit advocacy and lobbying group, AARP also purports to provide its members with a number of benefits, including discounts on shopping, dining, and travel as well as financial and insurance-related products and services. AARP offers its members such benefits through its wholly owned, *for-profit subsidiary*, Defendant AARP Services, Inc.

2.      In order to obtain access to such benefits—including benefits only accessible through the AARP website (*e.g.*, managing AARP membership accounts, viewing exclusive content, or redeeming promotional offers)—eligible consumers must sign up for a membership with AARP at a cost of $16 per year.

3.      A consumer who purchases a membership and registers an account on AARP's website is required to agree to a contract governing his or her use of AARP's online services. The contract "constitutes the entire agreement between [AARP] and [the member] with respect to the subject matter contained in [the] agreement and supersedes all previous and contemporaneous agreements, proposals, and communications, written and/or oral."[1] It also incorporates a Privacy Policy, which describes how AARP permits certain third parties to collect its members' personal information on the AARP website.

4.      As part of these contracts, AARP promises that only specifically-named third party companies will collect AARP members' information on its website, and that *no* third party company will collect AARP members' personally identifiable information ("PII").

5.      Unfortunately, despite its express promises to the contrary, AARP routinely allows third party data analytics companies to collect its members' PII—including at least their name, race, email address, state of residence, and employment information—along with the precise materials that they're viewing on the AARP website.

6.      These practices are particularly concerning here because the analytics companies that receive this sensitive data are capable of adding the information to their already massive, detailed databases of individual consumer information, and are in the business of commercializing those datasets.

---

[1]      *AARP's Terms of Service*, AARP.org, http://www.aarp.org/about-aarp/info-05-2010/terms_of_service.html (last visited June 12, 2014).

7.      Had AARP informed its members that third party companies systematically collect their PII from the AARP website, they would have been unwilling to purchase their AARP memberships at the price charged, if at all. Thus, because AARP failed to disclose (and in fact misrepresented) these collection practices, it provided Plaintiff and the Class a fundamentally less useful and less valuable service than the one they paid for.

8.      In an era when the collection and monetization of consumer data proliferates on an unprecedented scale, it's important that companies are held accountable for the exploitation of their users' sensitive information—especially when such exploitation goes undisclosed or, even worse, runs contrary to a company's consumer-facing privacy disclosures. AARP chose to disregard Plaintiff's and thousands of other members' privacy rights by releasing their sensitive data into the marketplace. Accordingly, this putative class action lawsuit seeks (i) to prevent AARP from allowing the unauthorized collection of its members' sensitive and personally identifiable data, and (ii) damages for those deceived into paying for its services under false pretenses.

**PARTIES**

9.      Plaintiff Ethel Austin-Spearman is a natural person and citizen of the State of California.

10.     Defendant AARP is a corporation existing under the laws of the District of Columbia, with its headquarters and principal place of business located at 601 E Street NW, Washington, DC 20049. Defendant AARP conducts business throughout the District of Columbia, this District, and the United States.

11.     Defendant AARP Services, Inc. is a corporation existing under the laws of the State of Delaware, with its headquarters and principal place of business located at 601 E Street

NW, Washington, DC 20049. Defendant AARP Services, Inc. conducts business throughout

District of Columbia, this District, and the United States.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2),

because (a) at least one member of the putative class is a citizen of a state different from

Defendants, (b) the amount in controversy exceeds $5,000,000, exclusive of interest and costs,

and (c) none of the exceptions under the subsection apply to this action.

13.     This Court has personal jurisdiction over AARP because it is headquartered in

this District, conducts significant business transactions in this District, and the unlawful conduct

alleged in the Complaint occurred in, was directed to, and/or emanated from this District.

14.     Venue is proper in this District under 28 U.S.C. § 1391(b) because AARP

maintains its headquarters and principal place of business in this District and a substantial part of

the events giving rise to Plaintiff's Complaint occurred in this District.

## FACTUAL BACKGROUND

I.     **AARP Promises That Third Parties Will Not Collect Members' PII Through the
AARP Website.**

        **A.     *A brief introduction to AARP.***

15.     AARP was founded in 1958 as a non-profit membership organization for

America's senior community. The organization says that it both advocates for seniors and offers

discounted products and services to its over 40 million members.

16.      Although AARP is technically a non-profit organization, a 2011 Congressional

investigation revealed that its for-profit subsidiary, Defendant AARP Services, recently earned

4

revenues of over $425 million in a single year.[2] AARP Services primarily generates revenue through endorsement royalty payments from insurance companies using the AARP brand name to sell their products, membership dues, and advertising.[3]

17.     A person over the age of 50 may sign-up for an AARP membership by filling out a paper form and mailing it in, or by visiting AARP's website, www.AARP.org. A yearlong membership costs $16. Alternatively, AARP offers three-year ($43) and five-year ($63) membership options.

