**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ETHEL AUSTIN-SPEARMAN, individually and on behalf of all others similarly situated, | Case No.: 1:14-cv-01288-KBJ |
| *Plaintiff*, | Hon. Ketanji Brown Jackson |
| | **JURY TRIAL DEMANDED** |
| *v.* | |
| AARP, a District of Columbia corporation, and AARP SERVICES INC., a Delaware corporation, | |
| *Defendants*. | |

**FIRST AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff Ethel Austin-Spearman brings this First Amended Class Action Complaint and Demand for Jury Trial ("Complaint") against Defendants AARP and AARP Services Inc. (collectively referred to in the singular as "AARP") to put an end to, and obtain redress for, their unlawful practice of transmitting their members' sensitive and personally identifiable information to third parties. Plaintiff, for her Complaint, alleges as follows upon personal knowledge as to herself and her own acts and experiences and, as to all other matters, upon information and belief, including investigation conducted by her attorneys.

**NATURE OF THE ACTION**

1.      Defendant AARP is one of largest organizations in the United States for people aged 50 years and over. Perhaps best known for its eponymous non-profit advocacy and lobbying group, AARP also purports to provide its members with a number of benefits, including discounts on shopping, dining, and travel as well as financial and insurance-related products and services. AARP offers its members such benefits through its wholly owned, *for-profit subsidiary*, Defendant AARP Services, Inc. ("AARP Services"), which provides, among other things,

1

services to support AARP membership, including operating and maintaining AARP's website (www.aarp.org).

2.      In order to become an AARP member and obtain access to such benefits—including benefits only accessible through the AARP website (*e.g.*, managing AARP membership accounts, viewing exclusive content, or redeeming promotional offers)—eligible consumers must sign up for a membership at a cost of $16 per year. As many of AARP's membership benefits can only be accessed online, members must thereafter register their accounts on the AARP website to take full advantage of their paid-for membership benefits.

3.      To register an account on AARP's website (which, on information and belief, is developed and maintained by AARP Services), members are required to agree to its website's Terms of Service, which govern their use of AARP's online services. According to AARP, its Terms of Service "constitutes the entire agreement between [AARP] and [the member] with respect to the subject matter contained in [the] agreement and supersedes all previous and contemporaneous agreements, proposals, and communications, written and/or oral."[1] It also incorporates a Privacy Policy, which describes how AARP permits certain third parties to collect its members' personal information on the AARP website. Members cannot access their paid-for, online membership benefits without first creating an account and agreeing to the AARP website's terms of service and privacy policy.

4.      As part of its Terms of Service and Privacy Policy, AARP promises that only specifically-named third party companies will collect AARP members' information on its website, and that *no* third party company will collect AARP members' personally identifiable

---

[1]      *AARP's Terms of Service*, AARP.org, http://www.aarp.org/about-aarp/info-05-2010/terms_of_service.html (last visited June 12, 2014). The Terms of Service expressly state that the website (www.aarp.org) is "owned by AARP" and "operated in part by AARP Services, Inc."

information ("PII").

5.      Unfortunately, despite its express promises to the contrary, AARP routinely allows third party data analytics companies to collect its members' PII—including at least their name, race, email address, state of residence, and employment information—along with the precise materials that they've viewed on the AARP website. Upon information and belief, AARP receives financial benefit from the third party collection of its members' PII.

6.      In addition to the benefits reaped directly by AARP from permitting this third party access to its members PII, these practices are particularly concerning here because the analytics companies that collect this sensitive data add it to the information in their already massive, detailed databases of individual consumer information, and are in the business of commercializing those datasets.

7.      Had AARP informed its members that third party companies systematically collect their PII from the AARP website (including when members use the AARP website to access their paid-for online membership benefits), they would have been unwilling to purchase their AARP memberships at the price charged, if at all. Thus, because AARP failed to disclose (and in fact misrepresented) these collection practices, it provided Plaintiff and the Class a fundamentally less useful and less valuable service than the one they paid for, which Plaintiff and the Class had reasonably believed to contain the represented privacy protections.

8.      Once AARP's *actual* privacy practices are known, paying AARP members are left with an impossible dilemma—either (i) access their paid-for online membership benefits but submit to AARP's intrusive and undisclosed privacy practices or (ii) maintain the confidentiality of their PII but forgo paid-for membership benefits. In either case, the value of an AARP membership is lessened.

9.      In an era when the collection and monetization of consumer data proliferates on an unprecedented scale, it's important that companies are held accountable for the exploitation of their users' sensitive information—especially when such exploitation goes undisclosed or, even worse, runs contrary to a company's consumer-facing privacy disclosures. AARP chose to disregard Plaintiff's and thousands of other members' privacy rights by releasing their sensitive data into the marketplace for financial gain. Accordingly, this putative class action lawsuit seeks (i) to prevent AARP from allowing the unauthorized collection of its members' sensitive and personally identifiable data, and (ii) damages for those deceived into paying for its services under false pretenses.

## PARTIES

10.      Plaintiff Ethel Austin-Spearman is a natural person and citizen of the State of California.

11.      Defendant AARP is a corporation existing under the laws of the District of Columbia, with its headquarters and principal place of business located at 601 E Street NW, Washington, DC 20049. Defendant AARP conducts business throughout the District of Columbia, this District, and the United States.

12.      Defendant AARP Services, Inc. is a corporation existing under the laws of the State of Delaware, with its headquarters and principal place of business located at 601 E Street NW, Washington, DC 20049. Defendant AARP Services, Inc. is a wholly owned, taxable subsidiary of AARP and conducts business throughout District of Columbia, this District, and the United States.

13.      AARP Services provides, among other things, membership development, new product development, institutional relationship services, and other services designed to support

4

AARP's efforts to select, improve and expand member benefits and services. Such services include creating and maintaining partnership and sponsorship services, as well as operating and managing the AARP website. AARP Services and AARP additionally share members of their Boards of Directors.

**JURISDICTION AND VENUE**

14.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2), because (a) at least one member of the putative class is a citizen of a state different from Defendants, (b) the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and (c) none of the exceptions under the subsection apply to this action.

15.     This Court has personal jurisdiction over AARP because it is headquartered in this District, conducts significant business transactions in this District, and the unlawful conduct alleged in the Complaint occurred in, was directed to, and/or emanated from this District.

16.     Venue is proper in this District under 28 U.S.C. § 1391(b) because AARP maintains its headquarters and principal place of business in this District and a substantial part of the events giving rise to Plaintiff's Complaint occurred in this District.

**FACTUAL BACKGROUND**

**I.    AARP Promises That Third Parties Will Not Collect Members' PII Through the AARP Website.**

**A.    A brief introduction to AARP.**

17.     AARP was founded in 1958 as a non-profit membership organization for America's senior community. The organization says that it both advocates for seniors and offers discounted products and services to its over 40 million members.

