# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ETHEL AUSTIN-SPEARMAN,<br>Individually and on behalf of all others<br>similarly situated, | )<br>)<br>) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Case No. 1:14-cv-01288 |
| | ) | |
| AARP, *et al.*, | ) | The Honorable Ketanji B. Jackson |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT WITH PREJUDICE

Of Counsel:

Daniel Koslofsky (DC Bar 994899)
Associate General Counsel
AARP
601 E Street, N.W.
Suite 800
Washington, D.C.  20049
Tel:  202-434-2378
Fax:  202-434-2339

VENABLE LLP

  /s/  Thomas E. Gilbertsen
Thomas E. Gilbertsen (DC Bar 432290)
Kelly A. DeMarchis (DC Bar 501966)
Michael P. Bracken (DC Bar 992525)
575 Seventh Street, N.W.
Washington, D.C. 20004-1601
Tel: 202-344-4000
Fax: 202-344-8300

*Attorneys for Defendants AARP and
AARP Services, Inc.*

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

THE AMENDED COMPLAINT'S STATED FACTUAL BASIS ................................... 4

    AARP and ASI ......................................................................................................... 4

    Plaintiff's Alleged Use of Facebook and AARP Websites ...................................... 5

    AARP's Alleged Use of Adobe Software ............................................................... 7

    AARP's Website Terms of Service and Privacy Policy Disclose When Information Is
    Shared with Certain Third Parties........................................................................... 8

    How the AARP Website Interacts With Facebook and Adobe ............................. 11

ARGUMENT .................................................................................................................. 13

I.    PLAINTIFF MUST ESTABLISH ARTICLE III STANDING, AND HER CLAIMS
    ARE SUBJECT TO RULE 9(b)'s HEIGHTENED PLEADING STANDARD ................. 13

    A.   Plaintiff's Burden to Establish Standing Cannot Be Met by Guesswork. ...................... 13

    B.   "Information and Belief" Speculation Fails to Satisfy Rule 9(b) Pleading. ................... 14

    C.   *Twombly* and *Iqbal* Bar the Amended Complaint's "Puzzle Piece" Pleading. .............. 16

    D.   Documents Incorporated by the Amended Complaint Refute its Claims. ..................... 17

II.   MS. AUSTIN-SPEARMAN LACKS ARTICLE III STANDING ..................................... 18

    A.   Plaintiff Suffered No Cognizable Injury to Establish Article III Standing ................... 19

        1.  No Economic Injury ................................................................................... 20

        2.  No Membership Bargain Is Implicated ..................................................... 22

        3.  Reverse Chronology ................................................................................. 23

    B.   As Former AARP Member, Plaintiff Lacks Standing for Injunctive Relief ................. 24

III.  DCCPPA DOES NOT APPLY TO AARP ON THE FACTS ALLEGED ......................... 24

    A.   DCCPPA Expressly Bars Plaintiff's Claims Because AARP Is a Nonprofit
    Organization that Did Not Sell Separate Goods or Services to Plaintiff....................... 25

        1.  AARP is a Non-Profit Organization........................................................... 26

        2.  Plaintiff purchased no goods or services under the Act ......................... 27

    B.   AARP Is Not a "Merchant" Under the DCCPPA. ................................................... 28

IV.  THE AMENDED COMPLAINT FAILS TO STATE TIMELY FRAUD CLAIMS .......... 30

V.   PLAINTIFF FAILS TO STATE A CLAIM FOR UNJUST ENRICHMENT ................... 33

VI.  PLAINTIFF'S AMENDMENT FAILS TO RESTATE BREACH OF CONTRACT ........ 36

VII. INSUFFICIENT ASI CONDUCT IS ALLEGED ............................................................ 37

VIII. IMPERTINENT MATERIAL SHOULD BE STRICKEN ............................................... 39

CONCLUSION ................................................................................................................ 41

# TABLE OF AUTHORITIES

## Cases

*Abdelrhman v. Ackerman,* 76 A.3d 883 (D.C. 2013) ..................................................... 37

*Adler v. Vision Lab Telecomms., Inc.*, 393 F. Supp. 2d 35 (D.D.C. 2005) .................................. 29

*Antoine v. U.S. Bank Nat. Ass'n.*, 547 F. Supp. 2d 30 (D.D.C. 2008) .................................... 15, 16

*Armstrong v. Accrediting Council for Continuing Educ. & Training, Inc.*, 832 F. Supp. 419 (D.D.C. 1993) ................................................................................. 29

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ................................................................. passim

*Baird v. Snowbarger*, 744 F. Supp. 2d 279 (D.D.C. 2010) ............................................... 17

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ...................................................... passim

*Bennett v. Kiggins*, 377 A.2d 57 (D.C. 1977) ........................................................... 32

*Carleton v. Winter*, 901 A.2d 174 (D.C. 2006) .......................................................... 29

*Chelsea Condominium Unit Owners Ass'n v. 1815 A. St., Condominium Group, LLC*, 468 F. Supp. 2d 136 (D.D.C. 2007) ............................................................... 15

*City of New York v. Cyco.Net, Inc.*, 383 F. Supp. 2d 526 (S.D.N.Y. 2005) .............................. 16

*Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138 (2013) ................................................. 13

*Comwest, Inc. v. American Operator Services, Inc.*, 765 F. Supp. 1467 (C.D.Cal. 1991) ................................................................................................. 16

*Cornerstone Christian Schs. v. Univ. Interscholastic League*, 563 F.3d 127 (5th Cir. 2009) .............................................................................................. 19

*County of San Miguel v. Kempthorne*, 587 F. Supp. 2d 64 (D.D.C. 2008) ........................... 40, 41

*County of Santa Clara v. Astra U.S., Inc.*, 428 F. Supp. 2d 1029 (N.D. Cal. 2006)..................... 16

*Daimler Chrysler Corp. v. Cuno*, 547 U.S. 332 (2006)................................................... 18

*Davis v. United States*, 569 F. Supp. 2d 91 (D.D.C. 2008) ............................................. 40

*DeBerry v. First Gov't Mort. & Investors Corp.*, 743 A.2d 699 (D.C. 1999) ............................ 29

*Dyer v. Nw. Airlines Corp.,* 334 F. Supp. 2d 1196 (D.N.D. 2004)..................................... 36, 37

*Emerine v. Yancey,* 680 A.2d 1380 (D.C. 1996).......................................................... 35

*Fontaine v. Bank of America, N.A.*, C.A. No. 13-cv-1638-KBJ, 2014 WL 1999532 (May 16, 2014 D.D.C.) ................................................................................. 14

*Friends Christian High School v. Geneva Financial Consultants*, Case No. 13–1436 (ESH), 2014 WL 1623754 (D.D.C. April 24, 2014)....................................... 30

*Grand Lodge of Fraternal Order of Police v. Ashcroft*, 185 F. Supp. 2d 9 (D.D.C. 2001) ................................................................................................................ 14

*Hayduk v. Lanna*, 775 F.2d 441 (1st Cir. 1985) ........................................................ 15

*Henok v. Chase Home Fin., LLC*, 922 F. Supp. 2d 110 (D.D.C. 2013)....................... 30

*High v. McLean Financial Corp.*, 659 F. Supp. 1561 (D.D.C. 1987) ......................... 30

*Holland v. Florida*, 560 U.S. 631 (2010)................................................................... 32

*Horning v. Ferguson*, 52 A.2d 116 (D.C.1947)........................................................... 32

*Howard v. Riggs Nat'l Bank*, 432 A.2d 701 (D.C. 1981) ............................................ 29

*Hoyte v. YUM! Brands, Inc.*, 489 F. Supp. 2d 24 (D.D.C. 2007) ............................... 17

*Hughes v. Abell*, 794 F. Supp. 2d 1 (D.D.C. 2010)...................................................... 31

*In re Alamosa Holdings, Inc.,* 382 F. Supp. 2d 832 (N.D. Tex. 2005) ....................... 17

*In re APA Assessment Fee Litig.*, 862 F. Supp. 2d 1 (D.D.C. 2012) .................... 25, 28

*In re Doubleclick, Inc. Privacy Litig.*, 154 F. Supp. 2d 497 (S.D.N.Y. 2001) ........... 21

*In re Google, Inc.Privacy Policy Litig.*, No. 5:12-CV-01382-PSG, 2014 WL 3707508 (N.D. Cal. July 21, 2014) ....................................................................... 21

*In re iPhone Application Litig.*, No. 5:11-md-02250-LHK, 2011 WL 4403963 (N.D. Cal. Sept. 20, 2011)........................................................................................ 20

*In re JetBlue Airways Corp. Privacy Litig.*, 379 F. Supp. 2d 299 (E.D.N.Y. 2005) ............. 21, 37

*In re LinkedIn Privacy Litig.*, 932 F. Supp. 2d 1089 (N.D. Cal. 2013) ................ 22, 23

*In re LinkedIn User Privacy Litig.*, Case No. 5:12-CV-03088-EJD (March 28, 2014) 2014 WL 1323713 ........................................................................................ 23

*In re Metropolitan Secs. Litig.*, 532 F. Supp. 2d 1260 (E.D. Wa. 2007) ................... 17

*In re Nw. Airlines Privacy Litig.,* No. Civ. 04-126, 2004 WL 1278459 (D. Minn. June 6, 2004) .............................................................................................. 35

*In re Petsmart, Inc. Secs. Litig.*, 61 F. Supp. 2d 982  (D. Ariz. 1999).......................... 17

*In re Science Applications International Corp. (SAIC) Backup Tape Data Theft Litig.*, Misc. Action No. 12-347 (JEB), MDL No. 2360, 2014 WL 1858458 (D.D.C. May 9, 2014) ........................................................................................... 22

*In re U.S. Office Products Co. Securities Litigation*, 251 F. Supp. 2d 77 (D.D.C. 2003) ........................................................................................................... 30, 31

*In re U.S. Office Products Sec. Litig.*, 326 F. Supp. 2d 68 (D.D.C. 2004) ................... 15

iii

*Johnson v. District of Columbia*, 248 F.R.D. 46 (2008)....................................................... 24

*Kaempe v. Myers*, 367 F.3d 958 (D.C. Cir. 2004) ......................................................... 18

*Kimmel v. Peterson*, 565 F. Supp. 476 (E.D. Pa. 1983)............................................... 16

*Kmart Corp. v. Gator Feasterville Partners*, Civ. No. 13-345, 2013 WL 5309265
    (E.D. Pa. Sept. 20, 2013)....................................................................................... 38

*Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271 (D.C. Cir. 1994) ........................... 15, 16

*Kozup v. Georgetown Univ.*, 663 F. Supp. 1048 (D.D.C. 1987............................... 27

*LaCourt v. Specific Media, Inc.*, No. SACV 10-1256-GW (JCGx), 2011 WL
    1661532 (C.D. Cal. Apr. 28, 2011)....................................................................... 20

*Lewis v. Casey*, 518 U.S. 343 (1996) ....................................................................... 19

*Low v. LinkedIn Corp.*, 900 F. Supp. 2d 1010 (N.D. Cal. 2012) ............................. 20

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ........................................... 18, 19

*McLaughlin v. Anderson*, 962 F.2d 187 (2d Cir. 1992)............................................. 17

*McNair v. Synapse Group Inc.*, 672 F.3d 213 (3rd Cir. 2012) ................................ 24

*McQueen v. Woodstream Corp.*, 672 F. Supp. 2d 84 (D.D.C. 2009) ..................... 15, 32

*Morris v. Carter Global Lee, Inc.*, 997 F. Supp. 2d 27 (D.D.C. 2013) ...................... 30

*News World Commc'ns, Inc. v. Thompsen,* 878 A.2d 1218 (D.C. 2005) ................... 33

*Oregon St. Univ. Alumni Ass'n v. C.I.R.*, 193 F.3d 1098 (9th Cir. 1999)................... 27

*Paulin v. George Wash. Univ. Sch. of Med.*, 878 F. Supp. 2d 241 (D.D.C. 2012)...... 36