18.     Regardless of how an individual signs up, AARP recommends registering for an account on its website. The AARP website offers paying members access to exclusive features and perks, including "[online] manage[ment] [of] membership account[s] and exclusive content and benefits."[4]

### B.     Registering for an online account.

19.     During the registration process, members create login credentials (by inputting an email and password), and enter their demographic information (first name, last name, country, zip code, and birthday) on AARP's website. To proceed, members must select a "checkbox" indicating that they agree to AARP's Terms of Service and Privacy Policy.

20.     Figure 1, on the following page, shows AARP's account registration webpage, with the Terms of Service and Privacy Policy agreement language circled in red.

---

[2]     *"Behind the Veil: The AARP America Doesn't Know,"* Report prepared by Reps. Wally Herger and Dave Reichert (Mar. 30, 2011), *available at* http://waysandmeans.house.gov/uploadedfiles/aarp_report_final_pdf_3_29_11.pdf.

[3]     AARP, *Consolidated Financial Statements Together with Report of Independent Certified Public Accountants* (Dec. 31, 2013 and 2012), http://www.aarp.org/content/dam/aarp/about_aarp/annual_reports/2014-06/2013-Consolidated-Financial-Statements-AARP.pdf.

[4]     Sign up for AARP.org, https://login.aarp.org/online-community/register/index.action (last visited May 19, 2014).



(**Fig. 1.**)

21.     Clicking on the Privacy Policy hyperlink shown in <u>Figure 1</u> opens a new web browser window that re-directs to a separate AARP webpage (www.AARP.org/about-aarp/info-05-2010/privacypolicy.html). There, AARP's Privacy Policy is displayed.

### C.     AARP's Privacy Policy.

22.     <u>Figure 2</u> below, shows the first page of AARP's Privacy Policy, which is divided into twelve sections (each contained on separate webpages).



(**Fig. 2.**)

23.     Section three of the Privacy Policy defines the types of information—including

PII—collected by AARP from visitors to its website:

> **3. Information We Collect From You**
> When you join AARP, we collect basic information such as your name, contact
> information, preferences and date of birth. We collect information about your
> participation in AARP activities, including member services and discounts
> obtained by using your membership card.
>
> AARP also collects information on our website. We collect both information that
> identifies you as a particular individual ("personally identifiable information")
> and anonymous information that is not associated with a specific individual
> ("nonpersonally identifiable information"). When you visit our website, some
> information may be collected automatically as part of the site's operation. We
> also collect information we receive from you during online registration and when
> you complete other forms. In the following sections, we explain in more detail the
> types of information we collect online.

24.     Section four of the Privacy Policy explains the types of information that AARP

allows certain third parties to collect from visitors to its website:

> **4. Information Collected by Third Parties**
> We may allow third-party analytics companies, research companies or ad
> networks to collect nonpersonally identifiable information on our website. These
> companies may use tracking technologies, including cookies and Web beacons, to
> collect information about users of our site in order to analyze, report on or
> customize advertising on our site or on other sites. For information about how to
> opt-out of the customization of advertising from many ad networks, you can visit
> here.

25.     Two lines from this Section deserve special attention. The first sentence assures

members that AARP only allows certain third parties to collect "nonpersonally identifiable

information" from its website, which AARP defines in Section three as: "anonymous

information that is not associated with a specific individual." In the last sentence, AARP presents

a hyperlink to a website with more information about opting-out of "customization of advertising

from ad networks" (that is, avoiding third party data collection).

26.     Clicking the hyperlink leads to the webpage shown in Figure 3 below.



(**Fig. 3.**)

27.     AARP describes this webpage as follows: "[t]his tool will help you understand what information is being collected [from AARP's website], and give you control over how it is being collected and used." (*See id.*) A table is displayed below this description and lists the specific third party companies that AARP allows to collect information about visitors to its website. At the time of filing this Complaint, the table named 22 third party companies that collect data from the site. Neither Facebook nor Adobe is found in this list.

28.     This is significant because contrary to AARP's promises and information described above, an inspection of the data transmitted  while visiting AARP's website (*i.e.*, from AARP's website to third parties) reveals that it systematically allows at least two companies, Facebook and Adobe, to collect its members' PII. As explained in Section II below, these actions directly violate AARP's Privacy Policy and its members' paid-for privacy rights.

## II.   AARP Violates its Privacy Policy by Allowing Facebook and Adobe to Collect Its Members' PII.

### A.   *How Facebook collects PII from AARP's website.*

29.   The transmission of AARP members' PII to Facebook's servers is accomplished using code developed by Facebook that AARP has integrated into its website. The following is a brief explanation of the technology and how it's used by AARP.