18.      Although AARP is technically a non-profit organization, a 2011 Congressional investigation revealed that its for-profit subsidiary, Defendant AARP Services, recently earned

5

revenues of over $425 million in a single year.[2] AARP Services primarily generates revenue

through endorsement royalty payments from insurance companies using the AARP brand name

to sell their products, membership dues, and advertising.[3]  Additionally, AARP Services engages

in product development with various third parties, whereby various goods and services are

offered through AARP to paying AARP members—including, on information and belief, by

selling advertising space on the AARP website.

19.    A person over the age of 50 may sign-up for an AARP membership by filling out

a paper form and mailing it in, or by visiting AARP's website, www.AARP.org. A yearlong

membership costs $16. Alternatively, AARP offers three-year ($43) and five-year ($63)

membership options.

20.    Regardless of how an individual signs up, certain membership benefits are only

available and accessible through the AARP website, which offers paying members access to

exclusive features and perks, including "[online] manage[ment] [of] membership account[s] and

exclusive content and benefits."[4] For instance, members are able to use the AARP website to

search for discounts and deals on consumer products (*e.g.*, movie tickets, electronics, and

apparel) and services (*e.g.*, travel, healthcare, and financial). Members are then able to "Shop

Now" for such products and services displayed on the AARP website, but must have a registered

---

[2]    *"Behind the Veil: The AARP America Doesn't Know,"* Report prepared by Reps. Wally Herger and Dave Reichert (Mar. 30, 2011)*, available at* http://waysandmeans.house.gov/uploadedfiles/aarp_report_final_pdf_3_29_11.pdf.

[3]    AARP, *Consolidated Financial Statements Together with Report of Independent Certified Public Accountants* (Dec. 31, 2013 and 2012), http://www.aarp.org/content/dam/aarp/about_aarp/annual_reports/2014-06/2013-Consolidated-Financial-Statements-AARP.pdf.

[4]    Sign up for AARP.org, https://login.aarp.org/online-community/register/index.action (last visited May 19, 2014).

AARP online account in to do so.[5]

21.     Thus, both AARP and its members recognize that a portion of the membership's value—as well as its cost—is derived from its online-only features.

22.     Accordingly, in order to access AARP online membership benefits, *all* AARP members are required to register for an account on the AARP website in order to access these paid-for benefits.

> ### B.     Registering for an online account.

23.     During the online account registration process, members create login credentials (by inputting an email and password), and enter their demographic information (first name, last name, country, zip code, and birthday) on AARP's website. To proceed, members must select a "checkbox" indicating that they agree to AARP's Terms of Service and Privacy Policy.

24.     <u>Figure 1</u> on the following page shows AARP's account registration webpage with the Terms of Service and Privacy Policy agreement language circled in red.

---

[5]     After clicking the "Shop Now" button, AARP members are directed to log in to their AARP accounts, but are then transferred to various third party webpages (which continue to display AARP logos and links) to complete their purchases.



(**Fig. 1.**)

25.     Clicking on the Privacy Policy hyperlink shown in <u>Figure 1</u> opens a new web browser window that re-directs to a separate AARP webpage (www.AARP.org/about-aarp/info-05-2010/privacypolicy.html). There, AARP's Privacy Policy is displayed.

### C.     *AARP's Privacy Policy.*

26.     <u>Figure 2</u> below shows the first page of AARP's Privacy Policy, which is divided into twelve sections (each contained on separate webpages).



(**Fig. 2.**)

27.     Section three of the Privacy Policy defines the types of information—including PII—collected by AARP from visitors to its website:

### 3. Information We Collect From You
When you join AARP, we collect basic information such as your name, contact information, preferences and date of birth. We collect information about your participation in AARP activities, including member services and discounts obtained by using your membership card.

AARP also collects information on our website. We collect both information that identifies you as a particular individual ("personally identifiable information") and anonymous information that is not associated with a specific individual ("nonpersonally identifiable information"). When you visit our website, some information may be collected automatically as part of the site's operation. We also collect information we receive from you during online registration and when you complete other forms. In the following sections, we explain in more detail the types of information we collect online.

28.     Section four of the Privacy Policy explains the types of information that AARP allows certain third parties to collect from visitors to its website:

### 4. Information Collected by Third Parties
We may allow third-party analytics companies, research companies or ad networks to collect nonpersonally identifiable information on our website. These companies may use tracking technologies, including cookies and Web beacons, to collect information about users of our site in order to analyze, report on or customize advertising on our site or on other sites. For information about how to opt-out of the customization of advertising from many ad networks, you can visit here.

29.     Two lines from this Section deserve special attention. The first sentence assures members that AARP only allows certain third parties to collect "nonpersonally identifiable information" from its website, which AARP defines in Section three as: "anonymous information that is not associated with a specific individual." In the last sentence, AARP presents a hyperlink to a website with more information about opting-out of "customization of advertising from ad networks" (that is, avoiding third party data collection entirely).

30.     Clicking the hyperlink leads to the webpage shown in Figure 3 below.



(**Fig. 3.**)

31.     AARP describes this webpage as follows: "[t]his tool will help you understand what information is being collected [from AARP's website], and give you control over how it is being collected and used." (*See id.*) A table is displayed below this description and lists the specific third party companies that AARP allows to collect information about visitors to its website. At the time of filing this Complaint, the table names twenty-two third party companies that collect data from the site. Neither Facebook nor Adobe is found on this list.

32.     This is significant because contrary to AARP's promises and information described above, an inspection of the data transmitted while visiting AARP's website (*i.e.*, from AARP's website to third parties) reveals that it systematically allows at least two companies, Facebook and Adobe, to collect its members' PII. As explained in <u>Section II</u> below, these actions directly violate AARP's Privacy Policy and its members' paid-for privacy rights.

33.     Upon information and belief, AARP and AARP Services jointly drafted and are aware of the representations made in the Terms of Service and Privacy Policy found on the www.aarp.org website (that AARP Services maintains and operates).

**II.**    **AARP Violates its Privacy Policy by Allowing Facebook and Adobe to Collect Its Members' PII.**

   ***A.***  ***How Facebook collects PII from AARP's website.***

  34.  Facebook's collection of AARP members' PII is accomplished using code developed by Facebook that AARP has integrated into its website. The following is a brief explanation of the technology and how it's used by AARP.

      1.  <u>Introduction to Facebook's Software Development Kit.</u>

  35.  Facebook is a social networking and analytics company that offers a Software Development Kit ("SDK"),[6] which allows businesses to add Facebook-related features to their websites. These features permit the company's website to interact with Facebook in various ways.[7] Examples include "Facebook Login," which lets visitors login to a website using their Facebook credentials, and "Facebook Social Plugins," which lets visitors use Facebook's "Like," "Share," or "Comment" functions.

  36.  Typically graphics are also added onto the webpage using Facebook's SDK. For instance, <u>Figures 4 and 5</u> below show how the Facebook Login and Facebook Social Plugin graphics may appear on a website, respectively.



(**<u>Fig. 4.</u>**)

(**<u>Fig. 5.</u>**)

  37.  To make use of the SDK, a company must first add Facebook's source code to its

---

  6  A Software Development Kit generally refers to a set of software development tools that allow programmers to develop applications that interface with a specific software platform.