*Pencheng Si v. Laogai Research Foundation*, C.A. No. 09-cv-2388-KBJ, 2014
    WL 5446487 (Oct. 4, 2014 D.D.C.)................................................................ 13, 14

*Schiff v. American Ass'n of Retired Persons*, 697 A.2d 1193 (D.C. 1997) .......... 20, 31

*Schmidt v. U.S. Capitol Police Bd.*, 826 F. Supp. 2d 59 (D.D.C. 2011)..................... 14

*Sierra Club*, 77 T.C.M. (CCH) 1569, 1999 WL 153733 (Mar. 23, 1999).................. 27

*Sierra Club, Inc. v. Comm'r*, 86 F.3d 1526 (9th Cir. 1996) ...................................... 27

*Signature Tech. Solutions v. Incapsulate, LLC,* No. MC 13-0661 (RBW), 2014
    WL 3522589 at *6 (D.D.C. July 17, 2014) ........................................................ 31

*Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998)..................................... 14

*Stein v. Bank of Am. Corp.*, 887 F. Supp. 2d 126 (D.D.C. 2012) .............................. 14

*Stewart v. National Educ. Ass'n*, 471 F.3d 169 (D.C. Cir. 2006)............................... 13

*Todhunter, Mandava, & Assocs. v. I.C.C.I. (Holdings) Pty. Ltd.*, C.A. No. 88-
3031, 1991 WL 166585 (D.D.C. Aug. 14, 1991) .................................................. 39

*Trudeau v. FTC,* 456 F.3d 178 (D.C. Cir. 2006) .................................................. 13, 26

*Tsintolas Realty Co. v. Mendez*, 984 A.2d 181 (D.C. 2009) .................................... 36

*U.S. Ecology, Inc. v. U.S. Dep't of Interior,* 231 F.3d 20 (D.C. Cir. 2000) ................................. 14

*U.S. v. Universal Health Servs., Inc.*, No. 1:07CV00054, 2010 WL 2976080
(W.D. Va., July 28, 2010) .......................................................................... 38

*Vector Realty Grp., Inc. v. 711 Fourteenth St., Inc.*, 659 A.2d 230 (D.C. 1994) ........................ 36

*Virginia Academy of Clinical Psychologists v. Group Hospitalization and Med.
Servs., Inc.*, 878 A.2d 1226 (D.C. 2005) ......................................................... 32

*Wagshal v. Rigler*, 947 F. Supp. 10 (D.D.C. 1996) ............................................... 32

*Watts v. Jackson Hewitt Tax Service Inc.*, 579 F. Supp. 2d 334 (E.D.N.Y. 2008) ..................... 16

*Wexner v. First Manhattan Co.*, 902 F.2d 169 (2nd. Cir. 1990) .................................... 15

*White v. United States*, 601 F.3d 545 (6th Cir. 2010) ............................................ 19, 38

*Whitmore v. Ark.*, 495 U.S. 149 (1990) ............................................................ 18

*Wiggins v. Philip Morris, Inc.*, 853 F. Supp. 457 (D.D.C.1994) ................................. 39

*Witherspoon v. Philip Morris Inc.*, 964 F. Supp. 455 (D.D.C. 1997) ........................... 15

*Young v. Wells Fargo & Co.*, 671 F. Supp. 2d 1006 (S.D. Iowa 2009) ........................ 15

*Z Street,Inc. v. Koskinen*, C.A. No. 12-cv-0401-KBJ, 2014 WL 2195492 (May 27,
2014 D.D.C.) ........................................................................................ 13

## Other Authorities

D.C. Code § 28-3901 *et seq.* ................................................................ passim

D.C. Code § 28-3905 ............................................................... 25, 26, 27, 28

I.R.C. §§ 512 ............................................................................... 28

## Rules

Fed. R. Evid. 201 ............................................................................ 42

Fed. R. Evid. 401 ............................................................................ 42

Fed. R. Evid. 402 ............................................................................ 42

Fed.R.Civ.P. 12 ........................................................................ passim

Fed.R.Civ.P.9 ........................................................................... 15, 17

Defendants AARP Inc. ("AARP" or the "Association") and its wholly-owned subsidiary, AARP Services, Inc. ("ASI"), respectfully submit this memorandum of law in support of their renewed motion to dismiss the amended complaint of Ethel Austin-Spearman ("Amended Complaint") – with prejudice – because the plaintiff lacks Article III standing to bring these claims and the Amended Complaint again fails to state claims for which relief may be granted. This motion also asks that impertinent allegations be stricken from the Amended Complaint.

## INTRODUCTION

Plaintiff filed the original complaint on July 29, 2014 ("Original Complaint") claiming that AARP contradicted its own privacy policy by allowing Facebook and Adobe to collect personal information about the plaintiff when she visited AARP's website.  [Dkt. No. 1]  AARP and ASI moved to dismiss the Original Complaint on several grounds.  *See* Memorandum of Law in Support of Defendants' Motion to Dismiss, filed October 3, 2014 (the "Original Dismissal Motion").  [Dkt. No. 18-1]  In *lieu* of responding to that motion, plaintiff filed an Amended Complaint on October 24 under Fed. R. Civ. P. 15.  [Dkt. No. 23]

While the Amended Complaint applies an elaborate gloss to the prior pleading's allegations, the result is an even more attenuated narrative of disjointed liability theories, inapplicable generalities and speculative injuries that cannot withstand this motion to dismiss. Much of the Amended Complaint's narrative is seemingly based on "information and belief" guesswork culled from newspaper articles and political battles on the Hill.  While there are a number of current news items raising valid privacy concerns, this lawsuit involves none of them.

Plaintiff spends considerably less time talking about AARP's actual privacy policy.  In fact, both her Original Complaint and her Amended Complaint fail to acknowledge that AARP's privacy policy discloses the challenged practices.  The policy states that when services like Facebook and LinkedIn are used by AARP website visitors like the plaintiff, they may be sharing

information with their social networking sites.  *See infra* at 8-10.  AARP's privacy policy also directs website visitors to review policies of their social networking sites when using these services with AARP's website.  *See infra* at 10-11.  AARP's privacy policy discloses that it may share certain information with vendors (like Adobe) who perform certain website functions for the Association (like database management), and that commercially reasonable steps are taken to avoid further disclosures.  *See infra* at 8-11.

Despite these disclosures and without alleging that her own information was used in any way contrary to AARP's disclosures, plaintiff implausibly claims that she never would have agreed to pay full price in 2010 for an AARP membership if she had known that some of her information may be shared with Facebook or Adobe.  AARP's initial motion showed that plaintiff lacks Article III standing because she has no cognizable injuries to redress.  Original Dismissal Motion at 12-17.  The Amended Complaint fails to improve upon the original.  Speculation is offered about a reduction in the value of plaintiff's AARP membership, and free-floating anxiety about "privacy hazards," but these facts cannot support standing under well-settled law.  *See infra* at 19-24.  And as a former AARP member, Ms. Austin-Spearman lacks standing to seek prospective injunctive relief.  *See infra* at 24.

Ms. Austin-Spearman claims under the District of Columbia Consumer Protection Procedures Act, D.C. Code §§ 28-3901 *et seq*. (the "DCCPPA" or "Act") must also fail.  By its express terms, the DCCPPA does ***not*** apply to nonprofit membership and benefit disputes of this type.  The DCCPPA was enacted to protect consumers from unscrupulous merchants, but the Amended Complaint presents neither a consumer transaction nor a merchant.  *See infra* at 25-30.

Like the Original Complaint, the Amended Complaint fails to plead facts supporting timely fraud or breach of contract claims, even after a make-over of these allegations.  The

plaintiff pleads that she bought an AARP membership first, *then* reviewed AARP's website privacy policy.  Ms. Austin-Spearman could not possibly have relied on the challenged privacy policy when deciding to become a member of AARP.  Nor do the facts pled support a claim that plaintiff conferred any benefit upon AARP from the conduct alleged, let alone an unjust one.

It also remains evident that ASI is not a proper defendant.  The Original Complaint pled no transaction with ASI nor any part by ASI in the conduct alleged, a deficiency that cannot be cured by the Amended Complaint's unsupported "information and belief" allegations.

At bottom, plaintiff is concerned about how Facebook works, not AARP's website.  The challenged data sharing happens whenever a Facebook member like Ms. Austin-Spearman decides to "keep me logged in" and then visits other websites, or when she decides to use Facebook-branded logins and plugins at other websites to share things on her own Facebook homepage.  *See infra* at 5-12.  Likewise, the stated concerns about Adobe's data brokerage capabilities are better directed at Adobe, not AARP.  The Adobe vendor software that AARP allegedly uses to manage its own website – in precisely the manner disclosed by Section 5 of AARP's website – is not rendered suspect by plaintiff's blind speculation that AARP is also paying Adobe for additional data that Adobe captures elsewhere.  There is no allegation that Adobe uses information about AARP website visitors for its own purposes, and AARP already discloses that website visitor information may be shared with vendors who perform data management tasks.  *Id.*

The Amended Complaint's elaborate gloss does not take this case outside the scope of AARP's existing disclosures, and the revised pleading is now ripe for dismissal with prejudice.

### THE AMENDED COMPLAINT'S STATED FACTUAL BASIS

### AARP and ASI

AARP – one of the nation's leading consumer advocates – is a nonprofit membership organization for people age 50 and older, headquartered in the District of Columbia. Amended Complaint at ¶¶ 1, 17. AARP is dedicated to enhancing the quality of life for everyone as they age. *Id.* A vital component of the nonprofit advocacy cited in the Amended Complaint is AARP Foundation Litigation ("AFL"), which fights in court for consumer rights in age discrimination and employment, housing, voting rights, financial fraud, employee benefits and pensions, investor protection, health care, low-income benefits and a variety of other consumer protection arenas often overlooked by private class action lawyers. *See* "About Foundation Litigation," *available at* http://aarp.org/aarp-foundation/our-work/legal-advocacy/. AARP Legal Counsel for the Elderly ("LCE") also provides free legal services to vulnerable elderly residents of Washington, DC on issues such as consumer protection, housing and public benefits. In addition to vigorous legal advocacy, AARP members also benefit from legislative advocacy at both the federal and local level on issues such as protecting Social Security, Medicare and Medicaid, preventing excessive utility rate increases, and protecting seniors from predatory lenders. Members also receive AARP's bimonthly magazine, access to AARP website content, and discounts on certain third-party products and services. Amended Complaint at ¶ 1.

The Association owns a for-profit subsidiary, AARP Services, Inc. ("ASI"). *Id.* at ¶ 1. The Amended Complaint alleges "on information and belief" a series of statements that its drafters are guessing might be true: that AARP memberships are offered "through" ASI; (*Id.* at Introduction and ¶1); that ASI operates the AARP website at issue (*Id.*); that ASI sells advertising space on AARP's website (*Id.* at ¶ 18); that the Terms of Service and Privacy Policy governing use of AARP's website were "jointly drafted" by AARP and ASI (*Id.* at ¶ 33); and

that ASI "generates revenue through endorsement royalty payments from insurance companies using the AARP brand name to sell their products, membership dues, and advertising." *Id.* at ¶ 18. The Amended Complaint cites AARP's Consolidated Financial Statements and the AARP website's Terms of Service as support for some of this speculation. *Id.* at ¶¶ 1; 3 at n. 1; 18 n.3. But the cited materials make clear that ASI's operations are quite limited: ASI does not transact business with any AARP members. Rather, ASI receives fees from AARP to provide quality control services in connection with certain licensees of AARP intellectual property, as well as other membership and product development services. *See* AARP Consolidated Financial Statements, dated Dec. 31, 2013 and 2012 (**Ex. 1**; cited at Amended Complaint at ¶ 18 n.3). At no point does the consolidated financial statement suggest that ASI offers benefits directly to AARP members, or that it receives revenue from membership dues or advertising on AARP's website. AARP's Terms of Service state that its website is owned by AARP and operated "in part" by ASI, but the Amended Complaint's drafters identify no specific "information and belief" about which part of the website is operated by ASI and whether it is a relevant part to Ms. Austin-Spearman's claims.