### 1.   Introduction to Facebook's Software Development Kit.

30.   Facebook is a social networking and analytics company that offers a Software Development Kit ("SDK"),[5] which allows businesses to add Facebook-related features to their websites. These features permit the company's website to interact with Facebook in various ways.[6] Examples include "Facebook Login," which lets visitors login to a website using their Facebook credentials, and "Facebook Social Plugins," which lets visitors use Facebook's "Like," "Share," or "Comment" functions.

31.   Typically graphics are also added onto the webpage using Facebook's SDK. For instance, Figures 4 and 5 below show how the Facebook Login and Facebook Social Plugin graphics may appear on a website, respectively.



(**Fig. 4.**)

(**Fig. 5.**)

32.   To make use of the SDK, a company must first add Facebook's source code to its

---

[5]   A Software Development Kit generally refers to a set of software development tools that allow programmers to develop applications that interface with a specific software platform.

[6]   Facebook SDK for JavaScript, https://developers.facebook.com/docs/javascript (last visited May 28, 2014).

website.[7] This code is customizable, and allows the company to choose which features to include (*e.g.*, Facebook Login or Social Plugins).

33.     The Facebook SDK also relies in part on cookies.[8] When a person visits a website using the SDK (*e.g.*, a webpage that includes a Facebook Social Plugin), the code attempts to force the visitor's web browser to check whether certain cookies exist on their computer.

34.     One of the cookies that Facebook's code forces a user's web browser to look for is "**c_user**," which contains the user's "Facebook ID." The Facebook ID is a unique numeric string assigned by Facebook to a specific user when their account is first created. This string may be inputted into a web browser to view an individual's Facebook "profile" page, thus making it a personal identifier.[9]

35.     The "**c_user**" cookie is placed onto a person's computer when first logging in to Facebook. A checkbox on Facebook's main login screen reads, "Keep me logged in." (*See* Figure 6 below). The **"c_user"** cookie remains on the computer of users who select this checkbox, regardless of whether they close their web browser.



(**Fig. 6.**)

36.     When a person visits a webpage that includes the SDK, Facebook's code causes their web browser to create a connection with Facebook's servers. Once connected, and depending on the Facebook SDK configuration chosen by the website's owner, data about the

---

[7]     Quickstart: Facebook SDK for JavaScript,
https://developers.facebook.com/docs/javascript/quickstart/v2.0 (last visited May 28, 2014).

[8]     A cookie is a simple text file placed onto a user's computer that can be used to track browsing activity and report said activity back to the server that originally placed the cookie.

[9]     For example, a Facebook ID may be plugged into a web browser using the following URL to access a person's individual Facebook profile:
www.facebook.com/profile.php?id=<Facebook ID>.

user's web browsing may be silently transmitted back to Facebook. In AARP's case, it chose to transmit the visitor's Facebook ID, the URL of the webpage currently being viewed, the date and time, and information about their web browser.

      2.    <u>AARP configured its website to allow Facebook to collect PII</u>.

37.    AARP's website uses both the Facebook Login (circled in red in <u>Figure 7</u>) and Facebook "Like" Social Plugin (circled in red in <u>Figure 8</u>).



(**Fig. 7.**)

(**Fig. 8.**)

38.    When a person visits AARP's home page, the Facebook SDK automatically loads and the AARP website initiates a transmission to Facebook that includes the value "http://www.aarp.org", and the visitor's Facebook ID from the "**c_user**" cookie on their

computer.[10]

39.     On AARP's website are hyperlinks to articles, videos, and various other content

for members. As the user clicks on these hyperlinks, the Facebook SDK loads a Social Plugin (in

particular, a "Like" button) as the target webpage loads. Next, the webpage initiates a

transmission to Facebook called "/plugins/like.php?" which contains the Facebook ID from the

"**c_user**" cookie and the full URL of the article or video webpage accessed and viewed by the

user, as illustrated by <u>Figure 9</u> below.



(**Fig. 9.**)

40.     As a result of these data transmissions, Facebook collects a full record of: (i) the

Facebook ID of the visitor browsing AARP's website, along with (ii) the exact titles of the

written and video materials that they accessed and viewed. Not only do these actions run

contrary to AARP's promises in its Privacy Policy, they also create serious privacy risks for its

members, as detailed in Section III.

---

[10]     As discussed *supra*, the Facebook ID is extracted from the "**c_user**" cookie for users who
selected the "Keep me logged in" checkbox on Facebook's login page, regardless of whether the
individual is actively using Facebook's website.

### B.   How Adobe collects PII from AARP's website.

41.     The transmission of AARP members' PII to Adobe's servers is also accomplished using code developed by Adobe that AARP has integrated into its website.

42.     The process starts with AARP placing a cookie onto the website visitor's computer. If the visitor is a registered member, the cookie—aptly named 'aarp.org'—will be populated with PII retrieved from AARP's database about the member.