  7  Facebook SDK for JavaScript, https://developers.facebook.com/docs/javascript (last visited May 28, 2014).

website.[8] This code is customizable, and allows the company to choose which features to include (*e.g.*, Facebook Login or Social Plugins).

38.     The Facebook SDK also relies in part on cookies.[9] When a person visits a website using the SDK (*e.g.*, a webpage that includes a Facebook Social Plugin), the code attempts to force the visitor's web browser to check whether certain cookies exist on their computer.

39.     One of the cookies that Facebook's code forces a user's web browser to look for is "**c_user**," which contains the user's "Facebook ID." The Facebook ID is a unique numeric string assigned by Facebook to a specific user when their account is first created. This string may be inputted into a web browser to view an individual's Facebook "profile" page, thus making it a personal identifier.[10]

40.     The "**c_user**" cookie is placed onto a person's computer when first logging in to Facebook. A checkbox on Facebook's main login screen reads, "Keep me logged in." (*See* Figure 6 below). The **"c_user"** cookie remains on the computer of users who select this checkbox, regardless of whether they close their web browser.



(**Fig. 6.**)

41.     When a person visits a webpage that includes the SDK, Facebook's code causes their web browser to create a connection with Facebook's servers. Once connected, and depending on the Facebook SDK configuration chosen by the website's owner, data about the

---

[8]     Quickstart: Facebook SDK for JavaScript, https://developers.facebook.com/docs/javascript/quickstart/v2.0 (last visited May 28, 2014).

[9]     A cookie is a simple text file placed onto a user's computer that can be used to track browsing activity and report said activity back to the server that originally placed the cookie.

[10]    For example, a Facebook ID may be plugged into a web browser using the following URL to access a person's individual Facebook profile: www.facebook.com/profile.php?id=<Facebook ID>.

user's web browsing may be silently transmitted back to Facebook. In AARP's case, it chose to

transmit the visitor's Facebook ID, the URL of the webpage currently being viewed, the date and

time, and information about their web browser.

> 2. <u>AARP configured its website to allow Facebook to collect PII</u>.

42. AARP's website uses both the Facebook Login (circled in red in <u>Figure 7</u>) and

Facebook "Like" Social Plugin (circled in red in <u>Figure 8</u>).



(**Fig. 7.**)



(**Fig. 8.**)

43. When a person visits AARP's home page, the Facebook SDK automatically loads

and the AARP website initiates a transmission to Facebook that includes the value

"http://www.aarp.org", and the visitor's Facebook ID from the "**c_user**" cookie on their

computer.[11]

44.     On AARP's website are hyperlinks to articles, videos, and various other content for members. As the user clicks on these hyperlinks, the Facebook SDK loads a Social Plugin (in particular, a "Like" button) as the target webpage loads. Next, the webpage initiates a transmission to Facebook called "/plugins/like.php?" which contains the Facebook ID from the "**c_user**" cookie and the full URL of the article or video webpage accessed and viewed by the user, as illustrated by <u>Figure 9</u> below.



(**Fig. 9.**)

45.     As a result of these data transmissions, Facebook collects a full record of: (i) the Facebook ID of the visitor browsing AARP's website, along with (ii) the exact titles of the written and video materials that they accessed and viewed. Not only do these actions run contrary to AARP's promises in its Privacy Policy, they also create serious privacy risks for its members, as detailed in <u>Section III</u>.

**B.     *How Adobe collects PII from AARP's website.***

46.     Adobe's collection of AARP members' PII is also accomplished using code

---

[11]     As discussed *supra*, the Facebook ID is extracted from the "**c_user**" cookie for users who selected the "Keep me logged in" checkbox on Facebook's login page, regardless of whether the individual is actively using Facebook's website.

developed by Adobe that AARP has integrated into its website.

47.     The process starts with AARP placing a cookie onto the website visitor's computer. If the visitor is a registered member, the cookie—aptly named 'aarp.org'—will be populated with PII retrieved from AARP's database about the member.

48.     Next, as a member navigates through the AARP website, the special Adobe code[12] forces the member's web browser to extract information from the cookie and transmit it, along with data revealing the online materials being accessed and viewed by the member (*i.e.*, on the AARP website), to Adobe's analytics servers. Member information collected by Adobe through this method includes the following data points:

    (i)     the member's name;

    (ii)    the member's age;

    (iii)   the member's race;

    (iv)    the member's email address;

    (v)     the member's state of residence;

    (vi)    health insurance information;

    (vii)   employment data; and

    (viii)  family demographic information (*e.g.*, whether the member has children).

49.     What's more, the hostname assigned to one of the Adobe servers that receive the collected AARP member data is "metrics.aarp.org." In other words, although *Adobe* collects and receives a tremendous amount of member PII from AARP's website, a facial examination of the web traffic suggests that the data is being transmitted back to an *AARP* server. Yet, in reality, the

---

[12]     In technical parlance this is called an "analytics code library," which often takes the form of a hidden hyperlink embedded into a webpage that causes the user's web browser to load and run additional third party code.

information is really sent to Adobe's servers—not AARP's.

50.     The effect of this design is two-fold: first, it creates the appearance that Adobe isn't collecting any member information—personally identifiable or otherwise—through the use of AARP's website (especially inasmuch as the placed cookie and target servers are AARP-branded). Second, it gives Adobe free reign to collect information from the cookies stored on members' computers while using the AARP website in order to, among other things, collect information about AARP members (e.g., their PII and website usage) and display targeted advertisements to members.

51.     The Adobe service used by AARP for targeted advertising is called "Adobe Target," which Adobe describes as "everything you need to tailor and personalize your customers' experiences to maximize revenue on your web and mobile sites, apps, social media, and other digital channels at the segment and individual levels."[13] In addition to the data that it collects from AARP's website, Adobe also relies on additional information that it obtains through its analytics service to determine which advertisements are shown to AARP members.[14]

52.     For example, AARP uses information collected about its members to display targeted life insurance advertisements to them. A numerical score—which presumably identifies the type of life insurance the member is most likely to purchase based on factors collected about him or her—is silently passed to Adobe Target's servers under the label "LIFE_INS", which is then processed along with other data by Adobe to decide which particular life advertisement to deliver. Figure 10 on the following page depicts how one of these advertisements would appear

---

[13]     *Adobe Target / Test&Target*, http://www.adobe.com/solutions/testing-targeting/testandtarget.html (last visited, Oct. 21, 2014).

[14]     *Adobe Target Standard*, http://http://wwwimages.adobe.com/content/dam/Adobe/en/solutions/testing-targeting/pdfs/target-standard-overview-ue.pdf (last visited, Oct. 21, 2014).

16

to a member on AARP's website.



**(Fig. 10.)**

53.     On information and belief, AARP receives royalty payments when members sign-up for life insurances plans through these targeted advertisements (like the one offered by New York Life in <u>Figure 10</u>), and therefore directly profits from the practice.