### Plaintiff's Alleged Use of Facebook and AARP Websites

Plaintiff Austin-Spearman is a California resident and member of Facebook's social media network since 2007. Amended Complaint at ¶¶ 10, 71. Plaintiff frequently accesses her Facebook account and clicks the "Keep me logged in" button when signing in to her Facebook account. *Id.* ¶ 71. According to Facebook disclosures, when a Facebook member elects to "keep me logged in" to that social network, Facebook "receive[s] data whenever you visit a game, application, or website that uses Facebook Platform or visit a site with a Facebook feature (such as a social plugin), sometimes through cookies. This may include the date and time you visit the site; the web address, or URL, you're on; technical information about the IP address, browser

and the operating system you use; and, if you are logged in to Facebook, your [Facebook] User ID."   *See* Facebook Data Use Policy, *Other information we receive about you*, found at https://www.facebook.com/full_data_use_policy.[1]

In 2010, Ms. Austin-Spearman bought a three-year membership to AARP for $43. Amended Complaint at ¶¶ 72-74.   ***After*** purchasing her AARP membership, Ms. Austin-Spearman visited AARP's website to register for an online account.   Original Complaint at ¶ 57; Amended Complaint at ¶ 77.   She alleges that in the course of that registration, she read and accepted the Terms of Service and Privacy Policy governing her use of the site.   Amended Complaint at ¶¶ 77-80.   Based on the information provided by AARP's website Privacy Policy, and the fact that she had earlier paid for a three-year AARP membership, Ms. Austin-Spearman formed a belief that AARP would not allow her personally identifying information ("PII") to be collected by third parties without her permission.[2]

At some unstated point in time, Ms. Austin-Spearman became aware that by checking the box "keep me logged in" on her Facebook account, or by using a prominently-displayed, Facebook-branded "plugin" to log into AARP's website (*Id.* at ¶¶ 35-44, 71), Facebook captured (i) her Facebook ID as she browsed AARP's website; and (ii) the exact titles of written and video materials accessed and viewed, if any.   *Id.* at ¶ 45.   Plaintiff alleges that "serious privacy risks"

---

[1]     As established *infra* at 8-12 and 17-18, this additional factual material is essential to plaintiff's claims, part of the relevant disclosures pled by the Amended Complaint, and therefore proper for this Court's consideration on this renewed motion to dismiss.

[2]     While exploring the benefits of an AARP membership but before purchasing one, and before examining the AARP website's Terms of Service and Privacy Policy, Ms. Austin-Spearman supposedly formed a series of subjective beliefs and mental impressions about how she valued her personal privacy and expected AARP to do likewise by not allowing third parties to collect her PII.   These allegations are new to the Amended Complaint, at ¶¶ 72-73, 75-76.

are created when Facebook users remain logged in to their Facebook accounts or use Facebook-labeled plugins to visit and browse through content on AARP's website.  *Id.*

### AARP's Alleged Use of Adobe Software

Ms. Austin-Spearman also alleges that AARP's website is "using code developed by Adobe" to capture its user's PII.  *Id.* at ¶¶ 46-55.  The Amended Complaint alleges that the AARP website places a cookie named 'aarp.org' onto website visitors' computers and, if a visitor is an AARP member, the cookie is populated with PII that the member provided to AARP earlier, as stored on AARP's database.  *Id.* at ¶ 47.  The Amended Complaint depicts an AARP member navigating the AARP website while AARP retrieves the member's information from an aarp.org cookie – via Adobe's software – and transmits the member information to an Adobe server called "metrics.aarp.org."  *Id.* at ¶¶ 48-50.

The Amended Complaint goes beyond the Original Complaint's pleading by further alleging that the Adobe vendor service being used by AARP is called "Adobe Target," which allows AARP to target advertising to members visiting its own website and create "individualized profiles" about its own members based on that information.  *Id.* at ¶¶ 51-55.  The Amended Complaint alleges that in addition to the information AARP gleans from its own members via the aarp.org cookie, Adobe reports back to AARP with enhanced data on AARP members that Adobe apparently obtains "through its analytics service" to "determine which advertisements are shown to AARP members" on the AARP website.  *Id.* at ¶¶ 51-54 (portraying example of AARP website targeting a New York Life insurance product to an AARP member while visiting the AARP website).

The Amended Complaint does not allege that Adobe uses this information for its own purposes.  It only alleges that AARP's use of Adobe code and servers to collect and manage AARP member data constitutes a "privacy hazard" because "Adobe operates one of the largest

7

and most sought-after analytics service in the industry" and has "amassed an incredible volume of consumer data from numerous sources."   *Id.* at ¶ 60. Using Adobe's analytics service is allegedly a "privacy hazard" simply because that company has the hypothetical "ability" to track online consumer behavior and gain a "comprehensive view of a consumer's digital life," which Adobe supposedly commercializes through various licenses and analytic reports it sells to "its many customers."   *Id*. at ¶ 61.   But the Amended Complaint never alleges that AARP's use of Adobe vendor software contributes in any way to this process.

### AARP's Website Terms of Service and Privacy Policy Disclose When Information Is Shared with Certain Third Parties

While the Amended Complaint often strays into a general discussion about the data brokerage industry at-large and how AARP collects information about its own members to deliver targeted advertising to its own members on its own website, Ms. Austin-Spearman's claims are actually limited to whether and how AARP discloses that ***Facebook*** and ***Adobe*** are collecting information about AARP members from the website for their own purposes. Amended Complaint at Section V ("Plaintiff Austin-Spearman's PII Was Collected by Facebook and Adobe Without her Permission"); ¶ 81 ("[W]hen she used AARP's website AARP routinely permitted third parties Facebook and Adobe to collect her PII . . ..").

Like most websites that collect information from its users, AARP's website ([www.aarp.org](www.aarp.org)) contains "Terms of Service" that explain the terms on which AARP offers the website to visitors, and a "Privacy Policy" that explains the information collection and use practices associated with the website.   *Id.* at ¶¶ 26-32, 78.   As demonstrated by the registration link cited in the Amended Complaint, AARP's website Terms of Service and Privacy Policy apply to ***all*** site visitors who register – both paying AARP members and non-paying registrants.

*Id.* at ¶ 20 n.4 (citing "Sign Up for AARP.org," available at https://login.aarp.org/online-community/register/index.action).[3]

To register on the site, visitors must select a "checkbox" indicating that they have reviewed and agree to AARP's Terms of Service and Privacy Policy.  *Id.* at ¶¶ 23-25 and Fig. 1. Paragraphs 25-26 of the Amended Complaint incorporate by reference the AARP website Privacy Policy, and cite to a hyperlink for it:  http://www.aarp.org/about-aarp/info-05-2010/privacypolicy.html.  The Privacy Policy discloses the types of information that the AARP website collects from site visitors, ***including*** personally identifiable information.  *Id.* at ¶ 27 (citing Section 3 of the AARP website Privacy Policy).  It also discloses AARP's practices about information collected by third parties.  *Id.* at ¶ 28.  Although the Privacy Policy must be read as a whole, the Amended Complaint selects two sentences for "special attention" – two disclosures from Section 4 that (1) AARP allows certain third parties to collect "nonpersonally identifiable information" from its website, and (2) presents a hyperlink for opting-out of the "customization of advertising from many ad networks."  *Id.* at ¶ 29.

Section 5 of the cited AARP website Privacy Policy – entitled "With Whom We Share Your Information" – alerts website visitors that when they access a service offered by certain service providers (liked LinkedIn and Facebook), they may be sharing information with both

---

[3]     Any visitor can register for a free account on the AARP website by clicking the "Register" button at the top of the AARP.org website.  *See*  AARP.org, https://login.aarp.org/online-community/register/index.action?request_locale=en   (Amended Complaint at ¶ 18 n.4).  Registering for a free online account allows users to access a wide array of content on the AARP website, such as "Daily News Alert, Webletter, discount alerts, topical newsletters, [and] local event updates."  *Id.*  To register for a free online account, users must review and agree to AARP's Terms of Service and Privacy Policy by clicking a check-box labeled "Yes, I agree to AARP's Terms of Service and Privacy Policy," which contains hyperlinks to the AARP website Terms of Service and Privacy Policy.

AARP and the service provider with whom they have registered, and refers users to the privacy

policies of those service providers:

> **Service Providers.** Service Providers are third parties with whom we may work
> to offer a service or feature, such as LinkedIn. You can tell when you are
> accessing a service offered by a Service Provider because the Service Provider's
> name will be featured prominently. You may be asked to provide information
> about yourself to register for a service offered by a Service Provider.  In doing so,
> you may be providing your information to both us and the Service Provider, or we
> may share your information with the Service Provider. Please note that the
> Service Provider's privacy policy may apply to its use of your information.

*See* AARP, "Our Privacy Policy, Your Privacy Rights – With Whom We Share Your

Information" *available   at*   http://www.aarp.org/about-aarp/info-05-2010/privacypolicy.html

(emphasis added).  *See also* Amended Complaint at ¶ 26.

Section 5 of the AARP website Privacy Policy also alerts users that AARP shares user

PII with vendors who provide administrative functions to AARP:

> **Approved Vendors.** We may share your information including your personally
> identifiable information with companies we hire to provide certain administrative
> services such as processing address labels, managing databases and sending
> mailings.

*Id.*  And in the following section of AARP's website Privacy Policy – entitled "How We Keep

Your Information Secure" – AARP advises website users that the AARP "uses commercially

reasonable physical, procedural and technological security measures to help prevent

unauthorized access to and improper use of the information we collect about you."  *Id.* at Section

6, *available at* http://www.aarp.org/about-aarp/info-05-2010/privacypolicy.html.

Sections 5 and 6 of the Privacy Policy alert AARP website users that (1) by using another

service provider's site, the user may be sharing information with both AARP and that provider;

(2) users can tell when they are accessing a service provider's site because the provider's name

will be featured prominently – as depicted by the Amended Complaint at ¶ 36 fig. 4 (displaying

prominently-branded Facebook login and plugin); (3) users should consult service provider's

privacy policies to learn more about the information that these providers may acquire under those circumstances; and (4) AARP shares users' PII with vendors employed by AARP to provide certain administrative functions – like database management – and that security measures are maintained to prevent unauthorized access and improper use of such information.  With regard to Service Providers, the Privacy Policy notes that the name of a third party Service Provider will be "featured prominently," that users may have to provide information to register for a service offered by a Service Provider, and that this information may be shared with the Service Provider, where it would be governed by the Service Provider's privacy policy.  *Id.*[4]

### How the AARP Website Interacts With Facebook and Adobe

AARP uses a publicly-available software development kit ("SDK") that adds Facebook-related features to its own website, enabling the two sites to interact based on whether a Facebook member chooses to "keep me logged in" on Facebook or uses Facebook–labelled logins or plugins.  Amended Complaint at ¶ 35.  "Facebook Login" lets Facebook members log on to the AARP website using their Facebook credentials, and a "Facebook Social Plugin" lets aarp.org visitors use Facebook-branded "Like," "Share," or "Comment" functions to post AARP website materials onto their own Facebook homepages.  *Id.*

As the Amended Complaint acknowledges, webpages using these Facebook SDK tools also prominently display Facebook-branded graphics to alert users to their availability.  *Id.* at ¶ 36 figs. 4 & 5.  Plaintiff alleges that Facebook's SDK code "attempts to force the visitor's web browser to look for certain cookies on their computer," and specifically for a Facebook "c_user" cookie that contains the user's Facebook ID.  *Id.* at ¶¶ 38-41.  The Amended Complaint

---

[4]        The Amended Complaint maintains willful blindness about Sections 5 and 6 of AARP's Privacy Policy, even though these provisions apply directly to the challenged conduct and AARP's initial motion addressed these provisions at length.  *See* Original Dismissal Motion at 6-8 [Dkt. No. 18-1]

emphasizes that when a Facebook member checks the box "Keep me logged in" on her Facebook login screen – as the plaintiff Ms. Austin-Spearman does – Facebook's "c_user" cookie remains on the computer regardless of whether that user closes her web browser.  *Id.* at ¶ 40.  When a Facebook user elects to "keep me logged in" to her Facebook account, or uses a Facebook login to visit AARP's website, the Facebook member who takes those actions may share information about her aarp.org web visit with Facebook.  *Id.* at ¶ 41.