43.     Next, as a member navigates through the AARP website, the special Adobe code[11] forces the member's web browser to extract information from the cookie and transmit it, along with data revealing the online materials being accessed and viewed by the member (*i.e.*, on the AARP website), to Adobe's analytics servers. Member information collected by Adobe through this method includes the following data points:

(i)     the member's name;

(ii)    the member's age;

(iii)   the member's race;

(iv)    the member's email address;

(v)     the member's state of residence;

(vi)    health insurance information;

(vii)   employment data; and

(viii)  family demographic information (*e.g.*, whether the member has children).

44.     What's more, the hostname assigned to the Adobe servers that receive the collected AARP member data is "metrics.aarp.org." In other words, although *Adobe* collects and

---

[11]     In technical parlance this is called an "analytics code library", which often takes the form of a hidden hyperlink embedded into a webpage that causes the user's web browser to load and run additional third party code.

receives a tremendous amount of member PII from AARP's website, a facial examination of the web traffic suggests that the data is being transmitted back to an *AARP* server. Yet, in reality, the information is really sent to Adobe's servers—not AARP's.

45.     The effect of this design is two-fold: first, it creates the appearance that Adobe isn't collecting any member information—personally identifiable or otherwise—through the use of AARP's website (especially inasmuch as the placed cookie and target servers are AARP-branded). Second, it gives Adobe free reign to collect information from the cookies stored on members' computers while using the AARP website. This is particularly troubling given Adobe's reach in the analytics industry, as described in Section III below.

**III.     The Privacy Hazards Created by AARP's Unlawful Practices.**

46.     An entire industry is now devoted to the collection and commercialization of consumer data.[12] Companies in this industry—known as data brokers—develop, share, and sell comprehensive profiles containing details about every aspect of individuals' digital lives.

47.     A Senate Committee hearing on Online Advertising and Hidden Hazards to Consumer Security and Data Privacy recently addressed this issue. United States Senator Carl Levin noted that, "as consumers use the internet, profiles are being created based on what they read, what movies they watch, what music they listen to, on and on."[13]

48.     Although primarily recognized for its eponymous social network, Facebook is

---

[12]     *A Review of the Data Broker Industry: Collection, Use, and Sale of Consumer Data for Marketing Purposes*, Staff Report for Chairman Rockefeller (Dec. 18, 2013).

[13]     *Opening Statement of Senator Carl Levin Before Permanent Subcommittee on Investigations on Online Advertising and Hidden Hazards to Consumer Security and Data Privacy.* (May 15, 2014).

also a data broker and analytics company.[14] With over 130 million users in the United States

alone,[15] Facebook has exclusive access to an exorbitant amount of personal consumer data. This

wealth of information feeds into an analytics and advertising platform that Facebook markets to

clients across a wide spectrum of industries.

49.     Facebook is uniquely able to directly link the data they accumulate on

individuals' digital behaviors with the additional personal data that it extracts from its users'

Facebook accounts. The result is that Facebook obtains a holistic look at specific consumers'

online behaviors. Not surprisingly, Facebook recently announced that it was going to start

providing advertisers with access to this highly detailed data, including information about

consumers' web browsing habits on third party websites like AARP, which it collects from

millions of consumers online.[16]

50.     Likewise, Adobe operates one of the largest and most sought-after analytics

services in the industry. That reputation stems from the fact that Adobe has amassed an

incredible volume of consumer data from numerous sources—including from websites like

AARP's.

51.     As a result, Adobe has the ability to track online consumer behavior to gain a

comprehensive view of a consumer's digital life. Using this amassed data, Adobe both creates

---

[14]     *Facebook Moves to Become World's Most Powerful Data Broker*,
http://www.forbes.com/sites/parmyolson/2014/04/30/facebok-moves-to-become-the-worlds-
most-powerful-data-broker/ (last visited May 28, 2014).

[15]     *Internet World Stats: Usage and Population Statistics*,
http://www.internetworldstats.com/stats26.htm (last visited, June 3, 2014).

[16]     Chris Morran, *Facebook Is Now Selling Your Web-Browsing Data To Advertisers*, The
Consumerist (June 12, 2014), http://consumerist.com/2014/06/12/facebook-is-now-selling-your-
web-browsing-data-to-advertisers/; *see also* Facebook*, Making Ads Better And Giving You More
Control*, https://www.facebook.com/help/585318558251813?ref=notif&notif_t=oba (last visited
June 16, 2014).

and sells/licenses "marketing reports and analytics, ad hoc analysis, and data workbench technologies" to its many customers.