54.     Likewise, and on information and belief, because AARP's usage of Adobe's collection methodologies and analytics services (i.e., using the information collected about AARP's members) allows it to serve targeted advertising to its members, AARP is able to sell advertising space on its website at a premium price. This practice results in additional profits for AARP—more than selling advertising space for traditional, untargeted advertising.

55.     The information fed to Adobe also allows it to create individualized profiles about AARP's members, as explained below.

**III.     <u>The Privacy Hazards Created by AARP's Unlawful Practices.</u>**

56.     An entire industry is now devoted to the collection and commercialization of consumer data.[15] Companies in this industry—known as data brokers—develop, share, and sell

---

[15]     *A Review of the Data Broker Industry: Collection, Use, and Sale of Consumer Data for*

comprehensive profiles containing details about every aspect of individuals' digital lives.

57.     A Senate Committee hearing on Online Advertising and Hidden Hazards to Consumer Security and Data Privacy recently addressed this issue. United States Senator Carl Levin noted that, "as consumers use the internet, profiles are being created based on what they read, what movies they watch, what music they listen to, on and on."[16]

58.     Although primarily recognized for its eponymous social network, Facebook is also a data broker and analytics company.[17] With over 130 million users in the United States alone,[18] Facebook has exclusive access to an exorbitant amount of personal consumer data. This wealth of information feeds into an analytics and advertising platform that Facebook markets to clients across a wide spectrum of industries.

59.     Facebook is uniquely able to directly link the data they accumulate on individuals' digital behaviors with the additional personal data that it extracts from its users' Facebook accounts. The result is that Facebook obtains a holistic look at specific consumers' online behaviors. Not surprisingly, Facebook recently announced that it was going to start providing advertisers with access to this highly detailed data, including information about consumers' web browsing habits on third party websites like AARP, which it collects from millions of consumers online.[19]

---

*Marketing Purposes*, Staff Report for Chairman Rockefeller (Dec. 18, 2013).

[16]     *Opening Statement of Senator Carl Levin Before Permanent Subcommittee on Investigations on Online Advertising and Hidden Hazards to Consumer Security and Data Privacy*. (May 15, 2014).

[17]     *Facebook Moves to Become World's Most Powerful Data Broker*, http://www.forbes.com/sites/parmyolson/2014/04/30/facebok-moves-to-become-the-worlds-most-powerful-data-broker/ (last visited May 28, 2014).

[18]     *Internet World Stats: Usage and Population Statistics*, http://www.internetworldstats.com/stats26.htm (last visited, June 3, 2014).

[19]     Chris Morran, *Facebook Is Now Selling Your Web-Browsing Data To Advertisers*, The

60.     Likewise, Adobe operates one of the largest and most sought-after analytics services in the industry. That reputation stems from the fact that Adobe has amassed an incredible volume of consumer data from numerous sources—including from websites like AARP's.

61.     As a result, Adobe has the ability to track online consumer behavior to gain a comprehensive view of a consumer's digital life. Using this amassed data, Adobe both creates and sells/licenses "marketing reports and analytics, ad hoc analysis, and data workbench technologies" to its many customers.

62.     Figure 11 below, demonstrates the dangers of the type of wholesale data collection at issue here. The graphic is from a recent FTC report[20] that illustrates how data brokers, like Facebook and Adobe, use such information to profile consumers that fall into "vulnerable" population category sets:

| Sample List of Targeting Products Identifying Financially Vulnerable Populations | | | |
|---|---|---|---|
| "Burdened by Debt: Singles" | "Struggling Elders: Singles" | "Meager Metro Means" | "Very Elderly" |
| "Mid-Life Strugglers: Families" | "Retiring on Empty: Singles" | "Relying on Aid: Retired Singles" | "Rolling the Dice" |
| "Resilient Renters" | "Tough Start: Young Single Parents" | "Rough Retirement: Small Town and Rural Seniors" | "Fragile Families" |
| "Very Spartan" | | | "Small Town Shallow Pockets" |
| "X-tra Needy" | "Living on Loans: Young Urban Single Parents" | "Financial Challenges" | "Ethnic Second-City Strugglers" |
| "Zero Mobility" | | | "Rural and Barely Making It" |
| "Hard Times" | | "Credit Reliant" | |
| "Enduring Hardships" | "Credit Crunched: City Families" | "Rocky Road" | |
| "Humble Beginnings" | | | |

Consumerist (June 12, 2014), http://consumerist.com/2014/06/12/facebook-is-now-selling-your-web-browsing-data-to-advertisers/; *see also* Facebook*, Making Ads Better And Giving You More Control*, https://www.facebook.com/help/585318558251813?ref=notif&notif_t=oba (last visited June 16, 2014).

[20]     *A Review of the Data Broker Industry: Collection, Use, and Sale of Consumer Data for Marketing Purposes* at 24, Staff Report for Chairman Rockefeller (Dec. 18, 2013), *available at* educationnewyork.com/files/rockefeller_databroker.pdf.

(**Fig. 11.**)

63.     Amid the many disturbing categories listed in Figure 11, "Struggling Elders: Singles," "Very Elderly," and "Rough Retirement: Small Town and Rural Seniors" are particularly relevant and troubling here. The tremendous amount of personal data that is collected from AARP members by Facebook and Adobe—described in Section II—enables this very type of exploitive (and profitable) profiling.

64.     Even AARP acknowledges as much. In an article penned for its own website, AARP warned seniors about the perils of data collection on the Internet—specifically (and ironically, given its actual but undisclosed privacy practices) noting that "Facebook [is] among the top recipients of leaks of personal information . . . includ[ing] . . . personal information, as well as a person's Internet surfing practices."[21] Conveniently, the article does not mention that AARP itself leaks members' highly sensitive data to both Facebook and Adobe.

65.     On information and belief, AARP receives monetary and non-monetary gain by permitting the collection of its members' PII (*e.g.*, in the form of increased advertising revenues, enhanced knowledge of AARP member demographics and behavior, payment royalties, and greater sponsorship and partnership opportunities).

**IV.     As Part of Their Paid Memberships, AARP's Members Justifiably Expected that Their PII Would be Kept Confidential by AARP.**

66.     As part of their purchases of AARP Memberships (which included online accounts), Plaintiff and the Class expected that AARP would maintain the confidentiality of their PII.[22]

---

[21]     *Many Websites Leak Personal Data*, http://www.aarp.org/technology/privacy-security/info-10-2011/many-websites-leak-personal-data.html (last visited May 28, 2014).

[22]     Recent studies confirm that consumers price privacy into their purchases. *See* Expert Witness Report of Dr. Serge Egelman, Ph.D., *In re LinkedIn User Privacy*

67.     When consumers pay for online services, they expect heightened levels of information security and privacy relative to when they use free online services. This is, in part, because they believe that some portion of the money they pay for their memberships goes toward the protection of their sensitive information.