Section 5 of AARP's website Privacy Policy describes features of this type – telling users that these services share information with both AARP and the provider, while directing users to consult privacy policies of the service provider for more information.  *See supra* at 9-11. Plaintiff acknowledges that AARP's website prominently displays Facebook-labelled features with the Facebook login and plugin services.  *See* Amended Complaint at ¶ 42 figs. 7 and 8.

The Amended Complaint also pleads that aarp.org is using Adobe as a vendor to manage information that AARP gathers from its own website visitors and to present these same visitors with targeted ads on the AARP website.  *Id.* at ¶¶ 46-55.  Plaintiff alleges that AARP is using an Adobe service called "Adobe Target" to provide this function.  *Id.* at ¶ 51 and n.13 and 14.  The "analytics code libraries" described in the Amended Complaint's footnote 12 are used by organizations to analyze visitor traffic to their ***own*** websites.  This collection practice and vendor arrangement are disclosed by Sections 3 and 5 of the Privacy Policy on which plaintiff bases her claims.  *See supra* at 8-11.  Section 3 discloses that AARP collects PII from visitors to its own website, and Section 5 advises that vendors are contractually retained by AARP to perform "certain administrative services" for the Association, and vendors may receive PII in that capacity.  The Privacy Policy's Section 6 assures users that adequate measures are taken by AARP to assure the privacy and security of such information.

**ARGUMENT**

AARP moves to dismiss the Amended Complaint pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction, and pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted.  The Original Complaint's defects were foundational, not mere oversights curable by edits to a re-draft.  These foundational defects remain, despite the drafters' attempts to plead over and around them.

**I.    PLAINTIFF MUST ESTABLISH ARTICLE III STANDING, AND HER CLAIMS ARE SUBJECT TO RULE 9(B)'s HEIGHTENED PLEADING STANDARD**

In this case where an amended complaint has been filed in response to a dismissal motion, the pleading standards deserve careful consideration and more than a passing nod.  For both the 12(b)(1) and 12(b)(6) challenges presented, dismissal is appropriate assuming the truth of only well-pled facts pled and the Court need not accept the Amended Complaint's copious legal conclusions "couched as a factual allegation," nor inferences unsupported by facts and documents pled.  *See Stewart v. National Educ. Ass'n*, 471 F.3d 169, 173 (D.C. Cir. 2006); *Trudeau v. FTC,* 456 F.3d 178, 193 (D.C. Cir. 2006); *Pencheng Si v. Laogai Research Foundation*, C.A. No. 09-cv-2388-KBJ, 2014 WL 5446487 at *6 (Oct. 4, 2014 D.D.C.); *Z Street, Inc. v. Koskinen*, C.A. No. 12-cv-0401-KBJ, 2014 WL 2195492 at *3 (May 27, 2014 D.D.C.) ("The Court need not accept factual inferences drawn by plaintiffs if those inferences are not supported by facts alleged in the complaint.").

**A.    Plaintiff's Burden to Establish Standing Cannot Be Met by Guesswork.**

Plaintiff bears the burden of establishing standing and Article III jurisdiction on this motion.  *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1148 (2013) ("The party invoking federal jurisdiction bears the burden of establishing standing"); *U.S. Ecology, Inc. v. U.S. Dep't*

*of Interior,* 231 F.3d 20, 24 (D.C. Cir. 2000) (same); *Stein v. Bank of Am. Corp.*, 887 F. Supp. 2d

126, 129 (D.D.C. 2012) (same).   If the Amended Complaint does not establish plaintiff's

standing, this Court must dismiss for lack of subject matter jurisdiction under Article III.   *See*

*Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101-02 (1998); *Fontaine v. Bank of*

*America, N.A.*, C.A. No. 13-cv-1638-KBJ, 2014 WL 1999532 at *1 (May 16, 2014 D.D.C.),

*citing Schmidt v. U.S. Capitol Police Bd.*, 826 F. Supp. 2d 59, 64 (D.D.C. 2011) (district court

"must first examine [a] Rule 12(b)(1) challenge[]" because "if it must dismiss the complaint for

lack of subject[-]matter jurisdiction, the accompanying defenses and objections become moot

and do not need to be determined.")

The Amended Complaint's factual allegations "bear closer scrutiny" in a 12(b)(1)

motion, and "the court need not limit itself to the allegations of the complaint."  *Grand Lodge of*

*Fraternal Order of Police v. Ashcroft*, 185 F. Supp. 2d 9, 14 (D.D.C. 2001); *Stein*, 887 F. Supp.

2d at 129 (the Court may consider materials outside the pleadings, as it deems appropriate, to

resolve the jurisdictional challenge).   Under Rule 12(b)(1), it is presumed that a cause lies

outside the federal court's limited jurisdiction, unless the plaintiff establishes by a preponderance

of evidence that this Court possesses jurisdiction.  *Fontaine*, 2014 WL 1999532 at *2.

The Amended Complaint fails to meet the Rule 12(b)(1) pleading standard because

plaintiff has no cognizable injury-in-fact to plead.  *See infra* at 19-24.

### B.    "Information and Belief" Speculation Fails to Satisfy Rule 9(b) Pleading.

The Amended Complaint sounds in fraud, and therefore must satisfy the heightened

pleading standards of Rule 9(b).  Fed. R. Civ. P. 9(b).  Rule 9(b) requires that all averments of

fraud must "state with particularity the circumstances constituting fraud" and, at a minimum, the

pleader must "state the time, place and content of the false misrepresentations, the fact

misrepresented, and what was retained or given up as a consequence of the fraud."  *Pencheng Si*,

2014 WL 5446487 at *6-*7 (citations omitted).  This heightened pleading bar applies to the entirety of this plaintiff's claims, not just the two claims labelled "fraud."  *In re U.S. Office Products Sec. Litig.*, 326 F. Supp. 2d 68, 81 (D.D.C. 2004) (Rule 9 particularity requirement applies to claims that "sound in fraud"); *Witherspoon v. Philip Morris Inc.*, 964 F. Supp. 455, 463-64 (D.D.C. 1997) (claims under the DCCPPA for misrepresentation "must be pleaded with particularity because they are akin to allegations of fraud.") (citation omitted).

Rule 9(b) particularity is absent here.  The Amended Complaint gropes after a fraud claim by alleging that AARP either omitted or misrepresented material facts about whether or how Facebook and Adobe were collecting user information on AARP's website, but this elaborate narrative is never placed in context or time.  Ms. Austin-Spearman purchased her AARP membership "in late 2010."  Amended Complaint at ¶ 72.  But after two attempts in the Original Complaint and now the Amended Complaint, plaintiff never alleges when the challenged Facebook and Adobe data collection commenced.

"Information and belief" pleading ***cannot*** satisfy Rule 9(b)'s heightened pleading standard.  *Antoine v. U.S. Bank Nat. Ass'n.*, 547 F. Supp. 2d 30, 36 (D.D.C. 2008) ("a pleading subject to Rule 9(b) scrutiny may not rest on information and belief"), *citing Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1279 n. 3 (D.C. Cir. 1994).[5]  Yet here, the Amended Complaint

---

[5]  It is widely accepted that pleading fraud upon "information and belief" cannot satisfy Rule 9(b).  *See, e.g., Chelsea Condominium Unit Owners Ass'n v. 1815 A. St., Condominium Group, LLC*, 468 F. Supp. 2d 136, 146 (D.D.C. 2007) (fraud claim may not rest on information and belief, but must include allegation that necessary information lies within opponent's control, accompanied by statement of facts on which pleader bases his claim); *McQueen v. Woodstream Corp.*, 244 F.R.D. 26, 34 (D.D.C. 2007)  (same); *Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2nd. Cir. 1990) (complaint alleging fraud elements based on information and belief did not set forth with sufficient particularity the facts of the allegedly corrupt bargain); *Hayduk v. Lanna*, 775 F.2d 441, 444 (1st Cir. 1985) (allegations of fraud cannot be based on information and belief without supporting facts on which belief is founded); *Young v. Wells Fargo & Co.*, 671 F. Supp. 2d 1006, 1032 (S.D. Iowa 2009) (allegations of fraud pled on information and belief usually will

concedes at the outset that its allegations are entirely based on "information and belief" except as to the plaintiff's own acts and experiences.   Amended Complaint at 1.   At vital junctures throughout the pleading, plaintiff simply guesses at key fraud elements with "information and belief" speculation.[6]

Of particular application here, this Court has emphasized that Rule 9(b)'s heightened pleading standard "aims to prevent a claim filed as a 'pretext for the discovery of unknown wrongs.'"  *Antoine*, 547 F. Supp. 2d at 35, *citing Kowal*, 16 F.3d at 1279 n.3.

## C.   *Twombly* and *Iqbal* Bar the Amended Complaint's "Puzzle Piece" Pleading.

Beyond its failure to meet Rule 9(b)'s heightened pleading standard, the Amended Complaint fails to set forth "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  To be "plausible on its face," the complaint must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* at 678 (quoting *Twombly*, 550 U.S. at 556).  But it does not suffice to plead facts in conclusory terms.  *Twombly*, 550 U.S. at 570.  As the Supreme Court

---

not satisfy the particularity requirement); *Watts v. Jackson Hewitt Tax Service Inc.*, 579 F. Supp. 2d 334, 351 (E.D.N.Y. 2008) (same); *County of Santa Clara v. Astra U.S., Inc.*, 428 F. Supp. 2d 1029, 1036 (N.D. Cal. 2006) (allegations of fraud based on information and belief do not satisfy Rule 9(b)'s particularity requirement unless accompanied by a statement of the *specific* facts on which the belief is founded); *City of New York v. Cyco.Net, Inc.*, 383 F. Supp. 2d 526, 539 (S.D.N.Y. 2005) (allegations of fraud may not be based upon information and belief); *Comwest, Inc. v. American Operator Services, Inc.*, 765 F. Supp. 1467, 1470-72 (C.D.Cal. 1991)  (fraud allegations based "upon information and belief" did not satisfy Rule 9(b) where complaint was utterly devoid of specific facts from which adverse inference of fraud could be drawn.); *Kimmel v. Peterson*, 565 F. Supp. 476, 482 (E.D. Pa. 1983) ("information and belief" allegations do not satisfy specificity requirements of the rule governing fraud pleading).

[6]      For example, the Amended Complaint alleges on "information and belief" that AARP receives financial benefits from the challenged third party collection of member PII (Amended Complaint at ¶ 5); that ASI sells advertising on the AARP website (*Id.* at ¶ 18); and that ASI jointly drafted the website's Privacy Policy and Terms of Service with AARP (*Id.* at ¶ 33). These allegations are mere guesswork.

has emphasized, "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not [survive a motion to dismiss]," and "courts are ***not*** bound to accept as true a legal conclusion couched as a factual allegation." *Id.* at 555. (internal citation omitted) (emphasis added); *Hoyte v. YUM! Brands, Inc.*, 489 F. Supp. 2d 24, 27 (D.D.C. 2007) (while a court accepts well-pleaded factual allegations as true on a Rule 12(b)(6) motion to dismiss, unwarranted conclusions and inferences need not be accepted).

Nor does it suffice to plead speculation about what might be happening behind the scenes – "factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Neither Rule 8 nor Rule 9 pleading "unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 129 S.Ct. at 1950. Under *Twombly* and *Iqbal*, merely pleading a possibility of recovery is not enough.