52.   Figure 9, below, demonstrates the dangers of the type of wholesale data collection at issue here. The graphic is from a recent FTC report[17] that illustrates how data brokers, like Facebook and Adobe, use such information to profile consumers that fall into "vulnerable" population category sets:

| Sample List of Targeting Products Identifying Financially Vulnerable Populations | | | |
|---|---|---|---|
| "Burdened by Debt: Singles" | "Struggling Elders: Singles" | "Meager Metro Means" | "Very Elderly" |
| "Mid-Life Strugglers: Families" | "Retiring on Empty: Singles" | "Relying on Aid: Retired Singles" | "Rolling the Dice" |
| "Resilient Renters" | "Tough Start: Young Single Parents" | "Rough Retirement: Small Town and Rural Seniors" | "Fragile Families" |
| "Very Spartan" | | | "Small Town Shallow Pockets" |
| "X-tra Needy" | "Living on Loans: Young Urban Single Parents" | "Financial Challenges" | "Ethnic Second-City Strugglers" |
| "Zero Mobility" | | | "Rural and Barely Making It" |
| "Hard Times" | "Credit Crunched: City Families" | "Credit Reliant" | |
| "Enduring Hardships" | | "Rocky Road" | |
| "Humble Beginnings" | | | |

(**Fig. 9.**)

53.   Amid the many disturbing categories listed in Figure 9, "Struggling Elders: Singles," "Very Elderly," and "Rough Retirement: Small Town and Rural Seniors" are particularly relevant and troubling here. The tremendous amount of personal data that is collected from AARP members by Facebook and Adobe—described in Section II—enables this very type of exploitive (and profitable) profiling.

54.   Even AARP acknowledges as much. In an article penned for its own website, AARP warned seniors about the perils of data collection on the Internet—specifically noting that "Facebook [is] among the top recipients of leaks of personal information . . . includ[ing] . . .

---

[17]   *A Review of the Data Broker Industry: Collection, Use, and Sale of Consumer Data for Marketing Purposes*, Staff Report for Chairman Rockefeller (Dec. 18, 2013).

personal information, as well as a person's Internet surfing practices."[18] Conveniently, the article does not mention that AARP itself leaks members' highly sensitive data to both Facebook and Adobe.

## IV.   Plaintiff Austin-Spearman's PII Was Collected by Facebook and Adobe Without her Permission.

55.     Plaintiff has been a member of Facebook's social network since late 2007. Since then, Plaintiff has frequently accessed her Facebook account through her web browser and clicks the "Keep me logged in" button when signing into the account.

56.     In late 2010, Plaintiff Austin-Spearman purchased a three-year membership to AARP for approximately $43.

57.     Plaintiff then navigated to AARP's website to register for an online account. Before registering, Austin-Spearman—as she always does when signing up for an online service—viewed and agreed to the Terms of Service and Privacy Policy and the representations and obligations listed therein.

58.     The Terms of Service governing Austin-Spearman's account stated that it "constitutes the entire agreement between [AARP] and [her] with respect to the subject matter contained in [the] agreement and supersedes all previous and contemporaneous agreements, proposals, and communications, written and/or oral."[19] The Terms of Service governing Austin-Spearman's account also "incorporated by reference" AARP's Privacy Policy.[20]

59.     Following her normal routine, Austin-Spearman also viewed AARP's Privacy Policy, including the representations described above, before agreeing to sign up for account on

---

[18]     *Many Websites Leak Personal Data*, http://www.aarp.org/technology/privacy-security/info-10-2011/many-websites-leak-personal-data.html (last visited May 28, 2014).

[19]     *See AARP Terms of Service, supra* note 1.

[20]     *Id.*

AARP's website. In its Privacy Policy, AARP promised Austin-Spearman that AARP (i) would only allow certain third parties to collect "nonpersonally identifiable information" while she browsed the AARP website and (ii) would not allow any third parties to collect PII.[21]

60.     Because she was signing up for a paid service, Austin-Spearman believed that AARP would not allow her PII to be collected by third parties without her permission and believed that AARP confirmed that belief based upon the representations contained in its Privacy Policy.

61.     Nevertheless, and despite the fact that Austin-Spearman did not consent, agree, or otherwise permit AARP to release her PII to any third party company, when she used AARP's website AARP routinely permitted third parties Facebook and Adobe to collect her PII, along with the precise materials that she viewed, the titles of articles read and videos watched on the AARP website, and other detailed information, such as her name, race, email address, state of residence, and employment information.

62.     Had AARP disclosed that it allowed third parties (including Facebook and Adobe) to collect her PII, Austin-Spearman would have been aware of the same. Accordingly, had AARP disclosed that her PII would be collected by and transmitted to third parties, she would have viewed the service as less valuable and would either have attempted to purchase her membership at a lower price or not at all. In fact, based upon AARP's above-described practices, Austin-Spearman has decided to not renew her membership with AARP.