68.     These minimal confidentiality expectations are both reasonable and justified when applied to AARP for two reasons. First, as a company that has advised its members on the dangers of online information disclosures and the risks of making PII available to companies like Facebook, *see* ¶ 64 *supra*, Plaintiff and the Class members would reasonably expect that AARP would not then subject its members to the same dangers it warned of.

69.     Second, AARP itself justified its members' expectations by promising them exactly what they expected as part of their memberships and online accounts. That is, in its website Privacy Policy, which all members who create an online account are required to agree to, AARP promises its members that only certain specified third parties would collect personal information from the website, and even then, only in non-identifiable form.

70.     Accordingly, as part of their memberships, Plaintiff and the Class members reasonably and justifiably expected that AARP would maintain the confidentiality of their PII.

**V.      Plaintiff Austin-Spearman's PII Was Collected by Facebook and Adobe Without her Permission.**

71.     Austin-Spearman has been a member of Facebook's social network since late 2007. Since then, Austin-Spearman has frequently accessed her Facebook account through her web browser and clicks the "Keep me logged in" button when signing into the account.

72.     In late 2010, Austin-Spearman accessed the AARP website (www.aarp.org) in order to learn more about the benefits of AARP membership.

*Litig*., No. 5:12-cv-3088-EJD, Dkt. No. 78-1, at 4-6 (N.D. Cal. Apr. 30, 2013).

73.     While on the AARP website, Austin-Spearman was presented with (and viewed) representations regarding the various benefits of AARP membership, including, *inter alia*, the ability to search for and access online discounts and services through the AARP website.

74.     Based upon these representations, Austin-Spearman purchased a three-year AARP membership for approximately $43.

75.     At the time she paid for her membership, and based upon the many representations found across AARP's website, Austin-Spearman understood she was paying money for access to the exclusive "member's only" content on AARP's website and that she would be required to register for an AARP.org account in order to access these benefits.

76.     Additionally, at the time she paid for her membership, Austin-Spearman valued her personal privacy and expected that AARP would not permit third parties to collect her PII without first obtaining her permission to do so—including when accessing the paid-for "member's only" content on AARP's website.

77.     After paying for her membership, Austin-Spearman was directed to create and register her online AARP account. Before registering, Austin-Spearman—as she always does when signing up for an online service—viewed and agreed to AARP's Terms of Service and Privacy Policy and the representations and obligations listed therein.

78.     The Terms of Service governing Austin-Spearman's account stated that it "constitutes the entire agreement between [AARP] and [her] with respect to the subject matter contained in [the] agreement and supersedes all previous and contemporaneous agreements, proposals, and communications, written and/or oral."[23] The Terms of Service governing Austin-

---

[23]     *See AARP Terms of Service*, *supra* note 1.

Spearman's account also "incorporated by reference" AARP's Privacy Policy.[24]

79.     Following her normal routine, Austin-Spearman also viewed AARP's Privacy Policy, including the representations described above, before agreeing to sign up for an account on AARP's website. In its Privacy Policy, AARP promised Austin-Spearman that AARP (i) would only allow certain third parties to collect "nonpersonally identifiable information" while she browsed the AARP website and (ii) would not allow any third parties to collect PII.[25]

80.     Because the website registration was required to access portions of her paid-for AARP membership (and thus constituted a part of her membership benefits), Austin-Spearman believed that AARP would not allow her PII to be collected by third parties without her permission and believed that AARP confirmed that belief based upon the representations contained in its Privacy Policy.

81.     Nevertheless, and despite the fact that Austin-Spearman did not consent, agree, or otherwise permit AARP to release her PII to any third party company (*i.e.*, outside of those disclosures expressly provided for in AARP's Privacy Policy), when she used AARP's website AARP routinely permitted third parties Facebook and Adobe to collect her PII, along with the precise materials that she viewed, the titles of articles read and videos watched on the AARP website, and other detailed information, such as her name, race, email address, state of residence, and employment information.

82.     Had AARP informed Austin-Spearman that it allows third parties to collect member PII through the AARP website at the time that she purchased her membership, she either (i) would not have paid for an AARP membership in the first place or (ii) would not have used

---

[24]     *Id.*

[25]     *AARP's Privacy Policy*, AARP.org, http://www.aarp.org/about-aarp/info-05-2010/privacypolicy.html (last visited June 12, 2014).

the AARP website at all (and, thus, would give up her paid-for membership benefits only accessible through the website). In either case, Austin-Spearman would have viewed her paid-for membership as worth less than the $43 she paid.

83.     Stated otherwise, AARP required that Austin-Spearman register her membership on the AARP website in order to access the entirety of her paid-for AARP membership benefits. Had Austin-Spearman known that signing up for and using the AARP website would allow undisclosed third parties to collect her PII, she would not have signed up for an AARP website account and, thus, would not have been able to access the full value of her paid-for membership benefits. But, because Austin-Spearman *did* sign up for the AARP website and *was* subject to AARP's undisclosed third party PII collection practices, the service she agreed to and paid for was inherently less-valuable than the one she paid for.

84.     Accordingly, had AARP disclosed that in order to access the exclusive "member's only" content on its website it would also allow undisclosed third parties to collect her PII, Austin-Spearman would have viewed her membership as less valuable and would either have attempted to purchase her membership at a lower price or not at all.

85.     Further, had AARP disclosed that that registering her AARP account online would cause her PII to be shared with undisclosed third parties, Austin-Spearman would have chosen to exercise and redeem her AARP membership benefits through the phone or via mail where possible, rather than create an online account.

86.     In fact, based upon the above-described practices, Austin-Spearman decided to not renew her membership with AARP.

## CLASS ALLEGATIONS

87.     **Class Definition**: Plaintiff brings this action pursuant to Fed. R. Civ. P. 23(a),

(b)(2), and (b)(3) on behalf of herself and a Class of similarly situated individuals, defined as
follows:

> All current and former AARP members who (i) paid a membership fee to
> AARP and (ii) who had their PII collected by a third party, including either
> Facebook or Adobe, while visiting AARP's website.

Excluded from the Class are (1) Defendants, Defendants' agents, subsidiaries, parents,
successors, predecessors, and any entity in which Defendants or their parents have a controlling
interest, and those entity's current and former employees, officers, and directors, (2) the Judge to
whom this case is assigned and the Judge's immediate family, (3) persons who execute and file a
timely request for exclusion from the Class, (4) persons who have had their claims in this matter
finally adjudicated and/or otherwise released, and (5) the legal representatives, successors, and
assigns of any such excluded person.

88. **Numerosity**: The exact number of members of the Class is unknown and is not
available to Plaintiff at this time, but individual joinder in this case is impracticable. The Class
likely consists of thousands of individuals. Class members can be easily identified through
Defendants' records.