The Amended Complaint's "shotgun" or "puzzle piece" style – with a swirl of impenetrable allegations vying to prop up alternative liability and injury theories – also violates Rule 8 and 9 pleading standards. *See McLaughlin v. Anderson*, 962 F.2d 187, 191 (2d Cir. 1992) (claims cannot be assembled by "cobbling together plainly inconsistent allegations of fraud."); *In re Alamosa Holdings, Inc.,* 382 F. Supp. 2d 832, 857-58 (N.D. Tex. 2005) ("[A]ssembling puzzles is not the duty of the Court" but, rather, it is "the parties' burden to present succinct pleadings which clearly lay out the elements . . . ."); *In re Petsmart, Inc. Secs. Litig.*, 61 F. Supp. 2d 982, 991 (D. Ariz. 1999); *In re Metropolitan Secs. Litig.*, 532 F. Supp. 2d 1260, 1279 (E.D. Wa. 2007).

### D.   Documents Incorporated by the Amended Complaint Refute its Claims.

Under Rule 12(b)(6), the Court may consider "documents referenced in the complaint or central to the plaintiff's claim" without converting this motion to one for summary judgment. *Baird v. Snowbarger*, 744 F. Supp. 2d 279, 287 n.2 (D.D.C. 2010). The Amended Complaint's

drafters incorporate and rely on AARP's website Privacy Policy and Terms of Service, so this Court may consider these materials (and not just plaintiff's cherry-picked quotations) when considering this motion. *Twombly*, 550 U.S. at 568 n.13. The Amended Complaint's narrative is ***not*** entitled to be taken as true when the documents cited in support actually refute the allegations. *Kaempe v. Myers*, 367 F.3d 958, 963-65 (D.C. Cir. 2004) (dismissing claim where the complaint's cited documents contradict its allegations, because courts need not "accept as true the complaint's factual allegations insofar as they contradict exhibits to the complaint or matters subject to judicial notice").

The Amended Complaint cites to and relies upon AARP's Terms of Service, Privacy Policy, and a number of other documents necessary to plaintiff's claims. The totality of these materials – not just the snippets quoted in the Amended Complaint's narrative – are reviewable on this motion to dismiss. And where the actual language of AARP's Privacy Policy, Terms of Service or another cited reference contradicts the Amended Complaint's narrative, it is the original source material that controls – not the pleading's spin.

## II.     MS. AUSTIN-SPEARMAN LACKS ARTICLE III STANDING

To satisfy standing under Article III, Ms. Austin-Spearman must allege (1) injury-in-fact, that is (2) "fairly traceable to the defendant's allegedly unlawful conduct," and (3) "likely to be redressed by the requested relief," for each claim she seeks to press. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342, 352 (2006). Injury-in-fact is an injury "distinct and palpable" as opposed to "***merely abstract***," and the alleged harm "must be actual or imminent, not '***conjectural***' or '***hypothetical***.'" *Whitmore v. Ark.*, 495 U.S. 149, 155 (1990) (emphasis added). Only future harm that is "imminent" and "certainly impending" can constitute injury in fact. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 564 n.2 (1992). Moreover, in a putative class

18

action, the named plaintiff must establish her personal standing or she may not seek relief on behalf of the class. *Lewis v. Casey*, 518 U.S. 343, 357 (1996). "[P]laintiffs must allege facts that give rise to a plausible claim of...standing," under *Twombly* and *Iqbal*. *Cornerstone Christian Schs. v. Univ. Interscholastic League*, 563 F.3d 127, 133-134 (5th Cir. 2009); *White v. United States*, 601 F.3d 545, 551-552 (6th Cir. 2010) (applying *Iqbal* plausibility standard to standing on a motion to dismiss); *Lujan*, 504 U.S. at 561 (each of the elements for standing "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation").

### A.      Plaintiff Suffered No Cognizable Injury to Establish Article III Standing

For at least three reasons, plaintiff cannot show that AARP's alleged data-sharing with Facebook and Adobe resulted in legally-cognizable harm to her. *First*, under well-settled case law, an individual's PII has no compensable economic value and the collection or sharing of an individual's personal information does not typically constitute a loss to that individual. *Second,* Ms. Austin-Spearman alleges that she overpaid for her AARP membership, but cannot cogently allege how the data-sharing affects the value of her AARP membership. She cannot plausibly allege that she did not receive all of the AARP membership benefits that she bargained for, and because the challenged Privacy Policy applies equally to non-paying website visitors, it can create no economic benefit for members. *Third*, the Original Complaint alleged that Ms. Austin-Spearman purchased her three-year AARP membership ***before*** she reviewed AARP's privacy policy (Original Complaint at ¶¶ 56-57), and the Amended Complaint does not and cannot contradict that chain of events. *Cf.* Amended Complaint at ¶ 77 ("After paying for membership, Austin-Spearman was directed to create and register her online AARP account. Before registering, Austin-Spearman – as she always does when signing up for online service – viewed

and agreed to AARP's Terms of Service and Privacy Policy and the representations and obligations listed therein.").[7]

There is simply no basis to find that Ms. Austin-Spearman has standing to bring these claims. The Amended Complaint alleges "privacy hazards" arising from the challenged practices, and speculates about what Facebook and Adobe "might do" with Ms. Austin-Spearman's PII. *See e.g.* Amended Complaint at ¶¶ 56-65. But speculation of this sort pleads no actual or certainly impending injury to Ms. Austin-Spearman from the conduct alleged.

1. ***No Economic Injury*:** Despite the Amended Complaint's elaborate attempts to avoid adverse precedents, federal courts routinely hold that an individual's PII has no compensable economic value, and that the collection or sharing of an individual's personal information does not constitute a loss to that individual sufficient to establish Article III injury and standing. *See, e.g., Low v. LinkedIn Corp.*, 900 F. Supp. 2d 1010, 1028-29 (N.D. Cal. 2012) (personal information has no independent economic value and the unauthorized collection of personal information does not create an economic loss); *In re iPhone Application Litig.*, No. 5:11-md-02250-LHK, 2011 WL 4403963, at *6 (N.D. Cal. Sept. 20, 2011) (dismissing claims under Article III because no harm resulted from the alleged collection and tracking of plaintiffs' personal information); *LaCourt v. Specific Media, Inc.*, No. SACV 10-1256-GW (JCGx), 2011 WL 1661532, at *4-5 (C.D. Cal. Apr. 28, 2011) (dismissing claims under Article III because no injury resulted from alleged sharing of PII obtained using Adobe Flash); *In re JetBlue Airways*

---

[7]      Because the plaintiff never saw AARP's Privacy Policy before buying her membership (*see* Original Dismissal Motion at 15-16), the Amended Complaint attempts to substitute the subjective and unstated "expectations" of the plaintiff about what AARP's privacy policy would or should be. *See e.g.* Amended Complaint at ¶¶ 66-70. Speculative allegations of this type fail to plead injury. *Schiff v. American Ass'n of Retired Persons*, 697 A.2d 1193, 1198 (D.C. 1997) (no cause of action arises where plaintiff "believes in good faith" that she is getting lowest possible price unless defendant represented that it provides the lowest price).

*Corp. Privacy Litig.*, 379 F. Supp. 2d 299, 327 (E.D.N.Y. 2005) (There is "no support for the proposition that an [individual's] personal information has or had any compensable value in the economy at large."); *In re Doubleclick, Inc. Privacy Litig.*, 154 F. Supp. 2d 497, 525 (S.D.N.Y. 2001) (unauthorized collection of PII using "cookies" results in no economic loss); *In re Google, Inc.Privacy Policy Litig.*, No. 5:12-CV-01382-PSG, 2014 WL 3707508, at *5-6 (N.D. Cal. July 21, 2014) (unauthorized disclosure of plaintiff's data in and of itself did not confer standing).

The Amended Complaint's re-draft cannot escape these case authorities and the revised pleading alleges no economic harm flowing from the data-sharing alleged.  Section III of the pleading is devoted to "Privacy Hazards" that allegedly arise from the challenged conduct.  The drafters speculate about Facebook's "abilities" to commercialize its own user data, while catastrophizing about what Adobe has the "ability" to do with consumer data it amasses.  Amended Complaint at ¶¶ 56-65.  But speculation about "privacy hazards" is insufficient to establish Article III injury and standing.

Most of plaintiff's injury narrative is culled from articles on the internet, but much is lost in translation.  For example, the Amended Complaint misrepresents a Senate staffer's report as a "recent FTC report" about the data broker industry.  Amended Complaint at ¶ 62 and n.20 (citing Senate staff report prepared for Sen. Rockefeller).  Plaintiff can allege no facts that her own PII has been brokered by Facebook, Adobe, or any other supposedly "unauthorized" party.  Bloviating about how data brokers might use personal information to prey on consumers in various categories adds nothing to plaintiff's amended claims.  The Amended Complaint's speculation is unfit for consideration in opposition to this motion, and provides no basis of support for the Amended Complaint.  *Twombly*, 550 U.S. at 555 ("factual allegations must be enough to raise a right to relief above the speculative level").

2.      ___No Membership Bargain Is Implicated___:  Plaintiff attempts to avoid the well-settled law that PII has no independent economic value by alleging that she suffered a loss in the original AARP membership bargain:  that she "paid for, but never received, the valuable privacy protection to which she was entitled, and which would have made her AARP membership significantly more useful to her."  Amended Complaint at ¶¶73-76;  80-85.   Several incurable defects bar this convoluted injury claim.   Plaintiff does not allege that she was denied any membership benefit or service for which she paid when purchasing her AARP membership.   Nor can Ms. Austin-Spearman plausibly contend that some indeterminate part of her $43 membership dues went toward PII protection, because such a claim is too speculative to support standing.

This same speculative injury theory has already been rejected in this judicial district.  *See In re Science Applications International Corp. (SAIC) Backup Tape Data Theft Litig.*, Misc. Action No. 12-347 (JEB), MDL No. 2360, 2014 WL 1858458, *10 (D.D.C. May 9, 2014) (finding no standing where plaintiffs alleged that their insurance premiums were devalued when the personal information they shared with the insurance company was obtained by third parties).

Significantly, non-paying registrants to AARP's website are also subject to the same Privacy Policy and Terms of Service.  *See supra* at 8-9.  It is therefore impossible for plaintiff to plead facts supporting her assertion that the market value of an AARP membership was somehow less than what she paid by virtue of the challenged data sharing.  This same injury theory was presented and rejected by the Northern District of California in *In re LinkedIn Privacy Litig.*, 932 F. Supp. 2d 1089 (N.D. Cal. 2013).  In that case, plaintiffs claimed they suffered injury because the value of their premium memberships were reduced by defendant's data sharing practices.  In exchange for the fees they paid for premium memberships, plaintiffs claimed that LinkedIn promised to provide heightened data protection, among other things.  The

Northern District of California rejected this injury theory because LinkedIn's privacy policy was the same for non-paying website visitors, so the bargain for a paying membership could not have included heightened data protection. That court held the first amended complaint "does not sufficiently demonstrate that included in Plaintiffs' bargain for premium membership was the promise of a particular (or greater) level of security that was not part of the free membership." *Id.* at 1093.[8]

As a matter of law, Ms. Austin-Spearman is unable to plead facts demonstrating any loss or diminution to the value of her AARP membership resulting from the conduct alleged.

**3.** ***Reverse Chronology***: Even if a "bargained-for exchange" theory of injury were cognizable in this Court, Ms. Austin-Spearman already pled herself out of it. The Amended Complaint alleges she reviewed the Privacy Policy for the first time when she signed up for an online account ***after*** purchasing her AARP membership. Amended Complaint at ¶ 77. As a result, the terms of the Privacy Policy could not possibly have factored in to the value of her AARP membership (even her subjective belief of the value) when she purchased it.