## CLASS ALLEGATIONS

63.     **Class Definition**: Plaintiff brings this action pursuant to Fed. R. Civ. P. 23(a), (b)(2), and (b)(3) on behalf of herself and a Class of similarly situated individuals, defined as

---

[21]     *AARP's Privacy Policy*, AARP.org, http://www.aarp.org/about-aarp/info-05-2010/privacypolicy.html (last visited June 12, 2014).

follows:

> All current and former AARP members who (i) paid a membership fee to AARP and (ii) who had their PII collected by a third party, including either Facebook or Adobe, while visiting AARP's website.

Excluded from the Class are (1) Defendants, Defendants' agents, subsidiaries, parents, successors, predecessors, and any entity in which Defendants or their parents have a controlling interest, and those entity's current and former employees, officers, and directors, (2) the Judge to whom this case is assigned and the Judge's immediate family, (3) persons who execute and file a timely request for exclusion from the Class, (4) persons who have had their claims in this matter finally adjudicated and/or otherwise released, and (5) the legal representatives, successors, and assigns of any such excluded person.

64.    **Numerosity**: The exact number of members of the Class is unknown and is not available to Plaintiff at this time, but individual joinder in this case is impracticable. The Class likely consists of thousands of individuals. Class members can be easily identified through Defendants' records.

65.    **Commonality and Predominance**: There are many questions of law and fact common to the claims of Plaintiff and the other members of the Class, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include but are not limited to the following:

a)    Whether Defendants, through their website, unlawfully permitted—and continue to permit—third parties to collect their members' PII;

b)    Whether Defendants' actions violate the District of Columbia's Consumer Protection Procedures Act (DC Code §§ 28-3901, *et seq.*);

c)    Whether Defendants' actions were committed knowingly;

      d)     Whether Defendants' actions constitute intentional misrepresentation; and

      e)     Whether Defendants' actions constitute breach of contract.

66.   **Typicality**: Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and the Class sustained damages as a result of Defendants' uniform wrongful conduct during transactions with Plaintiff and the Class.

67.   **Adequate Representation**: Plaintiff will fairly and adequately represent and protect the interests of the Class, and has retained counsel competent and experienced in complex litigation and class actions. Plaintiff has no interests antagonistic to those of the Class, and Defendants have no defenses unique to Plaintiff. Plaintiff and her counsel are committed to vigorously prosecuting this action on behalf of the members of the Class, and have the financial resources to do so. Neither Plaintiff nor her counsel has any interest adverse to those of the other members of the Class.

68.   **Policies Generally Applicable to the Class**: This class action is appropriate for certification because Defendants have acted or refused to act on grounds generally applicable to the Class as a whole, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the members of the Class, and making final injunctive relief appropriate with respect to the Class as a whole. Defendants' policies challenged herein apply and affect members of the Class uniformly and Plaintiff's challenge of these policies hinges on Defendants' conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff. The factual and legal bases of Defendants' liability to Plaintiff and to the other members of the Class are the same, resulting in injury to the Plaintiff and to all of the other members of the Class. Plaintiff and the members of the Class have suffered harm and damages as a result of Defendants' unlawful and wrongful conduct.

69.     **Superiority**: This case is also appropriate for certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy. The injuries suffered by the individual members of the Class are likely to have been relatively small compared to the burden and expense of individual prosecution of the litigation necessitated by Defendants' actions. Absent a class action, it would be difficult, if not impossible, for the individual members of the Class to obtain effective relief from Defendants. Even if members of the Class themselves could sustain such individual litigation, it would not be preferable to a class action because individual litigation would increase the delay and expense to all parties and the Court and require duplicative consideration of the legal and factual issues presented herein. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single Court. Economies of time, effort, and expense will be fostered, and uniformity of decisions will be ensured.

70.     Plaintiff reserves the right to revise the foregoing "Class Allegations" and "Class Definition" based on facts learned through additional investigation and in discovery.

**FIRST CAUSE OF ACTION**
**Violation of the District of Columbia's Consumer Protection Procedures Act**
**DC Code §§ 28-3901, *et seq.***
**(On Behalf of Plaintiff and the Class)**

71.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

72.     The District of Columbia's Consumer Protection Procedures Act ("DCCPPA"), DC Code §§ 28-3901, *et seq.*, protects consumers from a broad spectrum of unscrupulous practices in the marketplace.

73.     The DCCPPA assures that a proper mechanism exists to remedy all improper trade practices and deter the continuing use of such practices.

74.     Plaintiff is a consumer under the DCCPPA because she purchased a membership to AARP's service and receives exclusive content and benefits AARP provides through her online account.

75.     AARP is a merchant under the DCCPPA because it, through the ordinary course of business, directly provides consumer services to its online members, such as exclusive access to content and benefits.

76.     When Plaintiff Austin-Spearman and the Class created their online AARP accounts, they reasonably expected that AARP would not allow third parties to collect their PII.