89. **Commonality and Predominance**: There are many questions of law and fact
common to the claims of Plaintiff and the other members of the Class, and those questions
predominate over any questions that may affect individual members of the Class. Common
questions for the Class include but are not limited to the following:

a)  Whether Defendants, through their website, unlawfully permitted—and
continue to permit—third parties to collect their members' PII;

b)  Whether Defendants' actions violate the District of Columbia's Consumer
Protection Procedures Act (DC Code §§ 28-3901, *et seq.*);

c)    Whether Defendants' actions were committed knowingly;

d)    Whether Defendants' actions constitute intentional misrepresentation;

e)    Whether Defendants' actions constitute fraud by omission;

f)    Whether Defendants' actions constitute breach of contract; and

g)    Whether Defendants have been unjustly enriched by the conduct alleged herein.

90.    **Typicality**: Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and the Class sustained damages as a result of Defendants' uniform wrongful conduct during transactions with Plaintiff and the Class.

91.    **Adequate Representation**: Plaintiff will fairly and adequately represent and protect the interests of the Class, and has retained counsel competent and experienced in complex litigation and class actions. Plaintiff has no interests antagonistic to those of the Class, and Defendants have no defenses unique to Plaintiff. Plaintiff and her counsel are committed to vigorously prosecuting this action on behalf of the members of the Class, and have the financial resources to do so. Neither Plaintiff nor her counsel has any interest adverse to those of the other members of the Class.

92.    **Policies Generally Applicable to the Class**: This class action is appropriate for certification because Defendants have acted or refused to act on grounds generally applicable to the Class as a whole, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the members of the Class, and making final injunctive relief appropriate with respect to the Class as a whole. Defendants' policies challenged herein apply and affect members of the Class uniformly and Plaintiff's challenge of these policies hinges on Defendants' conduct with respect to the Class as a whole, not on facts or law

applicable only to Plaintiff. The factual and legal bases of Defendants' liability to Plaintiff and to the other members of the Class are the same, resulting in injury to the Plaintiff and to all of the other members of the Class. Plaintiff and the members of the Class have suffered harm and damages as a result of Defendants' unlawful and wrongful conduct.

93.     **Superiority**: This case is also appropriate for certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy. The injuries suffered by the individual members of the Class are likely to have been relatively small compared to the burden and expense of individual prosecution of the litigation necessitated by Defendants' actions. Absent a class action, it would be difficult, if not impossible, for the individual members of the Class to obtain effective relief from Defendants. Even if members of the Class themselves could sustain such individual litigation, it would not be preferable to a class action because individual litigation would increase the delay and expense to all parties and the Court and require duplicative consideration of the legal and factual issues presented herein. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single Court. Economies of time, effort, and expense will be fostered, and uniformity of decisions will be ensured.

94.     Plaintiff reserves the right to revise the foregoing "Class Allegations" and "Class Definition" based on facts learned through additional investigation and in discovery.

### FIRST CAUSE OF ACTION
**Violation of the District of Columbia's Consumer Protection Procedures Act
DC Code §§ 28-3901, *et seq.*
(On Behalf of Plaintiff and the Class)**

95.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

96.     The District of Columbia's Consumer Protection Procedures Act ("DCCPPA"),

DC Code §§ 28-3901, *et seq.*, protects consumers from a broad spectrum of unscrupulous practices in the marketplace.

97.     The DCCPPA assures that a proper mechanism exists to remedy all improper trade practices and deter the continuing use of such practices.

98.     Plaintiff is a consumer under the DCCPPA because she purchased a membership to AARP's service and received exclusive content and benefits AARP provides through her online account.

99.     AARP is a merchant under the DCCPPA because it, through the ordinary course of business, either directly or indirectly provides consumer goods or services to its members. AARP Services is a merchant under the DCCPPA because it, through the ordinary course of business, either directly or indirectly provides consumer goods or services to its members.

100.    Further, the unlawful conduct alleged in the Complaint occurred in, was directed to, and/or emanated from the District of Columbia, where AARP and AARP Services are located, and from where they directly and/or indirectly provide consumer goods or services to AARP members.

101.    When Plaintiff and the Class purchased their AARP memberships and created their online AARP accounts, they reasonably expected that AARP would not allow third parties to collect their PII.

102.    Plaintiff's and the Class's expectations were justified by the fact that AARP affirmatively promised in its Privacy Policy that it would not allow any third party companies to collect members' PII.

103.    AARP was responsible for maintaining the privacy of its members' PII in accordance with its Privacy Policy. AARP knew that it permitted Facebook and Adobe to collect

its members' PII inasmuch as it designed its website and intentionally included Facebook's and

Adobe's code, which caused the collections and transmissions described in <u>Section II</u> to take

place. By representing in its Privacy Policy that such information would not be collected, AARP

actively misrepresented its true practices to Plaintiff and the Class.

104.     Consumers value their privacy. Services that offer greater privacy protections are

of greater usefulness and utility to consumers than services with less stringent privacy practices.

As such, consumers will—if given the choice between two otherwise identical services—choose

one with greater privacy protection.

105.     Because of this consumer preference for privacy, an Internet service that protects

its users' PII—and adheres to its published privacy policy—commands a higher market price

than a service with limited privacy protection.

106.     Consumers pay membership fees to AARP in order to use its service and website.

When a member signs up for AARP's website, he or she reasonably believes that AARP will

protect their PII, as represented in its Privacy Policy. By failing to do so, AARP made a material

misrepresentation, which has a tendency to mislead consumers as described in <u>Section II</u> because

consumers are told—and rely on—the misrepresentation that AARP does not allow third parties

to collect their PII. If members were aware of the true treatment of their PII, they would not have

paid the full price for their AARP memberships, or would not have paid at all.

107.     Further, AARP represents that the transaction of joining AARP and subsequently

creating an online account confers certain rights to its members—namely that its members' PII

will be kept private. In reality, and by intentional design, AARP routinely allows Facebook and

Adobe to collect its members' PII whenever a member uses its website. Accordingly, if members

were aware of this misrepresentation, they would not pay the full price for their AARP

memberships, or would not have paid at all.

108.    Accordingly, Plaintiff and the Class overpaid for their AARP memberships and suffered damages in the amount equal to the difference between the value of the services they paid for and the market value of the services they actually received.

109.    Pursuant to DC Code § 28-3905(k)(2), Plaintiff seeks an order requiring AARP to: (1) immediately stop the unlawful practices described in this Complaint; (2) pay Plaintiff and the Class statutory damages in the amount of $1,500 per person; and (3) pay reasonable attorneys' fees and costs.

## SECOND CAUSE OF ACTION
### Intentional Misrepresentation
### (On Behalf of Plaintiff and the Class)

110.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

111.    Before creating her online account, Plaintiff accepted AARP's Terms of Service and Privacy Policy. In its Privacy Policy, AARP explicitly represented that it would not allow third party companies to collect its members' PII. Plaintiff relied on this representation, and believed AARP's representation that it would not allow third parties to collect her PII as part of the online account that accompanied her AARP membership.

112.    However, when a user visits AARP's website, AARP actually lets third parties, like Facebook and Adobe, collect users' PII—including their Facebook IDs, names, race, email addresses, states of residence, and employment information—along with other information about their online activities. A user's Facebook ID is personally identifiable, as are their names and email addresses.