Ms. Austin-Spearman's pluperfect subjunctive claim that had she known AARP would not honor its privacy policy, she would have paid less for her membership or not purchased it at all (Amended Complaint at ¶¶ 82-84), fails the *Iqbal/Twombly* plausibility test. *See Twombly*, 550 U.S. at 557-58. The Complaint fails to plausibly allege that AARP members either bargained for data-sharing protections or that plaintiff lost some bargained-for membership value

---

[8] The same Chicago firm representing Ms. Austin-Spearman in this action – Edelson PC – represented plaintiffs in the *LinkedIn* litigation. Ultimately, plaintiff's Article III standing was established in the *LinkedIn* case on grounds foreclosed to this plaintiff: the *LinkedIn* plaintiff alleged she had reviewed and relied on the challenged representations in making her decision to purchase a premium subscription. *In re LinkedIn User Privacy Litig.*, Case No. 5:12-CV-03088-EJD (March 28, 2014) 2014 WL 1323713 at *6. Ms. Austin-Spearman cannot make that claim here. Amended Complaint at ¶ 77 (plaintiff reviewed AARP website's Privacy Policy and Terms of Service ***after*** purchasing membership).

as a result of the challenged conduct.   Ms. Austin-Spearman cannot allege injury to support Article III standing.

### B.      As Former AARP Member, Plaintiff Lacks Standing for Injunctive Relief

Plaintiff seeks an injunction requiring AARP to "immediately stop the unlawful practices described in the Complaint."   Amended Complaint at ¶ 109, Prayer for Relief ¶ C.   The Amended Complaint also emphasizes that plaintiff is no longer an AARP member and is most unlikely to become one in the future.  Amended Complaint at ¶ 86.  As a former AARP member, Ms. Austin-Spearman lacks standing to pursue prospective injunctive relief for herself or a class. To have standing for injunctive relief, a plaintiff must show a likelihood that she will be injured in the future by the conduct alleged, and the threat of injury must be real and immediate, not conjectural or hypothetical.  *Johnson v. District of Columbia*, 248 F.R.D. 46, 56 (D.D.C. 2008) (in order to meet the constitutional minimum of standing to seek injunctive relief, plaintiffs "cannot simply rely on past injury to show standing," but must "show a likelihood that they will be injured in the future."); s*ee also McNair v. Synapse Group Inc.*, 672 F.3d 213, 222-226 (3rd Cir. 2012) (because named plaintiffs in putative class action are former customers of the defendant, and have wholly conjectural claims about future injuries, they lack Article III standing to pursue injunctive relief under state consumer fraud statutes).

As a former AARP member, Ms. Austin-Spearman cannot meet a "real and immediate" likelihood of injury test, and therefore lacks Article III standing to pursue injunctive relief here.

## III.    DCCPPA DOES NOT APPLY TO AARP ON THE FACTS ALLEGED

The Amended Complaint's DCCPPA claim (Count I at Amended Complaint at ¶¶ 95-109) fails as a matter of law for many reasons.  The DCCPPA is a consumer protection statute aimed at curbing consumer fraud by merchants selling goods and services within the District of Columbia.  By its express terms, the statute does not apply to membership activity in nonprofit

associations like AARP.   D.C. Code § 28-3905(k)(5).   Nor is AARP a "merchant" under the

DCCPPA.   Throughout the Amended Complaint, Ms. Austin-Spearman never participates in a

consumer transaction with AARP or ASI.   Her DCCPPA claim must therefore fail.

> **A.    DCCPPA Expressly Bars Plaintiff's Claims Because AARP Is a Nonprofit Organization that Did Not Sell Separate Goods or Services to Plaintiff.**

The DCCPPA, as amended in 2007, sharply curtails application of the Act to nonprofit

organizations.   The Act expressly provides that suits against a "nonprofit organization shall not

be based on membership in such organization, membership services, training or credentialing

activities, sale of publications of the nonprofit organization, medical or legal malpractice, or any

other transaction, interaction or dispute not arising from the purchase or sale of consumer goods

or services in the ordinary course of business."   D.C. Code § 28-3905(k)(5).   The only

circumstances under which nonprofits like AARP might be subject to a private DCCPPA suit are

for sales of goods or services *apart* from those incidental to membership.   D.C. Code § 28-

3905(k)(5); s*ee In re APA Assessment Fee Litig.*, 862 F. Supp. 2d 1, 14 (D.D.C. 2012), *aff'd in*

*relevant part and reversed on other grounds*, 766 F.3d 39 (D.C. Cir. 2014) (observing that

DCCPPA exempts claims clearly based on membership in nonprofit organization).

AARP cannot be sued under the DCCPPA for disputes like Ms. Austin-Spearman's,

which arise out of a membership transaction and its attendant benefits.   In 2007, the DCCPPA

was amended to capture situations where nonprofits sell things to members, but the amendment

expressly retained the important exemption for membership services on which Ms. Austin-

Spearman's liability, injury and damages claims are based.   Even under the 2007 amendments

plaintiff's DCCPPA claims are barred.

All of Ms. Austin-Spearman's claims relate to her membership relationship with AARP. She pleads no other "purchase or sale of consumer goods or services in the ordinary course of business" from AARP or ASI.   D.C. Code § 28-3905(k)(5).   For these reasons, plaintiff's DCCPPA claim is barred by § 28-3905(k)(5) as a matter of law, and cannot avoid dismissal with prejudice.

### 1.   AARP is a Non-Profit Organization

As the Complaint acknowledges, AARP is a nonprofit organization within the meaning of the DCCPPA.   Amended Complaint at ¶¶ 17-18; D.C. Code § 28-3901(a)(14) (defining "nonprofit organization" as "a person who: A) is not an individual; and B) is neither organized nor operating, in whole or in significant part, for profit.").   In a seeming attempt to circumvent the § 28-3905(k)(5) nonprofit exemption, the Amended Complaint alleges that AARP's wholly-owned subsidiary ASI engages in "product development with various third parties," and "generates revenues through endorsement royalty payments from insurance companies using the AARP brand name to sell their products, membership dues, and advertising."   Amended Complaint at ¶ 18.   But Ms. Austin-Spearman nowhere alleges that *she* transacted any business with ASI, nor that ASI's conduct somehow transforms AARP into a for-profit entity or otherwise negates AARP's *bona fides* as a nonprofit organization.[9]

---

[9]     Plaintiff's unsupported and conclusory allegation that "AARP offers its members such benefits through its wholly owned, for-profit subsidiary, Defendant AARP Services, Inc." is insufficient to vitiate AARP's status as a nonprofit organization under the DCCPPA.   Amended Complaint at ¶ 1; *see Twombly*, 550 U.S. at 555-56 ("Courts 'are not bound to accept as true a legal conclusion couched as a factual allegation'"); *Trudeau*, 456 F.3d at 193 (court need not accept inferences unsupported by facts set forth in the complaint).   The Amended Complaint casts a variety of aspersions "based on information and belief," but alleges no specific facts about ASI's participation in the challenged conduct, nor any merchant-consumer interaction between plaintiff and ASI.   As set forth *infra* at 37-39, the Amended Complaint's drafters have no good faith basis in law or fact for naming ASI as a defendant, and ASI should be dismissed regardless of whether any part of the Amended Complaint survives dismissal.

Ms. Austin-Spearman has no good faith basis to assert different facts about AARP's

nonprofit status, and her "information and belief" allegations that ASI sells ads on the websites

or helped draft the challenged Privacy Policy are insufficient to suggest for-profit activity by

AARP.  *See Kozup v. Georgetown Univ.*, 663 F. Supp. 1048, 1060-61 (D.D.C. 1987), *vacated on

other grounds*, 851 F.2d 437 (1988) (noting that nonprofit entities were not converted into

"merchants" based upon the fact that the nonprofit charged fees or organized and operated itself

with sound business principles "not to turn a profit, but to survive and continue to perform

whatever functions they were founded to perform.").[10]

### 2.  Plaintiff purchased no goods or services under the Act

Ms. Austin-Spearman's claim involves no "purchase or sale of consumer goods or

services in the ordinary course of business."  *See* D.C. Code § 28-3905(k)(5).  As the Amended

Complaint emphasizes, plaintiff's DCCPPA claim is based **solely** on her AARP membership

purchase and its benefits.[11]  Nowhere does the Complaint allege that she or any putative class

members bought any separate goods or services for a fee from AARP – as the statute requires.

The DCCPPA claim rests entirely on Ms. Austin-Spearman's initial membership transaction and

her subjective expectations about AARP membership benefits.  *See e.g.* Amended Complaint at ¶

---

[10]     Nor does licensing a trademark in exchange for royalties constitute engaging in a taxable for-profit trade or business.  *See, e.g., Oregon St. Univ. Alumni Ass'n v. C.I.R*, 193 F.3d 1098, 1100-1102 (9th Cir. 1999); *Sierra Club, Inc. v. Comm'r*, 86 F.3d 1526, 1532 (9th Cir. 1996); *Sierra Club*, 77 T.C.M. (CCH) 1569, 1999 WL 153733 at *12-13, *16 (Mar. 23, 1999).  A tax-exempt organization's royalty income is considered passive income not subject to taxation under the federal code provisions for "unrelated business taxable income."  *See* I.R.C. §§ 512(a)(1), (b)(2); *Sierra Club*, 77 T.C.M. (CCH) 1569, 1999 WL 153733 at *8, *16.

[11]     Amended Complaint at ¶ 5 ("AARP routinely allows third-party data analytics companies to collect its members' PII"), ¶ 7 ("Had AARP informed its members that third party companies systematically collect their PII from the AARP website, they would have been unwilling to purchase their AARP memberships at the price charged, if at all"), ¶ 87 (defining putative class as "AARP members who (i) paid a membership fee to AARP and (ii) who had their PII collected by a third party, including either Facebook or Adobe, while visiting AARP's website.").

27

98 (DCCPPA Count I alleges that "plaintiff is a consumer under the DCCPPA because she purchased a membership to AARP's service and received exclusive content and benefits . . .."); ¶ 101 ("When Plaintiff and the Class [sic] purchased their AARP memberships and created their online AARP accounts, they reasonably expected that AARP would not allow third parties to collect their PII."); ¶ 106 ("Consumers pay membership fees to AARP in order to use its service and website.").

Ms. Austin-Spearman's DCCPPA claim is exempted by Section 28-3901(k)(5).   This Court's precedents leave no room to deny the law's impact here:  disputes about the benefits of AARP membership cannot support DCCPPA claims – only the purchase of separate goods or services for a separate fee will support claims under the Act.   *In re APA Assessment Fee Litig.*, 862 F. Supp. 2d at 14 (fee to support nonprofit's lobbying arm did not amount to 'purchase or sale of consumer goods or services in the ordinary course of business.'").

### B.     AARP Is Not a "Merchant" Under the DCCPPA.

Even if AARP's alleged conduct is somehow outside the safe harbor of DCCPPA's nonprofit exemption, plaintiff cannot plead in good faith that AARP is a "merchant" under the DCCPPA and these facts.  DCCPPA defines a "merchant" as a:

> person, whether organized or operating for profit or for a nonprofit purpose, who in the ordinary course of business does or would sell, lease (to), or transfer, either directly or indirectly, consumer goods or services, or a person who in the ordinary course of business does or would supply the goods or services which are or would be the subject matter of a trade practice.

D.C. Code § 28-3901(a)(3).

Ms. Austin-Spearman stakes her DCCPPA claim on the allegation that "AARP purports to provide its members with a number of benefits, including discounts on shopping, dining, and travel as well as financial and insurance-related products and services."  Amended Complaint at

28

¶ 1.  In response to the Original Dismissal Motion, the Amended Complaint elaborates on this theme by alleging that AARP or ASI are "directly or indirectly" providing goods or services to its members.  Amended Complaint at ¶ 99.  Yet, the Amended Complaint nowhere alleges facts sufficient to support this legal conclusion.