77.     Plaintiff's and the Class's expectations were justified by the fact that AARP affirmatively promised in its Privacy Policy that it would not allow any third party companies to collect members' PII.

78.     By transmitting its members' PII—including their Facebook IDs, names, race, email addresses, states of residence, and employment information—to third parties Facebook and Adobe, AARP allowed Facebook and Adobe to collect its members' PII without permission. Thus, AARP violated the terms of its own Privacy Policy.

79.     AARP was responsible for maintaining the privacy of its members' PII in accordance with its Privacy Policy. AARP knew that it permitted Facebook and Adobe to collect its members' PII inasmuch as it designed its website and intentionally included Facebook's and Adobe's code, which caused the collections and transmissions described in Section II to take place. By representing in its Privacy Policy that such information would not be collected, AARP actively misrepresented its true practices to Plaintiff and the Class.

80.     Consumers value their privacy. Services that offer greater privacy protections are of greater usefulness and utility to consumers than services with less stringent privacy practices.

As such, consumers will—if given the choice between two otherwise identical services—choose one with greater privacy protection.

81.     Because of this consumer preference for privacy, an Internet service that protects its users' PII commands a higher market price than a service with limited privacy protection.

82.     Consumers pay membership fees to AARP in order to use its service and website. When a member signs up for AARP's website, he or she reasonably believes that AARP will protect their PII, as represented in its Privacy Policy. By failing to do so, AARP made a material misrepresentation, which has a tendency to mislead consumers as described in Section II because consumers are told—and rely on—the misrepresentation that AARP does not allow third parties to collect their PII. If members were aware of the true treatment of their PII, they would not have paid the full price for their AARP memberships, or would not have paid at all.

83.     Further, AARP represents that the transaction of joining AARP and subsequently creating an online account confers certain rights to its members—namely that its members' PII will be kept private. In reality, and by intentional design, AARP routinely allows Facebook and Adobe to collect its members' PII whenever a member uses its website. Accordingly, if members were aware of this misrepresentation, they would not pay the full price for their AARP memberships, or would not have paid at all.

84.     Pursuant to DC Code § 28-3905(k)(2), Plaintiff seeks an order requiring AARP to: (1) immediately stop the unlawful practices described in this Complaint; (2) pay Plaintiff and the Class statutory damages in the amount of $1,500; and (3) pay reasonable attorneys' fees and costs.

## SECOND CAUSE OF ACTION
### Intentional Misrepresentation
### (On Behalf of Plaintiff and the Class)

85.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

86.     When Plaintiff created her online account, she viewed and accepted AARP's

Terms of Service and Privacy Policy. In its Privacy Policy, AARP explicitly represented that it

would not allow third party companies to collect its members' PII. Plaintiff Austin-Spearman

relied on this representation, and believed that AARP's representation that it would not allow

third parties to collect her PII was part of the online account that accompanied her AARP

membership.

87.     However, when a user visits AARP's website, AARP actually enables the

transmission of their PII—including their Facebook IDs, names, race, email addresses, states of

residence, and employment information—along with other information about their online

activities to third parties Facebook and Adobe. A user's Facebook ID is personally identifiable,

as are their names and email addresses.

88.     As such, AARP falsely represented the fact that it would not allow third parties to

collect its members' PII.

89.     Consumers expect that their PII will be kept private from third parties—especially

third party analytics companies—when they surf AARP's website.

90.     This expectation is justified by the express representation in AARP's Privacy

Policy that no third party would collect members' PII.

91.     Consumers will pay less, if they will pay at all, for services that do not protect

their PII. Had Plaintiff known that AARP would allow third parties, including Facebook and

Adobe, to collect her PII, she would have tried to pay less for her membership, or would not

have paid at all.

92.     Facts that affect the price or value of a service are always material. Thus, AARP has misrepresented a material fact that it would not allow third parties to collect its members' PII.

93.     AARP knew it was allowing Facebook and Adobe to collect its members' PII inasmuch as it designed and controls its website and intentionally included Facebook's and Adobe's website code, which enabled the collections described in Section II to take place.

94.     In its Privacy Policy, AARP lists the companies that collect information about its members. According to the Privacy Policy, the information collected by those organizations from AARP's website cannot be used to personally identify the user. Setting aside that Facebook and Adobe aren't even listed among the organizations that collect *nonpersonally* identifiable information, AARP fails to disclose that it actually allows Facebook and Adobe to collect its members' PII. AARP intended to mislead its members into believing that their information, personally identifying or otherwise, was not collected by Facebook or Adobe, and that PII was not collected by any third parties.

95.     When an AARP member accepts the terms of the Privacy Policy to create his or her online account, he or she agrees to AARP's representation that it will not allow third parties to collect his or her PII. With that in mind, members browse AARP's website under the notion that their PII is kept private. This reliance is blatantly disregarded by AARP because it facilitates the collection of its members' PII by Facebook and Adobe.