113.    As such, and with the intent to induce users and paying members to create online AARP accounts, AARP falsely represented the fact that it would not allow third parties to collect

its members' PII on the AARP website.

114.    Consumers expect that their PII will be kept private from third parties—especially third party analytics companies—when they surf AARP's website.

115.    This expectation is justified by the express representation in AARP's Privacy Policy that no third party would collect members' PII.

116.    Consumers view services that do not protect their PII as less valuable than services that do protect their PII—and will pay less for such non-protective services. Had Plaintiff known that AARP would allow third parties, including Facebook and Adobe, to collect her PII (i.e., if AARP had disclosed its privacy practices at the outset), she would (i) have tried to pay less for her membership or would not have paid at all; or (ii) would have chosen to not register for an online account, thereby forgoing the online-only benefits of her membership and limiting herself to those benefits that could be obtained by mail or telephone (while also denying AARP the ability to profit from its information sharing).

117.    Facts that affect the price or value of a service are always material. Thus, AARP has misrepresented a material fact that it would not allow third parties to collect its members' PII.

118.    AARP knew that it was allowing Facebook and Adobe to collect its members' PII inasmuch as it designed and controls its website and intentionally included Facebook's and Adobe's website code, which enabled the collections described in Section II to take place.

119.    In its Privacy Policy, AARP lists the companies that collect information about its members. According to the Privacy Policy, the information collected by those organizations from AARP's website cannot be used to personally identify the user. Setting aside that Facebook and Adobe aren't even listed among the organizations that collect *nonpersonally* identifiable

information, AARP fails to disclose that it actually allows Facebook and Adobe to collect its members' PII.

120.    Because it controls what entities may collect PII through its website and also profits from its third party PII collection practices, AARP intended to mislead its members into believing that their information, personally identifying or otherwise, was not collected by Facebook or Adobe, and that PII was not collected by any third parties.

121.    When an AARP member accepts the terms of the Privacy Policy to create his or her online account, he or she agrees to AARP's representation that it will not allow third parties to collect his or her PII. With that in mind, members browse AARP's website with the expectation that their PII is kept private. This expectation is blatantly disregarded by AARP because it facilitates the collection of its members' PII by Facebook and Adobe.

122.    Further, even though *some* member benefits are only available online, others may be equally accessed and redeemed through other methods, such as by phone or email. Thus, when AARP members (such as Plaintiff) elect to register their AARP account online and access benefits through the AARP website, he or she chooses to do so at the expense of the other available options for certain benefit redemptions (e.g., by redeeming benefits by phone or email). AARP intended that its members would rely upon its material misrepresentations regarding the AARP website's privacy protections and would choose to register for an online account (i.e., rather than redeem by phone or email, when possible). Directing members to register online allowed for the third party collection of PII described herein, and additionally allowed AARP to profit from such collection (e.g., through royalties, ad revenue generated from selling targeted advertising, and other sources).

123.    Accordingly, Plaintiff and the Class relied upon AARP's material

misrepresentations by accepting the terms of AARP's Privacy Policy and registering their AARP memberships on the AARP website. As a result of this reliance, Plaintiff and the Class suffered damages in the form of their overpayment for (or decreased value of) their AARP memberships (in the amount equal to the difference between the value of the services they paid for and the actual market value of services they actually received).

124.    Plaintiff, individually and on behalf of the Class, seeks an order declaring that AARP's conduct constitutes intentional misrepresentation, and awarding Plaintiff and the Class (i) damages in the amount equal to the difference between the value of the services they paid for and the market value of the services they actually received, and/or (ii) disgorgement of all profits and/or financial gain Defendants have received as result of the conduct alleged herein.

### THIRD CAUSE OF ACTION
**Fraud by Omission**
**(On Behalf of Plaintiff and the Class)**

125.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

126.    When Plaintiff created her online account, she accepted AARP's Terms of Service and Privacy Policy. In its Privacy Policy, and with the intent to induce members to sign up for online AARP accounts, AARP purposefully conceals, suppresses, and/or omits that it allows third parties (such as Facebook and Adobe) to collect members' PII through the AARP.org website.

127.    However, when a user visits AARP's website, AARP actually allows third parties (like Facebook and Adobe) to collect a user's PII—including their Facebook IDs, names, race, email addresses, states of residence, and employment information—along with other information about their online activities. A user's Facebook ID is personally identifiable, as are their names and email addresses.

128.    Given the fact that they paid for their memberships, AARP's previous statements and warnings regarding online information sharing, and the representations made in AARP's privacy policy, consumers expect that their PII will be kept private from third parties—especially third party analytics companies—when they surf AARP's website.

129.    This expectation is further justified by the express representation in AARP's Privacy Policy that no third party would collect members' PII.

130.    Consumers view services that do not protect their PII as less valuable than services that do protect their PII—and will pay less for such non-protective services. Had Plaintiff known that AARP would allow third parties, including Facebook and Adobe, to collect her PII, she would (i) have tried to pay less for her membership or would not have paid at all (i.e., if AARP had disclosed its privacy practices at the outset); or (ii) would have chosen to not register for an online account, thereby forgoing any paid-for online benefits and would have attempted to access and use her AARP benefits by phone or mail—to the extent such access and use was even possible.

131.    Facts that affect the price or value of a service are always material. Thus, AARP omission and concealment of the material fact that it would allow third parties to collect its members' PII—in manners contrary to those privacy practices disclosed through its Privacy Policy—was material to Plaintiff and the Class.

132.    AARP knew it was allowing Facebook and Adobe to collect its members' PII inasmuch as it designed and controls its website and intentionally included Facebook's and Adobe's website code, which enabled the collections described in Section II to take place.

133.    In its Privacy Policy, AARP lists the companies that collect information about its members. According to the Privacy Policy, organizations permitted to collect information from

AARP website users cannot collect PII (i.e., information that can be used to personally identify a user). Setting aside that Facebook and Adobe aren't even listed among the organizations that collect *nonpersonally* identifiable information, AARP fails to disclose that it actually allows Facebook and Adobe to collect its members' PII. This omission was intentional: AARP intended to mislead its members into believing that their information, personally identifying or otherwise, would not be collected by Facebook or Adobe, and that PII was not collected by any third parties.

134.     AARP had a duty to disclose the fact that it would allow third parties to collect its members' PII to Plaintiff and the Class because it was (i) in a superior position to know such information, (ii) it knew such information would be important to its website users (by virtue of it assuring users that such collection would not occur), and (iii) Plaintiff and the Class could not have readily discovered such information on their own.

135.     Plaintiff and the Class justifiably relied upon AARP's material omissions by accepting the terms of AARP's Privacy Policy and registering their AARP memberships on the AARP website. As a result of this reliance, Plaintiff and the Class suffered damages in the form of their overpayment for (or decreased value of) their AARP memberships (in the amount equal to the difference between the value of the services they paid for and the actual market value of services they actually received).