Merely making discounts available or recommending goods or services of another does **not** constitute "merchant" activity under the DCCPPA.  *Adler v. Vision Lab Telecomms., Inc.*, 393 F. Supp. 2d 35, 39 (D.D.C. 2005) ("[P]arties providing recommendations of the goods or services of a particular merchant to the consumer assume liability only when they are involved in [the] supply side of the transaction."); *Armstrong v. Accrediting Council for Continuing Educ. & Training, Inc.*, 832 F. Supp. 419, 424-25 (D.D.C. 1993), *vacated on other grounds*, 84 F.3d 1452 (D.C. Cir. 1996)) (declining to extend application of the DCCPPA to nonprofit accrediting organization that merely recommended services of a distinct, separate entity); *Howard v. Riggs Nat'l Bank*, 432 A.2d 701, 710 (D.C. 1981) (declining to "impose liability as a guarantor [under the DCCPPA] upon any private individual (or his employer) who recommends the goods or services of a particular merchant to another").[12]

Ms. Austin-Spearman has not pled a consumer transaction, and neither AARP nor ASI constitute "merchants" under DCCPPA, based on the conduct alleged.  This plaintiff cannot avoid the DCCPPA's nonprofit exemption, and Count I should be dismissed with prejudice.

---

[12]    *See also Howard*, 432 A.2d at 708-709 (only "merchants" are subject to DCCPPA); *Carleton v. Winter*, 901 A.2d 174, 179 (D.C. 2006) (DCCPPA regulates conduct of merchants or goods suppliers); *DeBerry v. First Gov't Mort. & Investors Corp.*, 743 A.2d 699, 701 (D.C. 1999) (under DCCPPA, unlawful trade practices can only be committed by a "merchant").

IV.     **THE AMENDED COMPLAINT FAILS TO STATE TIMELY FRAUD CLAIMS**

The Amended Complaint's claims for fraud – Count Two (Intentional Misrepresentation at ¶¶ 110-124) and Count Three (Fraud by Omission at ¶¶ 125-136) – have no good faith basis in law or fact.  These two counts are somewhat redundant, based on the same "information and belief" speculation and subject to the same elements.  *Friends Christian High School v. Geneva Financial Consultants*, Case No. 13–1436 (ESH), 2014 WL 1623754 at *4-*5 (D.D.C. April 24, 2014) (using fraud and intentional misrepresentation interchangeably and noting that they have the same elements and are subject to the heightened pleading standard of Rule 9(b)); *see also High v. McLean Financial Corp.*, 659 F. Supp. 1561, 1566 n.4 (D.D.C. 1987) (intentional misrepresentation is an "essential element of the tort of fraud, not a separate tort in itself"); *In re U.S. Office Products Co. Securities Litigation*, 251 F. Supp. 2d 77, 99 (D.D.C. 2003) (same); *Henok v. Chase Home Fin., LLC*, 922 F. Supp. 2d 110, 122 (D.D.C. 2013) ("A claim for fraud may be founded on a false representation or a willful omission.") (citations omitted).

Whether it rests on an affirmative misrepresentation or an omission that allegedly induced plaintiff to purchase her AARP membership, both of plaintiff's fraud counts must establish that: (1) defendants made false representations or willful omissions of material fact; (2) defendants had knowledge of the misrepresentations or willful omissions at the time of the alleged statements [i.e., scienter]; (3) defendants intended to induce plaintiff's reliance; (4) plaintiff actually relied on the misrepresentations or willful omissions; and (5) plaintiff suffered damages as a result.  *Morris v. Carter Global Lee, Inc.*, 997 F. Supp. 2d 27, 43 (D.D.C. 2013) (quotation marks omitted) .

The Amended Complaint fails to establish any false representations or willful omissions by AARP in 2010, when Ms. Austin-Spearman purchased her AARP membership, because the challenged data practices are disclosed by AARP's Privacy Policy. *See infra* at 8-11.  Nor did

Ms. Austin-Spearman rely on any AARP representations or omissions about its data collecting practices prior to purchasing her AARP membership. *See infra* at 6.   Whatever subjective "expectations" plaintiff had about AARP's practices prior to buying her membership, they were not based on any of defendants' affirmative statements or omissions.

Ms. Austin-Spearman can never plead plausible reliance on these facts, and both fraud counts must fail.   *See Schiff*, 697 A.2d at 1198 (no cause of action arises where plaintiff "believes in good faith" that she is getting lowest possible price unless defendant represented that it provides the lowest price); *In re U.S. Office Products Co. Securities*, 251 F. Supp. 2d at 101 ("Fraudulent inducement to enter a contract requires a misrepresentation or omission that pertains to an essential term of a contract and the intent to convince a plaintiff to enter the contract."); *see also Signature Tech. Solutions v. Incapsulate, LLC,* No. MC 13-0661 (RBW), 2014 WL 3522589 (D.D.C. July 17, 2014) ("a party's claimed intent is immaterial where it has agreed . . . to a clearly expressed and unambiguous intent to the contrary") (quotation marks and citations omitted).   And many of the Amended Complaint's prolix fraud allegations go to data collecting practices generally, with no attempt made to link them to the specific Facebook and Adobe practices at issue.   This plaintiff is serving "fraud stew" – not particularized allegations of fraud.

The Amended Complaint's obtuse chronology also raises serious questions about whether plaintiff's fraud and related DCCPPA claims are timely.   The Amended Complaint invokes a fraud-in-the-inducement theory, yet is strangely silent about **when** the alleged data collection by Facebook and Adobe began, or when Ms. Austin-Spearman learned about it.   Both the fraud and DCCPPA claims are subject to three-year limitations periods. *Hughes v. Abell*, 794 F. Supp. 2d 1, 12 (D.D.C. 2010).   Plaintiff's 2014 claims are necessarily untimely when

based upon an alleged misrepresentation or omission that induced her to buy an AARP membership in late 2010.  Nor does the Complaint assert particularized allegations capable of surmounting the high pleading burden imposed on those claiming fraudulent concealment or other equitable tolling doctrines.  *Holland v. Florida*, 560 U.S. 631, 649 (2010) (equitable tolling is only available to a party who can show that "some extraordinary circumstance stood in his way and prevented timely filing") (quotation marks and citations omitted).

The Amended Complaint also fails to plead that AARP had no intent to perform its Privacy Policy promises at the time they were made to plaintiff in late 2010.  A promise or contractual commitment may be actionable as fraud only if "at the time of its making, the promisor had no present intention of carrying it out." *Virginia Academy of Clinical Psychologists v. Group Hospitalization and Med. Servs., Inc.*, 878 A.2d 1226, 1234 (D.C. 2005). "[A] promissory representation, or a representation as to future events asserted in a common law fraud action, should only be considered a misrepresentation of fact where the evidence shows that the promise was made without the intent to perform, or that the promisor had knowledge that the events would not occur." *Bennett v. Kiggins*, 377 A.2d 57, 60-61 (D.C. 1977).

The Complaint makes no attempt to place AARP's alleged *scienter* within the pleader's tortured chronology of plaintiff's membership enrollment and subsequent disappointments. Plaintiff cannot allege that AARP never intended to perform its "late 2010" Privacy Policy promises at the time plaintiff saw them.  A future breach of the policy (which cannot even be pled here in good faith) does not support permissible inferences of fraud, standing alone.  *See Wagshal v. Rigler*, 947 F. Supp. 10, 14 (D.D.C. 1996) ("subsequent breach of contract does not

give rise to a claim of fraud unless fraudulent intent existed at the time of the contract.").[13]

For all of these reasons, the Amended Complaint's fraud counts lack any good faith basis in fact or law, and should be dismissed with prejudice.


## V.     PLAINTIFF FAILS TO STATE A CLAIM FOR UNJUST ENRICHMENT

In response to the initial motion's assessment that plaintiff has no valid contract claims to press against AARP (Original Dismissal Motion at 27-29), the Amended Complaint adds a new claim for unjust enrichment.  Amended Complaint at ¶¶ 137-143 (Fourth Cause of Action).  That claim must fail for a variety of reasons, including that plaintiff has conferred no benefit upon AARP by the challenged conduct, nor would it be unjust for AARP to retain such a benefit under the fully-disclosed circumstances.

Under District law, "unjust enrichment occurs when: (1) plaintiff conferred a benefit on the defendant; (2) defendant retains the benefit; and (3) under the circumstances, defendant's retention of that benefit is unjust." *News World Commc'ns, Inc. v. Thompsen,* 878 A.2d 1218, 1222 (D.C. 2005).  Ms. Austin-Spearman cannot plausibly plead these elements because the crux of her claims is that AARP allows Facebook and Adobe to collect members' PII from the AARP website.  Plaintiff is unable to plead any facts supporting her "information and belief" speculation that AARP gets a direct or indirect benefit from the plaintiff as a result of the challenged conduct.

---

[13]     Plaintiff's "benefit of the bargain" injury theory is also incompatible with her fraud claims.  "The District of Columbia Court of Appeals has explicitly recognized the 'out-of-pocket' damages measure as the norm in fraudulent misrepresentation cases."  *McQueen v. Woodstream Corp.*, 672 F. Supp. 2d 84, 89 (D.D.C. 2009) (quotation marks and citations omitted).  *See also Horning v. Ferguson*, 52 A.2d 116, 119 (D.C. 1947) (reversing trial court's award of "loss of the bargain" damages and holding that plaintiff was entitled to recover only for the "direct consequences of the false representations").

The plaintiff's allegations appear to benefit Facebook and Adobe, not AARP.   Plaintiff does not plead, nor could she, that AARP receives a benefit when Facebook gets information about AARP members who elect to remain logged in to their Facebook account while visiting other websites.   To be sure, the Amended Complaint spins an elaborate narrative about how Facebook benefits from data gathering generally, but nowhere alleges specific facts about how AARP receives any benefit.   Similarly, Ms. Austin-Spearman does not explain how AARP's sharing of its members' information with its own data management vendor, Adobe, confers any unjust benefit on AARP.   The fact that AARP uses a vendor to gather and manage its own members' information – as explicitly disclosed in the Privacy Policy – is incapable of conferring unjust benefits to AARP.

The Amended Complaint alleges that the "benefit" at issue is actually the contractual membership fees paid by AARP members.   But these membership fees are not derived from the alleged wrongful conduct – the sharing of data with third parties - and therefore cannot serve as the basis for plaintiff's unjust enrichment claim.   Membership fees were *not* unjustly conferred on AARP by Ms. Austin-Spearman because, in return for her enrollment payment, plaintiff received all of the membership benefits she bargained for and she concedes that she did not read or consider the terms of the AARP's Privacy Policy before purchasing that membership.   There can be no plausible unjust enrichment claim on these facts.

Additionally, as plead at ¶¶145-150, Austin-Spearman's payment of fees in exchange for AARP membership services is a contract that is separate from the AARP Privacy Policy.   This is evidenced by the fact that the Privacy Policy applies to paying members and non-members alike. Therefore, plaintiff's claim that the membership fees were received in exchange for the "data protections" set forth in the AARP Privacy Policy is untenable.   Even if the Court suspends

disbelief and considers that Ms. Austin-Spearman's AARP membership fee may have conferred a latent benefit on the Association because of AARP's alleged sharing of information, the fact that a contract was formed between AARP and Austin-Spearman for her membership fee (Amended Complaint at ¶ 145) precludes a claim for unjust enrichment. *Emerine v. Yancey,* 680 A.2d 1380, 1384 (D.C. 1996) (unjust enrichment will not lie when "the parties have a contract governing an aspect of [their] relation," because "a court will not displace the terms of that contract and impose some other duties not chosen by the parties").

The Amended Complaint also offers a conclusory allegation that AARP receives a benefit from enabling third party collection of her personal information because AARP earns profits from royalties and advertising sales. Amended Complaint at ¶ 140.  AARP's royalty and advertising profits have no connection to Facebook's alleged data harvesting, nor does the Amended Complaint allege that Adobe uses information gleaned from the AARP website for its own purposes or pays anything to AARP for doing so.  As the Amended Complaint tells it, these alleged profits necessarily derive from AARP using its own member information collected for its own use to target advertisements to its own website users.  As the Amended Complaint concedes at ¶ 27, AARP's own collection of user PII from its own website is fully disclosed in the Privacy Policy, and any resulting benefit could not be deemed unjust as a matter of law.[14]

---

[14]     The Amended Complaint also asserts an alternative count for breach of contract.  ¶¶144-158.  In that count, plaintiff pleads that AARP's alleged wrongful conduct is expressly covered by a valid and enforceable contract.  The law is clear that an unjust enrichment claim cannot be based on conduct that is governed by an express contract, *Emerine* 680 A.2d at 1384, and therefore at least one of these claims cannot survive this motion to dismiss.  Indeed, neither should.