96.     Accordingly, Plaintiff, individually and on behalf of the Class, seeks an order declaring that AARP's conduct constitutes intentional misrepresentation, and awarding Plaintiff and the Class damages in the amount equal to the difference between the value of the services

they paid for and the services they actually received.

### THIRD CAUSE OF ACTION
**Breach of Contract**
**(On Behalf of Plaintiff and the Class)**

97.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

98.     AARP on the one hand, and Plaintiff and members of the Class on the other, entered into valid and enforceable contracts whereby those Class members provided, and AARP accepted, payment in the form of membership fees in exchange for AARP membership and access to exclusive AARP online services.

99.     In order to use AARP's exclusive online services, AARP likewise required that Plaintiff affirmatively assent to its Terms of Service, which incorporated its Privacy Policy. AARP's Privacy Policy contained, among other things, its representations regarding the collection and use of its members' PII.

100.    Plaintiff Austin-Spearman viewed and relied upon the Terms of Service, and with it, AARP's Privacy Policy and representations regarding its handling of her PII, before registering for her online account.

101.    Austin-Spearman affirmatively assented to the Terms of Service when she registered for her account, and thereafter by using her account on AARP's website.

102.    The Terms of Service constitute a valid and enforceable contract between Plaintiff Austin-Spearman and AARP.

103.    As part of this contract, AARP imposed upon itself an obligation to not allow third party companies to collect its members' PII.

104.    Austin-Spearman relied on this representation and considered it in making her decision to create an online account to manage her AARP membership. Had AARP represented

that they would allow third parties such as Facebook and Adobe to collect her PII, Austin-Spearman would have recognized that the account was less useful, and would have either attempted to purchase her AARP membership at a lower price or not purchased it all.

105.    Austin-Spearman performed all of her obligations under the contract, including assenting to the Terms of Service and paying her membership fees.

106.    By allowing Facebook and Adobe to collect Austin-Spearman's PII—including her Facebook ID, name, race, email address, state of residence, and employment information—AARP breached the term of its contract with Plaintiff to not allow third parties to collect her PII.

107.    Consumers, including Internet users, value their privacy. Services, including organizations that offer online accounts, that offer greater privacy protection offer consumers greater usefulness and utility than services with minimal or no privacy protection. As such, AARP's services were fundamentally less useful and valuable than if it were to adhere to the privacy-related representations contained in its Privacy Policy.

108.    Austin-Spearman believed that—as part of her AARP membership and online account—AARP would not allow third party companies to collect her PII, which was valuable to her.

109.    Thus, Austin-Spearman paid for, but never received, the valuable privacy protection to which she was entitled, and which would have made her AARP membership significantly more useful to her.

110.    Accordingly, Plaintiff, on behalf of herself and the other Class members, seeks an order declaring that AARP's conduct constitutes breach of contract, and awarding Plaintiff and the Class damages in the amount equal to the difference between the value of the services they paid for and the services they actually received.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Ethel Austin-Spearman, individually and on behalf of the

Class, prays for the following relief:

A.      Certify this case as a class action on behalf of the Class defined above, appoint

Ethel Austin-Spearman as representative of the Class, and appoint her counsel as Class Counsel;

B.      Declare that Defendants' actions, as described herein, violate the District of

Columbia's Consumer Protection Procedures Act (DC Code §§ 28-3901, *et seq.*), and constitute

intentional misrepresentation and breach of contract;

C.      Award injunctive and other equitable relief as is necessary to protect the interests

of Plaintiff and the Class members, including an order prohibiting Defendants from engaging in

the wrongful and unlawful acts described herein;

D.      Award appropriate damages and restitution to Plaintiff and the Class in an amount

to be determined at trial;

E.      Award Plaintiff and the Class their reasonable litigation expenses and attorneys'

fees;

F.      Award Plaintiff and the Class pre- and post-judgment interest, to the extent

allowable; and

G.      Award such other and further relief as equity and justice may require.

## JURY TRIAL

Plaintiff demands a trial by jury for all issues so triable.


//


//


28

Respectfully submitted,

**ETHEL AUSTIN-SPEARMAN**, individually and on behalf of all others similarly situated,

Dated: July 29, 2014

By: /s/Maria C. Simon_____
  One of Plaintiff's Attorneys

Maria C. Simon
msimon@thegellerlawgroup.com
THE GELLER LAW GROUP
4000 Legato Road, Suite 1100
Fairfax, Virginia 22033
Tel: 703.679.7067
Fax: 703.259.8584

Jay Edelson*
jedelson@edelson.com
Rafey S. Balabanian*
rbalabanian@edelson.com
Benjamin S. Thomassen*
bthomassen@edelson.com
Alicia E. Hwang*
ahwang@edelson.com
EDELSON PC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

*Motion for admission to be sought.