136.     Accordingly, Plaintiff, individually and on behalf of the Class, seeks an order declaring that AARP's conduct constitutes fraud by omission, and awarding Plaintiff and the Class (i) damages in the amount equal to the difference between the value of the services they paid for and the market value of the services they actually received and/or (ii) disgorgement of all profits and/or financial gain Defendants have received as result of the conduct alleged herein.

## FOURTH CAUSE OF ACTION
### Unjust Enrichment
### (On Behalf of Plaintiff and the Class)

137.   Plaintiff incorporates the foregoing allegations as if fully set forth herein,

138.   AARP knowingly received a direct monetary benefit from Plaintiff and the Class in the form of membership fees. The membership fees were received from Plaintiff in order to perform services that included the data protections set forth in AARP's Privacy Policy—including AARP's commitment to not allow third parties to collect PII from users of the AARP website.

139.   AARP did not perform the data protection services set forth in the AARP Privacy Policy, but retained Plaintiff's payment.

140.   Additionally, AARP enjoyed other financial benefits that were obtained from enabling the third party collection of Plaintiff and the Class's PII on the AARP website—including profits derived from royalties and advertising sales.

141.   AARP appreciates or has knowledge of such benefits.

142.   Under principles of equity and good conscience, AARP should not be permitted to retain the benefits it wrongly received from Plaintiff and the Class as a result of its unlawful conduct.

143.   Plaintiff, individually and on behalf of the Class, seeks restitution of all monies AARP has unjustly received as a result of the conduct alleged herein, including disgorgement of any and all profits received.

## FIFTH CAUSE OF ACTION
### Breach of Contract (*in the alternative to unjust enrichment*)
### (On Behalf of Plaintiff and the Class)

144.   Plaintiff incorporate the foregoing allegations as if fully set forth herein,

excluding paragraphs 137 through 143.

145.    AARP on the one hand, and Plaintiff and members of the Class on the other, entered into valid and enforceable contracts whereby those Class members provided, and AARP accepted, payment in the form of membership fees in exchange for AARP membership and access to exclusive AARP online services.

146.    In order to use AARP's exclusive online services, AARP likewise required that Plaintiff affirmatively assent to its Terms of Service, which incorporated its Privacy Policy. AARP's Privacy Policy contained, among other things, its representations regarding the collection and use of its members' PII.

147.    Plaintiff accepted AARP's Terms of Service, and with it, AARP's Privacy Policy and representations regarding its handling of her PII, before registering for her online account.

148.    Plaintiff affirmatively assented to the Terms of Service when she registered for her account, and thereafter by using her account on AARP's website.

149.    The Terms of Service constitute a valid and enforceable contract between Plaintiff and AARP.

150.    As part of this contract, AARP imposed upon itself an obligation to not allow third party companies to collect its members' PII.

151.    Had AARP represented that they would allow third parties such as Facebook and Adobe to collect her PII, Plaintiff would have either (i) attempted to purchase her AARP membership at a lower price or not purchased it all, or (ii) would have chosen not to use the AARP website to access and/or redeem paid-for membership benefits (and, as such, would have been deprived of such use). In either case, Plaintiff would have recognized that her paid-for AARP members was less useful than the one AARP promised to her.

152.    Plaintiff performed all of her obligations under the contract, including assenting to the Terms of Service and paying her membership fees.

153.    By allowing Facebook and Adobe to collect Plaintiff's PII—including her Facebook ID, name, race, email address, state of residence, and employment information— AARP breached the term of its contract with Plaintiff to not allow third parties to collect her PII.

154.    Consumers, including Internet users, value their privacy. Services, including organizations that offer online accounts, that offer greater privacy protection offer consumers greater usefulness and utility than services with minimal or no privacy protection. As such, AARP's services were fundamentally less useful and valuable than if it were to adhere to the privacy-related representations contained in its Privacy Policy.

155.    Plaintiff believed that—as part of her AARP membership and online account— AARP would not allow third party companies to collect her PII. Those protections were valuable to her.

156.    Thus, Plaintiff paid for, but never received, the valuable privacy protection to which she was entitled. That protection would have made her AARP membership significantly more useful to her, and would have allowed her to access the entirety of her paid-for membership benefits without being forced to subject herself to undisclosed PII collection practices.

157.    As a result of Defendants' breach of contract, Plaintiff and the Class suffered damages in the form of their overpayment for their AARP memberships (in the amount equal to the difference between the value of the services they paid for and the actual market value of services they actually received).

158.    Accordingly, Plaintiff, individually and on behalf of the Class, seeks an order declaring that AARP's conduct constitutes breach of contract, and awarding Plaintiff and the

Class damages in the amount equal to the difference between the value of the services they paid for and the services they actually received.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff Ethel Austin-Spearman, individually and on behalf of the Class, prays for the following relief:

A.      Certify this case as a class action on behalf of the Class defined above, appoint Plaintiff Ethel Austin-Spearman as representative of the Class, and appoint her counsel as Class Counsel;

B.      Declare that Defendants' actions, as described herein, violate the District of Columbia's Consumer Protection Procedures Act (DC Code §§ 28-3901, *et seq*.), and constitute intentional misrepresentation, fraud by omission, breach of contract, and unjust enrichment (in the alternative to breach of contract);

C.      Award injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and the Class members, including an order prohibiting Defendants from engaging in the wrongful and unlawful acts described herein;

D.      Award appropriate damages and restitution to Plaintiff and the Class in an amount to be determined at trial;

E.      Award Plaintiff and the Class their reasonable litigation expenses and attorneys' fees;

F.      Award Plaintiff and the Class pre- and post-judgment interest, to the extent allowable; and

G.      Award such other and further relief as equity and justice may require.

## JURY TRIAL

Plaintiff demands a trial by jury for all issues so triable.

Respectfully submitted,

**ETHEL AUSTIN-SPEARMAN**, individually and
on behalf of all others similarly situated,

Dated: October 24, 2014

By: Alicia E. Hwang
One of Plaintiff's Attorneys
Illinois Bar No. 6309294

Maria C. Simon
msimon@thegellerlawgroup.com
THE GELLER LAW GROUP
4000 Legato Road, Suite 1100
Fairfax, Virginia 22033
Tel: 703.679.7067
Fax: 703.259.8584

Jay Edelson (Admitted *Pro Hac Vice*)
jedelson@edelson.com
Rafey S. Balabanian (Admitted *Pro Hac Vice*)
rbalabanian@edelson.com
Benjamin S. Thomassen (Admitted *Pro Hac Vice*)
bthomassen@edelson.com
Alicia E. Hwang (Admitted *Pro Hac Vice*)
ahwang@edelson.com
EDELSON PC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

## <u>CERTIFICATE OF SERVICE</u>

I, Alicia E. Hwang, an attorney, hereby certify that on October 24, 2014, I served the above and foregoing ***First Amended Class Action Complaint and Demand for Jury Trial***, by causing a true and accurate copy of such paper to be filed and transmitted to all counsel of record via the Court's CM/ECF electronic filing system, on this 24th day of October 2014.

<u>/s/ Alicia E. Hwang</u>