## VI.   PLAINTIFF'S AMENDMENT FAILS TO RESTATE BREACH OF CONTRACT

The Amended Complaint's breach of contract claim (Fifth Cause of Action ¶¶ 144-158) must fail because privacy policies are typically viewed as general statements of policy and not bargained for agreements that entitle consumers to contract damages in the event of a breach. *See, e.g., In re Northwest Airlines Privacy Litig.,* No. Civ. 04-126 (PAM/JSM), 2004 WL 1278459, at *5-6 (D. Minn. June 6, 2004) (privacy statement on defendant's website did not constitute a unilateral contract); *Dyer v. Nw. Airlines Corp.,* 334 F. Supp. 2d 1196, 1200 (D.N.D. 2004) (holding that "broad statements of company policy do not generally give rise to contract claims" and "the alleged violation of the privacy policy at issue does not give rise to a contract claim."). And in this case, plaintiff pleads she reviewed the AARP website's Privacy Policy only ***after*** purchasing her AARP membership, so a contract claim cannot be based on an alleged breach of AARP's Privacy Policy.

Nor does the Amended Complaint sufficiently assert contract breach elements. To proceed on a breach claim under District of Columbia law, a plaintiff must allege four elements: "(1) a valid contract between the parties; (2) [a] duty arising out of the contract; (3) a breach of that duty; (4) damages caused by the breach." *Paulin v. George Wash. Univ. Sch. of Med.*, 878 F. Supp. 2d 241, 246 (D.D.C. 2012); (quoting *Tsintolas Realty Co. v. Mendez*, 984 A.2d 181, 187 (D.C. 2009)).

As discussed above at 8-11, AARP's website functions precisely as its Privacy Policy discloses, and therefore no breach occurred in this case. And because the Amended Complaint pleads no cognizable injuries from the conduct alleged, no contract damages arise. One basic principle of contract law is that the purpose of its damage remedy is to put a plaintiff in the same economic position she would occupy if the contract had been fully performed. *Vector Realty Grp., Inc. v. 711 Fourteenth St., Inc.*, 659 A.2d 230, 234 n.8 (D.C. 1994). Even if the AARP

Privacy Policy was somehow part of Ms. Austin-Spearman's membership contract, her economic position did not change when AARP allegedly breached its Privacy Policy.

Plaintiff has no basis under law to plead subjective expectations that she would be compensated for the "value" of her PII, or that a portion of her membership price went towards the protection of PII, especially when non-paying AARP website registrants are subject to the same challenged conduct. *See In re JetBlue Airways Corp. Privacy Litig.*, 379 F. Supp. 2d 299, 327 (E.D.N.Y. 2005) (dismissing breach of contract claim for lack of damages where plaintiffs' personal information was accessed by third parties but plaintiffs "had no reason to expect that they would be compensated for the 'value' of their personal information"). And plaintiff's unexpressed belief that part of her AARP membership fees were going towards some heightened level of security cannot serve as the basis for her contract claim. *See Abdelrhman v. Ackerman,* 76 A.3d 883, 890 (D.C. 2013) ("'a party's unexpressed intent is irrelevant' if a contract's language is clear on its face") (citations omitted); *Dyer v. Bilaal*, 983 A.2d 349, 361 (D.C. 2009) ("Pursuant to the objective theory of contract law, we hold parties to the promises they articulate, without attempting to discern their unexpressed intentions.").

Plaintiff has no expectation damages as a matter of law, and her contract claim must fail.

## VII.   INSUFFICIENT ASI CONDUCT IS ALLEGED

The Amended Complaint provides no real basis for asserting any claims against ASI. Documents pled by the Amended Complaint make clear that ASI's operations are limited to providing support to AARP in specific areas not relevant to Ms. Austin-Spearman's claims. For example, ASI provides quality control for the use of AARP trademarks and other intellectual property by companies that make certain products and services available to AARP members. *See* AARP Consolidated Financial Statements, dated Dec. 31, 2013 and 2012 (**Ex. 1**; cited at

Complaint at ¶ 16 n.3).  The Amended Complaint pleads a rash of speculation "on information and belief" that ASI helped draft the challenged Privacy Policy, or sells ads on the AARP website, but nowhere does the pleader identify the basis for this rash speculation.  Conclusory "information and belief" allegations of this type may not be considered on this motion.  *See supra* at 16-17.[15]

The Amended Complaint pleads no transaction – by Ms. Austin-Spearman or any other person – implicating these ASI activities.  Documents cited and relied upon by the Amended Complaint demonstrate that ASI provides administrative and development support to AARP, in exchange for a fee paid to it by AARP.  Plaintiff pleads no relevant facts implicating these ASI administrative functions, nor could she consistent with Rule 11.  Plaintiff has transacted no business with ASI, and there is no good faith Rule 11 basis for alleging that ASI plays any role in the conduct alleged.

For this reason – and regardless of whether some part of plaintiff's claims against AARP survive this motion – ASI should be dismissed with prejudice.  *See U.S. v. Universal Health Servs., Inc.*, No. 1:07CV00054, 2010 WL 2976080, at *2 (W.D. Va., July 28, 2010) (plaintiff failed to plead sufficient facts against a corporate parent by "simply pleading that 'the defendants' (plural) committed the acts," and explaining that "this stroke of computer keys fails to create a pleading that meets *Iqbal*'s standards or the particularity requirements of Rule 9(b)"); *Kmart Corp. v. Gator Feasterville Partners*, Civ. No. 13-345, 2013 WL 5309265, at *2 (E.D. Pa. Sept. 20, 2013) (dismissing complaint where plaintiff refers to "'defendants' in the plural throughout," but no facts were alleged suggesting that all defendants participated in the

---

[15]     The Amended Complaint cites the AARP Terms of Service as acknowledging that AARP's website is "operated in part" by ASI (Amended Complaint at ¶ 1), but there is no basis for pleading any link between ASI and the conduct alleged.

challenged conduct); *White v. Eberle & BCI Servs., LLC*, Civ. No. 12-2169 (JBS-kMW), 2013 WL 211249, at *4 (D.N.J. Jan. 17, 2013) (dismissing complaint against individual defendant where plaintiff merely referred to individual defendant and the corporate defendant collectively as "defendants" and made only "limited and conclusory assertions" as to the individual defendant's involvement in challenged conduct).

## VIII.   IMPERTINENT MATERIAL SHOULD BE STRICKEN

Defendants also respectfully urge the Court to strike a number of irrelevant and scandalous allegations from the Amended Complaint.  Rule 12(f) permits a court to "order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed.R.Civ.P. 12(f).  This court has broad discretion in ruling on a motion to strike and although motions to strike may be disfavored in certain circumstances, "if allegations in a complaint are irrelevant and [unfairly] prejudicial to the defendant, a motion to strike may be granted." *Wiggins v. Philip Morris, Inc.*, 853 F. Supp. 457, 457 (D.D.C.1994) (Lamberth, J.), citing *Todhunter, Mandava, & Assocs. v. I.C.C.I. (Holdings) Pty. Ltd.*, C.A. No. 88-3031, 1991 WL 166585 (D.D.C. Aug. 14, 1991).

Here, the Amended Complaint's drafters make a number of irrelevant allegations and cite internet sources that have no bearing on any of Ms. Austin-Spearman's claims.  For example, the Amended Complaint cites an item prepared in 2011 by Republican Congressmen Wally Herger (R-CA) and Dave Reichert (R-WA) as apparent retaliation for AARP's support of the Patient Protection and Affordable Care Act.  *See* Amended Complaint at ¶ 18 n. 2 (citing *Behind the Veil: The AARP America Doesn't Know*, prepared by Reps. Wally Herger and Dave Reichert (Mar. 30, 2011)).  This item is fallout from the political battles about the Affordable Care Act, and offers no support to the allegations for which it is cited (that ASI earned over $425 million in

revenue) but is simply an opinion piece drafted by two Congressmen strongly opposed to the Affordable Care Act and anyone who supported it. The Amended Complaint also misrepresents a Senate staff report as a "recent FTC Report" about how some data brokers are preying on vulnerable populations. Amended Complaint at ¶¶ 62-63. The Senate staffers who wrote this item appear focused on "nine representative companies," none of which were Facebook or Adobe (and certainly not AARP). As the cited report makes clear, the graphic duplicated as Fig. 11 in the Amended Complaint refers to population segment data that was offered for sale by two of the companies involved in the inquiry – neither of which were Facebook or Adobe.

AARP's initial motion sought to strike these items as impertinent, and the Amended Complaint's drafters responded by doubling down on their irrelevant internet article citations. *See e.g.*, Amended Complaint at ¶ 57 n. 16 (citing Senator Levin statement before a subcommittee investigating consumer security and data privacy); ¶ 58 n.17 (internet article about Facebook's data brokerage capabilities); ¶ 59 at n. 18-19 (more internet articles about Facebook's large subscriber base and data brokerage capabilities).

Because the Amended Complaint's reference to these items does not relate to any issues before the Court, they are not admissible under the relevancy requirements set forth in Fed. R. Evid. 401 and 402. For this reason, they are not judicially noticeable. *Davis v. United States*, 569 F. Supp. 2d 91, 98 (D.D.C. 2008) (court may not judicially notice matters that do not satisfy Rules 401 and 402). Further, the cited items written by Congress and Senate staffers were not issued in the context of an adjudicatory proceeding or formal Committee reports, and thus are ineligible for judicial notice under the requirements of Fed. R. Evid. 201(b). *See* Fed. R. Evid. 201(b) (requires submitted facts be "(1) generally known within the territorial jurisdiction of the trial court and (2) capable of accurate and ready determination by resort to sources whose

accuracy cannot reasonably be questioned.")  In *County of San Miguel v. Kempthorne*, 587 F. Supp. 2d 64, 77-78 (D.D.C. 2008), the Court refused to judicially notice a federal agency's Inspector General report concluding that the agency's deputy assistant secretary violated federal regulations.  As the Court explained, an extra-judicial investigative report is "not the type of document about which there can be no reasonable dispute." *See id.* at 78.

Because the cited references are irrelevant to plaintiff's claims and ineligible for judicial notice, they should be stricken under Rule 12(f).


## CONCLUSION

For the foregoing reasons, Defendants AARP and ASI respectfully request that plaintiff's Amended Complaint be dismissed with prejudice.

Respectfully submitted,

November 10, 2014

s/  Thomas E. Gilbertsen
**VENABLE, LLP**
Thomas E. Gilbertsen (DC Bar 432290)
Kelly A. DeMarchis (DC Bar 501966)
Michael P. Bracken (DC Bar 992525)
tgilbertsen@venable.com
kdemarchis@venable.com
mpbracken@venable.com
575 7th Street, N.W.
Washington, D.C.  20004
Tel: 202-344-4000
Fax: 202-344-8300

Of Counsel:
Daniel Koslofsky (DC Bar 994899)
Associate General Counsel
AARP
601 E Street, N.W.
Suite 800
Washington, D.C.  20049
Tel:  202-434-2378
Fax:  202-434-2339
*Attorneys for defendants*

41

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on November 10, 2014, I electronically filed the foregoing Motion to Dismiss, together with Proposed Order and Memorandum in Support, with all exhibits thereto, with the Clerk of this Court using the CM/ECF system, which provides notification and effective service of such filings to the following counsel of record:

Maria Christina Simon
THE GELLER LAW GROUP, PLLC
4000 Legato Road
Suite 1100
Fairfax, VA 22033

Jay Edelson
Alicia E. Hwang
Benjamin S. Thomassen
Rafey S. Balabanian
EDELSON PC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654

This the 10th day of November 2014.

/s/ _____
Michael P. Bracken