**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| ETHEL AUSTIN-SPEARMAN,<br>Individually and on behalf of all others<br>similarly situated, | ) | |
| Plaintiff | ) | |
| v. | ) | Civil Case No. 1:14-cv-01288 |
| AARP, *et al*., | ) | The Honorable Ketanji B. Jackson |
| Defendants. | ) | |

**REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT WITH PREJUDICE**

Of Counsel:

Daniel Koslofsky (DC Bar 994899)
Associate General Counsel
AARP
601 E Street, N.W.
Suite 800
Washington, D.C. 20049
Tel: 202-434-2378
Fax: 202-434-2339

VENABLE LLP

Thomas E. Gilbertsen (DC Bar 432290)
Kelly A. DeMarchis (DC Bar 501966)
Michael P. Bracken (DC Bar 992525)
575 Seventh Street, N.W.
Washington, D.C. 20004-1601
Tel: 202-344-4000
Fax: 202-344-8300

*Attorneys for Defendants AARP and AARP Services, Inc.*

# TABLE OF CONTENTS

THE AMENDED COMPLAINT'S STATED FACTUAL BASIS .............................................. 2

No "Online Marketplace" Is Pled .......................................................................... 2

Plaintiff's Chronology Cannot Be Re-Ordered ...................................................... 2

How Plaintiff Uses Facebook ................................................................................ 3

How AARP Uses Adobe ........................................................................................ 5

No Well-Pled Facts About ASI ............................................................................. 5

ARGUMENT ................................................................................................................ 6

I. SECTIONS 3 AND 5 OF AARP.ORG'S PRIVACY POLICY DISCLOSE THE CHALLENGED CONDUCT .......................................................................... 7

II. PLAINTIFF SUFFERED NO CONCRETE OR PARTICULARIZED INJURIES .............. 9

III. PLAINTIFF CAN STATE NO DCCPPA CLAIM AGAINST DEFENDANTS ................ 13

IV. NO FRAUD ARISES FROM THE AMENDED COMPLAINT'S ALLEGATIONS ......... 17

A. The Amended Complaint Cannot Support Fraud Claims. ........................................... 17

B. Plaintiff's Fraud Claims Are Time-Barred. ................................................................. 19

V. PLAINTIFF DOES NOT PLAUSIBLY PLEAD AARP'S UNJUST ENRICHMENT ........................................................................................................ 21

VI. PLAINTIFF SUFFERED NO CONTRACT DAMAGES .................................................. 23

VII. IMPERTINENT FACTS SHOULD BE STRICKEN IF ANY CLAIM SURVIVES .......... 24

CONCLUSION ............................................................................................................ 25

# TABLE OF AUTHORITIES

## Cases

*Adam A. Weschler & Son, Inc. v. Klank*, 561 A.2d 1003 (D.C. 1989) ........................................ 16

*Austin-Spearman v. AMC Network Entertainment LLC*, Case No. 1:14-cv-06840-NRB (S.D.N.Y. 2014)........................................................................................................ 21

*Cain v. Redbox Automated Retail, LLC*, 981 F. Supp. 2d 674 (E.D. Mich. 2013) ....................... 24

*Calvetti v. Antcliff*, 346 F. Supp. 2d 92 (D.D.C. 2004)............................................................... 16

*Cevenini v. Archbishop of Washington*, 707 A.2d 768 (D.C. 1998)............................................ 20

*Coghlan v. Wellcraft Marine Corp.*, 240 F.3d 449 (5th Cir. 2001) ............................................. 12

*Doe 1 v. AOL LLC*, 719 F. Supp. 2d 1102 (N.D. Cal. 2010) ....................................................... 12

*Drake v. McNair*, 993 A.2d 607 (D.C. 2010) .............................................................................. 20

*In re Adobe Systems, Inc. Privacy Litigation*, 2014 WL 4379916 (N.D. Cal. 2014) ................... 12

*In re APA Assessment Fee Litig.*, 766 F.3d 39, 52 (D.C. Cir. 2014) ...................................... 14, 15

*In re Google Privacy Litigation*, 2014 WL 3707508 (N.D. Cal. July 21, 2014).......................... 18

*In re LinkedIn Privacy Litig.*, 932 F. Supp. 2d 1089 (N.D. Cal. 2013) ....................................... 11

*In re SAIC Backup Tape Data Theft Litig.*, Misc. Action No. 12-347 (JEB), MDL No. 2360, 2014 WL 1858458 (D.D.C. May 9, 2014)...................................................... 10, 11, 22

*In re Toyota Motor Corp. Unintended Accel. Mktg., Sales Pracs.,& Prod. Liab. Litig.*, 754 F. Supp. 2d 1145 (C.D. Cal. 2010) ............................................................................... 12

*Kiwanuka v. Bakilana*, 844 F. Supp. 2d 107 (D.D.C. 2012)........................................................ 20

*Lipton v. Chattem, Inc.*, No. 11 C 2952, 2012 WL 1192083 (N.D. Ill. Apr. 10, 2012)............... 12

*Morton v. National Med. Enters.*, 725 A.2d 462 (D.C. 1999) ..................................................... 19

*Nordberg v. Trilegiant Corp.*, 445 F. Supp. 2d 1082 (N.D. Cal. 2006)....................................... 15

*Valentine v. Elliott (In re Estate of Delaney)*, 819 A.2d 968 (D.C. 2003)................................... 19

*Virginia Academy of Clinical Psychologists v. Group Hospitalization and Med. Servs., Inc.*, 878 A.2d 1226 (D.C. 2005) ............................................................................... 18

*Wagshal v. Rigler*, 947 F. Supp. 10 (D.D.C. 1996) ...................................................................... 17

*Wang v. OCZ Tech. Group, Inc.*, 276 F.R.D. 618 (N.D. Cal. 2011)............................................ 12

## Statutes

D.C. Code § 28-3905 ........................................................................................... 13, 14, 15

M.C.L. §§445.1711-1715.............................................................................................. 24

**Other Authorities**

Serwin, "*Poised on the Precipice: A Critical Examination of Privacy Litigation*" 25 Santa Clara Computer & High Tech. L.J. 883, 929-934 (2009)........................................... 12

Sherman, "*Class Actions And Access To Justice: 'No Injury' Plaintiffs and Standing*" 82 Geo. Wash. L. Rev. 834, 850-851 (May 2014) ................................................................ 12

Defendants AARP ("AARP" or the "Association") and its wholly-owned subsidiary AARP Services, Inc. ("ASI") respectfully submit this reply brief in support of the motion to dismiss [Dkt. 24] plaintiff's amended complaint ("Amended Complaint") and in response to plaintiff's opposition thereto [Dkt. 28] (the "Opposition Brief").

This plaintiff has no concrete injuries to support Article III standing. Ms. Austin-Spearman tries to calculate the value of aarp.org's Privacy Policy as part of her Association membership "bargained-for exchange," but that policy statement was simply not part of her membership bargain. This same Article III argument was "too flimsy to support standing" in the *In re SAIC* decision, and a different outcome here would be error. *See infra* at 9-13. Further, the DCCPPA exempts nonprofit associations like AARP from private suits about membership services. Hoping to dress this membership dispute in new garb, the Opposition Brief imagines aarp.org as an "online marketplace" that AARP members buy tickets to enter. This artifice is un-pled and implausible: the Amended Complaint makes clear that no goods or services are purchased at aarp.org and, in either event, this plaintiff never purchased anything there. *See infra* at 13-16. Plaintiff's fraud claims cannot proceed on "information and belief" speculation, nor when the supposedly inducing representations (data sharing promises) come ***after*** the plaintiff's purchase (AARP membership dues). *See infra* at 17-21. Plaintiff's contract and quasi-contract claims fare no better: her membership contract does not include aarp.org's Privacy Policy, which applies to members and non-paying website registrants alike.

Most importantly, the conduct at issue is disclosed by Section 5 of aarp.org's Privacy Policy – entitled "With Whom We Share Your Information." These claims cannot proceed while ignoring the challenged policy's most relevant provisions. *See infra* at 7-9. After two bites at the apple, plaintiff's Amended Complaint is ripe for dismissal with prejudice.

**THE AMENDED COMPLAINT'S STATED FACTUAL BASIS**

One challenge presented by the Amended Complaint, which plaintiff's Opposition Brief only exacerbates, is determining which facts are "well-pled." Most of the Amended Complaint is little more than supposition, often contradicted by the aarp.org Privacy Policy and other operative documents upon which the plaintiff's claims are based. *See* Memorandum in Support of Defendants' Motion to Dismiss [Dkt. 24-1] at 4-12 ("Brief in Support"). In response, the Opposition Brief strays substantially from the Amended Complaint's narrative and tries to introduce new allegations. For example, the Opposition Brief claims repeatedly that the aarp.org website constitutes an "exclusive online marketplace," and cites additional materials from outside the relevant time period to prop up speculation about whether ASI manages the aarp.org website.

**No "Online Marketplace" is Pled.** There is no "online marketplace" – exclusive or otherwise – alleged in the Amended Complaint. And none exists at aarp.org. The Amended Complaint acknowledges that no goods or services are available for sale from or at aarp.org. Amended Complaint at ¶¶ 1 and 73 (AARP provides members with "discounts on shopping, dining, and travel as well as financial and insurance-related products and services" and allows members to search for and access online discounts "*through*" aarp.org). According to the Amended Complaint, dues-paying AARP members get exclusive access not to some "online marketplace," but simply to editorial content and discounts made available by third parties. *Id.* at ¶¶ 1-2. Absent an allegation that consumers buy goods and services at aarp.org, there can be no plausible inference that the Association's site constitutes an "online marketplace."

**Plaintiff's Chronology Cannot be Re-Ordered.** The Amended Complaint's chronology receives another makeover in plaintiff's Opposition Brief. The Initial Complaint made plain that Ms. Austin-Spearman "purchased a three-year membership to AARP" in late 2010, and "then navigated to AARP's website to register for an online account," where she saw the aarp.org

Privacy Policy for the first time. Initial Complaint at ¶¶ 56-57. AARP's Initial Motion to Dismiss challenged whether this chronology supports plaintiff's claims, because aarp.org's Privacy Policy was not something presented to her, nor did she view it, as part of her AARP membership purchase. *See* AARP Initial Brief in Support at 15-16, 26 [Dkt. 18-1]. To avoid AARP's initial motion, plaintiff filed an Amended Complaint that cloaks her chronology in an elaborate 13-paragraph exegesis. Amended Complaint at ¶¶ 72-84. This futile amendment says that when buying her Association membership, Ms. Austin-Spearman anticipated a website privacy policy of some sort and, since she was paying for her membership, expected it to limit unauthorized access to her personal information. *Id*; AARP Brief in Support at 6-7.

Plaintiff's Opposition Brief carries the Amended Complaint's thought experiment a step further, arguing about the "known-unknowns" confronting Ms. Austin-Spearman at the time she bought her AARP membership. Opposition Brief at 19 ("at the time of her membership purchase, she was aware that certain of her paid-for benefits could only be accessed online and that she would subsequently have to register for an AARP online account (and agree to any attendant terms and policies) in order to access those benefits. Thus the representations made in Defendants' Online Terms [sic] (which Plaintiff knew she would have to agree to) constituted part of her original bargain."). The pleaders try to bend space-time and put glimpses of subsequent events first, so that plaintiff can claim reliance on them, but the simple chronology of the Initial Complaint cannot be recast to survive this motion.

**How Plaintiff Uses Facebook.** How the plaintiff allegedly used Facebook features at aarp.org is also a subject of shifting perspective in the Opposition Brief. The Amended Complaint alleges that AARP uses a publicly-available software development kit ("SDK") that adds Facebook-related features to aarp.org, enabling the two sites to interact when a Facebook member

opts to "keep me logged in" on Facebook or uses Facebook–labelled features in connection with her visit to aarp.org. Amended Complaint at ¶¶ 35-41. "Facebook Login" lets Facebook members log on to aarp.org using their Facebook credentials, and the well-known Facebook "Like," "Share," and "Comment" features allow Facebook members to post aarp.org materials to their own Facebook pages. *Id.* at ¶ 42-44; *See* AARP Brief in Support at 11-12. When a Facebook member uses these Facebook features, Facebook tracks her while she navigates through other websites via a "c_user" cookie that Facebook placed on her computer when she first logged in to her Facebook account. Amended Complaint at ¶ 40. AARP prominently displays Facebook-labelled features, such as the Facebook login and plugin services, on aarp.org. *Id.* at ¶ 42 figs. 7 and 8.

Plaintiff argues that AARP "enabled Facebook to monitor and collect personally identifiable information ["PII"] from its website users" (Opposition Brief at 7), but the Amended Complaint clearly states that Facebook already possesses identification information for its own members who – like Ms. Austin-Spearman – provide PII to Facebook as a condition of their membership in that social network. Amended Complaint at ¶ 39 ("Facebook ID is a unique numeric string assigned by Facebook to a specific user . . . ."). The only additional information that Ms. Austin-Spearman invited Facebook to collect (or AARP to share) about her visit to aarp.org is the titles of articles and other content this Facebook member accessed and viewed. *Id.* at ¶¶ 43-45. In sum, the Amended Complaint acknowledges that Facebook (1) placed the "c_user" cookie on plaintiff's computer; (2) already knows its own members' identifying information; (3) tracks users who "keep me logged in" or use other Facebook-branded features on websites that have them; and thereby (4) collects information about Facebook users, pursuant to Facebook's own un-pled disclosures and consents from such users. Having pled her relationship with Facebook, plaintiff cannot avoid her consent to Facebook's data collection by not pleading it.

**How AARP Uses Adobe.** The Amended Complaint pleads a prosaic vendor relationship between AARP and Adobe. Amended Complaint at ¶¶ 46-55 (AARP is "using code developed by Adobe" to capture data about aarp.org users and uses Adobe's services to serve ads on its own aarp.org website using that data); AARP Brief in Support at 7-8. No well-pled facts take this arrangement outside of a vendor relationship, but the Amended Complaint suggests that by using Adobe database management services, AARP somehow creates a "privacy hazard" because Adobe is a big data broker with the mere "ability" to *mis*use this data for its own purposes and its other customers. Amended Complaint at ¶¶ 60-61. AARP's Brief in Support challenged the sufficiency of these allegations to support plaintiffs' claims, because the Amended Complaint never gets around to pleading an *un*authorized disclosure of the plaintiff's PII by Adobe to any third party. *See* AARP Brief in Support at 7-8, 12. Nor could AARP possibly benefit from Adobe's not-quite-alleged misuse of the aarp.org data it manages as an AARP vendor, nor can plaintiff plausibly allege that any benefit to AARP would result from such a scenario.

In response, plaintiff restates the elements of a vendor relationship between AARP and Adobe, then speculates that this vendor relationship "allows" Adobe to create and sell more comprehensive services to its clients. Opposition Brief at 8-9. The Amended Complaint depicts the aarp.org information in Adobe's possession being used to serve AARP only, and ***not*** others. There remains no allegation that Adobe made *un*authorized use or disclosure of aarp.org data to any third party – and no good faith basis exists to plead otherwise.

**No Well-Pled Facts about ASI.** The Amended Complaint speculates about ASI's involvement in the aarp.org website. *See* Amended Complaint at ¶ 1 (supposing that AARP memberships are offered "through" ASI, and ASI "operates" the aarp.org website); ¶ 18 (ASI might sell advertising space on aarp.org); ¶ 33 (maybe the aarp.org Terms of Service and Privacy

Policy were "jointly drafted" by ASI); ¶ 18 (ASI might generate revenues for the Association through royalty payments, membership dues and advertising). AARP's Brief in Support demonstrated that the cited support for these "beliefs" – a recent consolidated financial statement – contradict or provide no support for them. Brief in Support at 4-5. Plaintiff's Opposition Brief offers no further support for these allegations (there can be none), but tries to assert new allegations about how ASI supposedly develops and markets products and services that are available to AARP members for purchase not "at" the aarp.org website, but "through" it. Opposition Brief at 3. The Opposition Brief cites a new document for these beliefs, but it predates the relevant time period by at least four years and is therefore not relevant. *Id.* at 3 n. 1.

## ARGUMENT

A foundational principle of AARP's renewed motion to dismiss is the heightened pleading standard applicable to the Amended Complaint. This plaintiff cannot establish Article III standing based on speculative injuries or disappointed subjective expectations, and an Amended Complaint sounding in fraud cannot satisfy Rule 9 standards by rote "information and belief" pleading. Nor are Rule 8 *Twombly* and *Iqbal* standards satisfied by plaintiff's "shotgun" style of pleading an array of often-competing and implausible inferences that contradict the operational documents on which her claims necessarily rely. *See generally* Brief in Support at 13-18. The Opposition Brief turns a deaf ear to this well-supported point, and offers a four-sentence pabulum seeking the "benefit of all inferences that can be derived" from the Amended Complaint. Opposition Brief at 9-10. Plaintiff wants broad license to speculate about adverse inferences at the pleading stage, but the Amended Complaint's operative facts actually support none of them.

## I. SECTIONS 3 AND 5 OF AARP.ORG'S PRIVACY POLICY DISCLOSE THE CHALLENGED CONDUCT

As already emphasized, Section 3 of the aarp.org Privacy Policy discloses that AARP will collect PII from site users, and Section 5 – entitled "With Whom We Share Your Information" – advises that AARP may share their information when (1) they use branded features of service providers like LinkedIn or Facebook; and (2) when vendors are hired by AARP to provide administrative services "such as . . . managing databases." *See* Brief in Support at 9-11. The Amended Complaint makes no mention of Section 5, even though AARP's initial dismissal motion was based in large part on Section 5 disclosures. *See* Initial Brief at 7-10, 25 [Dkt. 18-1]. Plaintiff tries to shrug off Section 5 by arguing that it applies only to information that AARP "shares" with others, and not to what AARP allows others like Facebook and Adobe to "collect." Opposition Brief at 6, 39-40. Plaintiff also offers an implausible reading of Section 5 while "previewing" a third amendment to her complaint. *Id.* at 38-40 and n.31.

These facile distinctions cannot avoid dismissal. Section 5 discloses what happens when aarp.org visitors use their social network features at the site: they may share information with "both us and the Service Provider, or we may share your information with the Service Provider." *See* Brief in Support at 9-11. The Amended Complaint alleges that AARP allows this to happen by using the Facebook SDK, and that aarp.org "initiates a transmission to Facebook" as a result. Amended Complaint at ¶¶ 43-44. Plaintiff routinely alleges that AARP's conduct caused her PII to be "fed to" or "shared with" third parties. *Id.* at ¶¶ 55, 85. The Amended Complaint challenges this conduct as unauthorized data "sharing," so its drafters cannot now ask to avoid dismissal by trying to distinguish the verbs "share" and "collect" in their Opposition Brief.

Having pled nothing about Section 5 in two prior complaint editions, plaintiff "previews" how a third edition might deal with it. *See* Opposition Brief at 39 n.31. Plaintiff's disorienting

preview shows that another amendment is futile. The Opposition Brief argues that Section 5 relates only to third party advertisers on AARP's website, and serves only to alert users that clicking onto those third party ads will lead the user to another site where other privacy terms may apply. This reading is implausible because most advertisers on the site do not meet the description of "Service Provider" that Section 5 addresses. Nor can it help plaintiff's claims to allege that aarp.org's Privacy Policy discloses an intent to "Share Your Information" with every advertiser on the site.

The facts pled about AARP's use of Adobe are unremarkable, putting that vendor arrangement squarely within the practices disclosed by Sections 3 and 5 of aarp.org's Privacy Policy. Adobe provides a service to AARP, which AARP pays for, whereby Adobe-licensed software is used to gather information for AARP from the aarp.org website. *See* Amended Complaint at ¶¶ 51-52. As alleged, this information is transmitted to and maintained on Adobe servers ***for*** AARP: the Association – like the vast majority of website operators – has not developed its own propriety database management software, nor designed and built its own computer network servers, to perform these functions. As plaintiff acknowledges, the resulting data is then used not to help Adobe or other third parties, but to "help Defendants serve targeted advertising on Defendants' website users." *See* Opposition Brief at 8; Amended Complaint at ¶¶ 50-51; AARP Brief in Support at 9-10.

The parties agree: Adobe is a vendor that AARP hires to help the Association collect and use data about visitors to its own website. Section 3 of the aarp.org Privacy Policy discloses that AARP will capture the PII of site users (Brief in Support at 9), and Section 5 advises that AARP vendors are among those third parties "With Whom We Share Your Information." Section 6 advises users that AARP takes adequate measures to assure the privacy and security of this data, and the Amended Complaint alleges no breach of that provision.

Nothing pled about Adobe takes this conduct outside of the vendor relationships described in Section 5 of aarp.org's Privacy Policy. The Opposition Brief only ***suggests*** that using Adobe software and servers "allows" that vendor to create and sell more comprehensive marketing reports to its other clients. Opposition Brief at 9. Allegations about what Adobe is "capable" of doing is not the same as what is in fact happening, and does not take Ms. Austin-Spearman's claims outside of Section 5. *See also* Amended Complaint at ¶ 61 (alleging Adobe's mere "ability" to misuse data it possesses). Wisely, this plaintiff is unwilling to plead that Adobe misuses or re-sells aarp.org data that it maintains as an AARP vendor. There is no Rule 11 basis for claiming that Adobe made *un*authorized disclosures of plaintiff's information to third parties, and flirting with that notion in a brief cannot defeat this motion to dismiss.

Plaintiff's evasions about Sections 3 and 5 are implausible, fail to satisfy *Twombly* and *Iqbal* standards, and reveal that this case is more about lawyers struggling to dream up claims, and not about an injured plaintiff striving to remedy concrete, particularized injuries.

## II. PLAINTIFF SUFFERED NO CONCRETE OR PARTICULARIZED INJURIES

Plaintiff concedes that to establish Article III standing, she must demonstrate her own "concrete and particularized injury" proximately caused by the challenged conduct. Opposition Brief at 11. Ms. Austin-Spearman paid for an AARP membership and received one, but now alleges disappointed expectations about the aarp.org Privacy Policy which plaintiff viewed after her membership purchase: a policy which applied to both paying AARP members and non-paying website users alike. The Amended Complaint fails to support injury claims because (i) plaintiff never saw or relied upon aarp.org's Privacy Policy while purchasing her AARP membership; (ii) plaintiff's PII has no economic value to calculate into the contract bargain; and (iii) plaintiff never alleges that her PII was brokered by Facebook, Adobe or any other third party. *See* Brief in Support

at 20-21 (citing decisions holding that no Article III standing exists for plaintiffs challenging unauthorized collection of PII under breach of contract, consumer fraud and other causes of action).

Ms. Austin-Spearman's AARP membership bargain is not impacted by her Facebook habits, nor by AARP's use of Adobe vendor services. Brief in Support at 22-23. Plaintiff tries to bend space-time by arguing about data sharing terms "she was promised" after buying her Association membership. But plaintiff cannot plausibly claim that aarp.org's Privacy Policy is something she "bargained for," because the Amended Complaint makes it clear that Ms. Austin-Spearman never read the aarp.org Privacy Policy until ***after*** she bought her Association membership. Amended Complaint at ¶ 77; Brief in Support at 23-24.

A District of Columbia federal court recently rejected the same injury theory in privacy litigation styled *In re SAIC Backup Tape Data Theft Litig.*, Misc. Action No. 12-347 (JEB), MDL No. 2360, 2014 WL 1858458, *10 (D.D.C. May 9, 2014) (no standing where plaintiffs alleged that contractual insurance premiums were devalued after their personal information was shared with third parties). Just like plaintiff here, those plaintiffs alleged that they factored in the defendant's promised security measures when valuing their purchases. Yet, the *SAIC* court – like so many others – held that plaintiffs lacked standing because "they were not denied coverage or services in any way whatsoever," and if "Plaintiffs claim that some ***indeterminate part*** of their premiums went toward paying for security measures, such a claim is too flimsy to support standing. * * * Nothing in the Complaint makes a plausible case that Plaintiffs were cheated out of their premiums. As a result, no injury lies." *Id.* (emphasis added) The same outcome is inevitable here: plaintiff cannot plausibly allege that she was denied any AARP membership benefit for which she

bargained, nor can she make a plausible case that she was cheated out of some "indeterminate part" of her AARP membership dues.[1]

Plaintiff argues that *SAIC* "has no bearing" on this case. Opposition Brief at 15. Plaintiff runs from this precedent on the illusory grounds that *SAIC*: (1) involved terms the plaintiff asked that court to read into the parties' agreement; (2) is a data breach case and therefore inapposite; and (3) involved the purchase of insurance services while Ms. Austin-Spearman's case involves the purchase of online services "like access to Defendants' AARP marketplace." Opposition Brief at 15-16. These distinctions fall flat because (1) this plaintiff indeed asks the Court to read the aarp.org Privacy Policy into her AARP membership agreement; (2) a data breach case from this jurisdiction rejecting plaintiff's injury theory is highly relevant, especially where plaintiff seems to be claiming that Adobe used her information in an unauthorized manner; and (3) this plaintiff's case involves the purchase of an AARP membership, not a ticket to some online bazaar that is never pled. *SAIC*'s reasoning applies unimpeded to this plaintiff's injury claim, and rejects it.

Plaintiff shrugs off AARP's authorities and constructs her own standing analysis with cases about the purchaser of a fiberglass boat who later discovered that the vessel was a fiberglass-wood composite, or purchasers of defective cars. Opposition Brief at 11-12. These cases present relatively simple Article III issues because they have something this plaintiff lacks:

[1] Because non-paying registrants at aarp.org are asked to accept the same Privacy Policy terms, it cannot plausibly be pled that any part of Austin-Spearman's AARP membership dues went towards the aarp.org Privacy Policy's data sharing disclosures. AARP Brief in Support at 22-23. *In re LinkedIn User Privacy Litig.*, 932 F. Supp. 2d 1089 (N.D. Cal. 2013) is indistinguishable, but plaintiff tries to draw a distinction by arguing that plaintiffs in that case upgraded from a free to a paying LinkedIn membership, while in this case Ms. Austin-Spearman was not upgrading but was a paying AARP member at all times relevant. See Opposition Brief at 16-17. This is a distinction without a difference. The *LinkedIn* court's reasoning remains unaffected by plaintiff's strained reading: that court determined that standing could not rest on the argument that "included in [their] bargain for the premium membership was the promise of a particular (or greater) level of security that was not part of the free membership." *Id.* at 1093.

misrepresentation of product attributes on which plaintiff relies ***before*** purchasing.[2] Plaintiff also cites two data breach cases where Article III standing was established – *Doe 1 v. AOL LLC*, 719 F. Supp. 2d 1102, 1105 (N.D. Cal. 2010) and *In re Adobe Systems, Inc. Privacy Litigation*, 2014 WL 4379916 (N.D. Cal. 2014). Both cases alleged that internet service and software providers failed to abide by express representations clearly designed to induce purchases of their services and software. Opposition Brief at 12-14. This case, by contrast, involves a non-profit association membership purchaser who did not see the aarp.org Privacy Policy before paying her AARP membership dues. Plaintiff's subjective and unexpressed beliefs about what she anticipated from the "online terms" cannot be relied on to make claims. Brief in Support at 37.

Privacy litigation is well-known for difficult Article III standing issues.[3] While cases raising legitimate privacy claims typically survive Article III challenges, lawsuits like this one – lawyerly creations raising only conjectural issues – usually do not. Plaintiff's approach to this standing issue demonstrates why. The Opposition Brief frequently chides AARP for "[o]ffering their own take on what they think plaintiff should have expected," and shields Ms. Austin-Spearman's subjective expectations before and after she bought her AARP membership. *See, e.g.*,

---

[2] *See Coghlan v. Wellcraft Marine Corp.*, 240 F.3d 449, 452 (5th Cir. 2001) (plaintiff purchased boat based on marketing that vessel was all fiberglass when it was not); *Wang v. OCZ Tech. Group, Inc.*, 276 F.R.D. 618, 628 (N.D. Cal. 2011) (defendant falsely marketed capacity and performance of computer storage devices); *In re Toyota Motor Corp. Unintended Accel. Mktg., Sales Pracs.,& Prod. Liab. Litig.*, 754 F. Supp. 2d 1145, 1163 (C.D. Cal. 2010) (plaintiffs purchased cars in reliance on marketing of vehicles as safe, but they were defective); *Lipton v. Chattem, Inc.*, No. 11 C 2952, 2012 WL 1192083, at *3 (N.D. Ill. Apr. 10, 2012) (defendant's deceptive advertising caused purchasers to believe product was safe when it was unsafe).

[3] *See* Sherman, "*Class Actions And Access To Justice: 'No Injury' Plaintiffs and Standing*" 82 Geo. Wash. L. Rev. 834, 850-851 (May 2014) (discussing challenges of establishing standing in privacy cases); Serwin, "*Poised on the Precipice: A Critical Examination of Privacy Litigation*" 25 Santa Clara Computer & High Tech. L.J. 883, 928-934 (2009) (surveying cases).

Opposition Brief at 10, 17. Plaintiff insists that her subjective expectations cannot be examined on this motion, but that posture only defeats Article III standing: concrete, particularized injury is not something that can exist solely in the mind of the plaintiff and not in the light of day.

## III. PLAINTIFF CAN STATE NO DCCPPA CLAIM AGAINST DEFENDANTS

The DCCPPA exempts AARP from plaintiff's statutory claims, providing that private suits against a "nonprofit organization shall not be based on membership in such organization [or] membership services." D.C. Code § 28-3905(k)(5). The Amended Complaint concedes that AARP is a nonprofit, and it claims that plaintiff overpaid for her Association membership in light of the alleged data sharing with Facebook and Adobe. The Opposition Brief drills home the point that plaintiff is challenging whether appropriate disclosures were made to her during her membership enrollment, and tries to claim that aarp.org's Privacy Policy was part of her membership services bargain.[4] Plaintiff alleges no other purchase from defendants in the ordinary

---

[4] *See* Opposition Brief at 10-11 (plaintiff purchased an AARP membership that allegedly included data protection, but "[d]efendants never intended to deliver that aspect of her purchase"); 14 (plaintiff alleges that AARP membership services she received were "inherently less valuable than the services *she was promised* . . . .") (emphasis original); 17 (plaintiff alleges that purchasing her AARP membership and registering for online account as "part of a single process" and therefore she "bargained for" data protections as part of her membership purchase); 18 ("Plaintiff's damages theory . . . focuses on the money *she paid* to Defendants and her failure to receive what *she bargained for*.") (emphasis original); 19 (at time of her membership purchase, she was aware that certain of her paid-for benefits could only be accessed online and that she would subsequently have to register for an AARP online account [] in order to access those benefits."). See also Amended Complaint at ¶ 66 ("as part of their purchases of AARP Memberships, Plaintiff and the Class expected that AARP would maintain the confidentiality of their PII."); at ¶ 80 (alleging that "website registration was required to access portions of her paid-for AARP membership"). Indeed, Ms. Austin-Spearman's entire standing argument is built on her claim that access to "exclusive content" on aarp.org is a membership benefit that she bargained for when paying her membership dues. Amended Complaint at ¶¶ 82-83; 106 (consumers pay membership fees to AARP in order to use its service and website); Opposition Brief at 10-16 (use of the AARP website and the terms of Privacy Policy is what she agreed to and paid for when she paid her $43 membership dues).

course, which would be impossible because – consistent with the Amended Complaint – neither AARP nor ASI sold goods or services to consumers at aarp.org during the relevant time period.

This lawsuit is based solely on plaintiff's membership in AARP, and not a separate purchase of goods or services in the ordinary course. Attempting to avoid the DCCPPA exemption for membership disputes, and application of that exemption in *In re APA Assessment Fee Litig.*, 766 F.3d 39 (D.C. Cir. 2014), the Opposition Brief invents a new theory about how a nonprofit membership service must relate to a nonprofit's "mission" for it to fall within Section § 28-3905(k)(5)'s exemption. Opposition Brief at 22-23.

Plaintiff's argument misstates the facts and outcome of *In re APA Assessment*. That case involved claims that the American Psychological Association ("APA") misled its members about whether an additional fee for the APA's political action committee ("APAPO") was required for membership in APA, when in reality it was not. APA and APAPO were both exempt from the DCCPPA because "Plaintiffs' claims are clearly based on 'membership in such organization [and] membership services,' not the 'purchase or sale of consumers goods or services in the ordinary course of business.'" 766 F.3d at 52 (D.C. Cir. 2014). Plaintiff reads *In re APA Assessment* as applying the DCCPPA exemption only to APAPO because its sole purpose was to conduct lobbying, and therefore the challenged fee related to the nonprofit's lobbying mission. But the *APA Assessment Fee* Court applied the exemption to APA as well, even though APA could not legally charge a mandatory lobbying fee as a 501(c)(3) organization. *Id.* at 44.

Lobbying activity was clearly ***not*** central to APA's mission – in fact, it was excluded from that association's mission by force of law. Yet the APA was held exempt from private DCCPPA lawsuits claiming that it intentionally misrepresented the cost and value of membership dues. Plaintiff's misperceived association "mission" standard cannot apply here, and the result in *APA*

*Assessement Fee* cannot be avoided. Trying to think about aarp.org as an "exclusive online marketplace" does not take plaintiff's case outside DCCPPA § 28-3905 (k)(5) or *APA Assessment Fee*. No "online marketplace" is pled and none exists. Even if it did, plaintiff's point seems to be that one AARP membership benefit is a ticket to the "online marketplace," the value of which is "inherently less" in light of aarp.org's Facebook features and the Adobe vendor relationship. The DCCPPA exempts both AARP and ASI from this association membership dispute.

Plaintiff also argues that AARP is a "merchant" selling goods and services for purposes of the DCCPPA, again based on her new idea that AARP is hosting an "exclusive online marketplace" at aarp.org. By selling access to this online bazaar, plaintiff's reasoning is that AARP should be deemed a seller of consumer goods or services. Opposition Brief at 23-25. But neither defendant can be deemed a "merchant" under the DCCPPA because the Amended Complaint makes plain that aarp.org is ***not*** selling goods or services to consumers. The aarp.org website provides only listings of third party discounts available to Association members; it does not provide a trading floor for redeeming those discounts or buying any of the underlying goods or services. Amended Complaint at ¶ 73.[5] And this plaintiff alleges no purchase of her own at the imaginary online bazaar: the only transaction alleged is Ms. Austin-Spearman's AARP membership purchase.[6]

---

[5] AARP offers Association memberships, and membership dues support a litany of benefits including legal advocacy for consumers and lobbying efforts in state and national legislatures, a monthly magazine, and the availability of discounts for Association members on certain third party products. *See* AARP Brief in Support at 4; Amended Complaint at ¶¶ 1, 17. The authorities already cited by AARP demonstrate that (1) no grounds exist for deeming ASI a "merchant" under the Act because ASI sells no goods or services, and merely managing trademark licenses that generate royalties does not constitute a for-profit trade or business; and (2) no DCCPPA "merchant" activity arises merely from AARP's recommendation of third party services. *See* AARP Brief in Support at 27 n. 10 and 28-29.

[6] Undeterred, plaintiff argues that when discounts for third party products are made available to AARP members at aarp.org, that is a "good or service" in itself, citing the California case *Nordberg v. Trilegiant Corp.*, 445 F. Supp. 2d 1082 (N.D. Cal. 2006). That case has no bearing

Nor does plaintiff's "supply side" theory pan out. Opposition Brief at 24 (arguing that "the relevant question is whether Defendants fall on the "supply" side of the transaction they facilitate and act as more than a "recommender"). Defendants are neither suppliers, producers, distributors, wholesalers nor retailers of the goods and services that third party merchants advertise on aarp.org. Unlike plaintiff's cited cases, aarp.org is not part of the supply chain operating as or through any dealers or agents to provide consumer products to purchasers.[7] There can be no agency argument about the arms-length relationship between defendants and advertisers on aarp.org, nor is there any analog to the overtly commercial activities in plaintiff's cited DCCPPA cases. Even if there were, Ms. Austin-Spearman has no involvement with any merchant advertising on aarp.org: plaintiff has purchased nothing from her imaginary "online marketplace." There is no merchant activity at issue and defendants are exempt from plaintiff's DCCPPA claim.

---

here: Trilegiant sold for-profit "buyers' club" memberships to consumers who often bought directly from defendant. *See Nordberg v. Trilegiant Corp.*, Case 3:05-cv-03246-MHP, 2005 WL 3143089 (N.D.Cal.) at ¶¶ 19, 29, 37 (Amended Complaint). Unlike AARP, Trilegiant was a for-profit entity and plaintiff's claims were brought under the California Consumer Legal Remedies Act ("CLRA") – which has no nonprofit exemption. Plaintiff argues that the CLRA is "analogous" to the DCCPPA, but without a nonprofit exemption under review, it is misleading to depict *Nordberg* as reaching anything close to an "analogous" issue on this motion.

[7] *See* Opposition Brief at 24, citing *Adam A. Weschler & Son, Inc. v. Klank*, 561 A.2d 1003, 1004 (D.C. 1989) (auction house possessing, displaying and selling goods on consignment for a fee was clearly connected with supply side of the challenged transaction); *Calvetti v. Antcliff*, 346 F. Supp. 2d 92, 104-05 (D.D.C. 2004) (on agency theory, contractor was liable under DCCPPA for construction services provided by subcontractor represented to consumer as one that would perform "on behalf of" the contractor, obtain supplies and contract with vendors through the defendant's company and perform under the defendant's active supervision).

## IV. NO FRAUD ARISES FROM THE AMENDED COMPLAINT'S ALLEGATIONS

Throughout the Amended Complaint's tortured chronology and hypothetical injuries, no fraud arises because (1) the challenged data sharing is disclosed in Sections 3 and 5 of the aarp.org Privacy Policy, (2) Ms. Austin-Spearman could not have relied on aarp.org's Privacy Policy in buying her AARP membership; (3) fraud claims are untimely under the three-year limitations period because plaintiff purchased in late 2010 and brought suit in mid-2014, without asserting plausible facts to invoke the discovery rule; (4) no facts are pled showing that AARP had no intent to perform, nor any scienter, at the time plaintiff purchased in late 2010; and (5) the Amended Complaint's fraud story is based on conjectural "information and belief" about what might be, without further support. *See* Brief in Support at 14-16; 30-33.

Plaintiff minimizes the issue as whether fraud is pled with sufficient detail, and then argues the discovery rule without pleading facts necessary to invoke it. Opposition Brief at 27-33.

### A. The Amended Complaint Cannot Support Fraud Claims.

While certainly prolix, the Amended Complaint fails to plead fraud elements, and its allegations are based on "information and belief" speculation that cannot support fraud as a matter of law. *See* Brief in Support at 14-16. For example, plaintiff argues that her pleading "describes the precise misrepresentations and omissions at issue." Opposition Brief at 28. But the Amended Complaint cannot fairly be read to do that: it never pleads facts showing that AARP deployed the Facebook features or entered the Adobe vendor relationship at the time this plaintiff read aarp.org's Privacy Policy in late 2010. Nor does plaintiff plead ***facts*** which, if true, demonstrate AARP had no intention in late 2010 of performing the aarp.org Privacy Policy. The Amended Complaint and Opposition Brief are silent about the basis for alleging fraudulent intent in late 2010.

The Court cannot overlook these failings on this motion. *See Wagshal v. Rigler*, 947 F. Supp. 10, 14 (D.D.C. 1996) (plaintiff must show fraudulent intent existed at time of contracting).

The plaintiff's fraud claims are built on lawyer arguments, not well-pled facts. The allegations highlighted by the Opposition Brief are conclusory statements only, and repeating them cannot avoid dismissal. Opposition Brief at 28-29 (citing Amended Complaint at ¶¶ 113, 126). Nor can fraud be based on the allegation that a Privacy Policy is being breached, without more. Opposition Brief at 29 (citing Amended Complaint at ¶¶ 27-32, 42-55, 127, 133).

Failure to perform a contract is not actionable fraud unless "at the time of its making, the promisor had no present intention of carrying it out." *Virginia Academy of Clinical Psychologists v. Group Hospitalization and Med. Servs., Inc.*, 878 A.2d 1226, 1234 (D.C. 2005). An allegation of breach, without more, does not equate to fraud. *See* AARP Brief in Support at 32-33. Even if plaintiff could plead a "breach," the Amended Complaint makes no attempt to establish the "more." Its fraud claim involves two steps: (1) allege that the aarp.org Privacy Policy is being breached; and (2) leap to a conclusory accusation of fraud without pleading more. *See* Opposition Brief at 28-29.

Nor can Ms. Austin-Spearman plead reliance under the Amended Complaint's chronology, which places the supposedly-inducing representations after the supposedly-resulting purchase. Brief in Support at 30-31. Plaintiff cites *In re Google Privacy Litigation*, but that case held that plaintiffs could not plead reliance on a privacy policy when they did not review the challenged policy until *after* their purchase. 2014 WL 3707508 at *8-10 (N.D. Cal. July 21, 2014).[8]

---

[8] "If Nisenbaum and the other members of his subclass did not see, read, hear or consider the terms of Google's then-active privacy policy before creating their account, they could not have relied on any representation it contained in making their decisions to purchase Android phones, and without affirmatively alleging reliance on Google's misrepresentations, the CLRA claim cannot survive. * * * [T]he Device Switch Subclass' CLRA claim must be dismissed once again based on deficient pleadings." *In re Google, Inc. Privacy Litig.*, 2014 WL 3707508 at *8-9. This subclass had its fraud claims dismissed because – like the plaintiff Ms. Austin-Spearman – they could not have relied on a policy they never saw, read, heard or considered before purchasing. Yet, the Opposition Brief (at 30) cites this same decision's approval of a different claim – the App

The Amended Complaint makes it impossible for this plaintiff to claim fraud, for all of the foregoing reasons. Perhaps more fundamentally, no misrepresentations occurred as a matter of law. Sections 3 and 5 of the aarp.org Privacy Policy disclose how social network features work at the site, how their use could result in sharing information with the user's social network, and that users should consult the privacy policies of those service providers for further details. *See supra* at 7-9. AARP's use of vendors like Adobe is also disclosed by Sections 5 and 6 of the aarp.org Privacy Policy. These disclosures render plaintiff's fraud claims implausible and disingenuous.

**B. Plaintiff's Fraud Claims Are Time-Barred.**

Plaintiff concedes that her fraud claims are subject to a three-year statute of limitation. Opposition Brief at 31. "[A] cause of action for fraud accrues for purposes of the statute of limitations when the plaintiff has either actual notice of her cause of action, or is deemed to be on inquiry notice because if she had met her duty to act reasonably under the circumstances in investigating matters affecting her affairs, such investigation, if conducted, would have led to actual notice." *Valentine v. Elliott (In re Estate of Delaney)*, 819 A.2d 968, 981-82 (D.C. 2003). Plaintiff argues that the discovery rule applies "where the alleged tortious conduct obscures when the injury occurs." Opposition Brief at 31 *quoting Morton v. National Med. Enters.*, 725 A.2d 462, 468 (D.C. 1999). Plaintiff's treatment of *Morton* distorts application of the discovery rule,[9] but in the next breath she appears to argue fraudulent concealment. Opposition Brief at 32 (arguing

---

Disclosure subclass claims – where plaintiffs "successfully plead that they relied on these policies in making the decision to use Google Play and download Android applications." *Id.* at *13. This plaintiff's fraud claim resembles the dismissed claims in *Google*, not the App Disclosure claim that survived, because reliance prior to purchase was well-pled.

[9] *Morton* actually reads: "[I]n cases where the relationship between the fact of injury and the alleged tortious conduct is obscure when the injury occurs, we apply a 'discovery rule' to determine when the statute of limitations commences." 725 A.2d at 468. The last thing this plaintiff admits is the obscure relationship between her alleged injury and the conduct at issue.

that plaintiff could not be expected to discover her injury due to "the steps Defendants took to disguise or otherwise obscure their practices . . ..").[10]

Plaintiff describes the analysis as "a fact-specific inquiry to evaluate a party's 'reasonable diligence' in pursuing evidence of wrongdoing." Opposition Brief at 32. Whether the discovery rule or fraudulent concealment applies, plaintiff's problem is that her Amended Complaint pleads ***no*** facts from which this Court can assess either argument. It describes aarp.org's use of prominently-labeled Facebook login and plugin features. *See* Amended Complaint at ¶ 42. The challenged conduct takes place in broad daylight, and the Amended Complaint lays no foundation for a discovery rule or fraudulent concealment case. *See Cevenini v. Archbishop of Washington*, 707 A.2d 768, 774 (D.C. 1998) ("Without even an allegation of misrepresentation intended to conceal the existence of a possible cause of action, there can be no finding of fraudulent concealment."); *Drake v. McNair*, 993 A.2d 607, 619 (D.C. 2010) ("fraudulent concealment requires something of an affirmative nature designed to prevent discovery of a cause of action").

Under these circumstances, it is difficult to imagine how pleading facts for discovery rule or fraudulent concealment tolling could comply with Rule 11. Nor is anything pled about plaintiff's discovery of the Adobe vendor relationship, when all the while Sections 5 and 6 of aarp.org's Privacy Policy put this plaintiff on notice that (1) vendors might be used by AARP; (2)

---

[10] By arguing fraudulent concealment, plaintiff necessarily asks to toll the limitations period, and therefore must clear the high hurdle applicable to equitable tolling doctrines. *See* Brief in Support at 31; *see also Kiwanuka v. Bakilana,* 844 F. Supp. 2d 107, 119 (D.D.C. 2012) ("District of Columbia courts recognize a restricted equitable tolling doctrine, which 'allows a plaintiff to initiate an action beyond the statute of limitations ... [if the] defendant's fraudulent concealment or misconduct lulled the plaintiff into allowing the filing deadline to pass….'").

AARP "might share your information" with these vendors; and (3) AARP would take steps to prevent unauthorized access to and improper use of data by vendors. *See supra* at 8-9. According to plaintiff, Adobe is one of the most prominent vendors in this field. Amended Complaint at ¶ 60; *See also* Opposition Brief at 8-9 ("Adobe is also a data broker that operates one of the largest analytics services in the country."). Plaintiff presents herself as a privacy advocate who regularly and closely reviews privacy policies, and she is suing other website operators for similar practices,[11] but she offers no explanation for her four-year delay in suing AARP for using Adobe.

Plaintiff wants to argue about the "discovery rule" and fraudulent concealment while pleading no facts no about them. For that additional reason, the fraud claims should fail as untimely.

## V. PLAINTIFF DOES NOT PLAUSIBLY PLEAD AARP'S UNJUST ENRICHMENT

AARP receives no definable benefit from the third party data collection alleged: Facebook is collecting data from certain Facebook members who visit aarp.org, and Adobe is claimed to possess and have the "ability" to misuse data as a vendor for AARP. The Amended Complaint fails to plead how AARP is unjustly enriched in either scenario.

In the case of Facebook, the social network allegedly reaps data about some of its own members visiting aarp.org, and then goes its own way. There is no corresponding benefit to AARP: nothing is alleged as payment or consideration or benefit conferred by Facebook to AARP for this data. Plaintiff argues that AARP benefits from "third party PII collection practices" generally. Opposition Brief at 33. Whatever these benefits are, they cannot plausibly arise from

---

[11] *See, e.g., Austin-Spearman v. AMC Network Entertainment LLC*, Case No. 1:14-cv-06840-NRB (S.D.N.Y. 2014), found at http://www.plainsite.org/dockets/2ecpmtpmg/new-york-southern-district-court/austinspearman-v-amc-network-entertainment-llc-et-al/.

the conduct alleged about Facebook, because that social network is culling data from aarp.org and leaving with it. And the Adobe vendor relationship is one in which AARP pays for database management services: the benefits of which naturally flow back to AARP, but there is nothing unjust about AARP paying for and getting those services. *See* Opposition Brief at 8.[12]

Plaintiff presents her Association membership dues as another benefit that AARP unjustly retains under the circumstances. Opposition Brief at 33-34. In return for her membership dues, plaintiff received all of the membership benefits for which she bargained – the Amended Complaint identifies no shortfall. Yet, plaintiff argues that some indeterminate part of her membership payment was "inherently" reduced and should be counted toward promises of data security in the aarp.org Privacy Policy. Opposition Brief at 14. That claim cannot survive dismissal, for the same reasons it failed in *In re SAIC,* 2014 WL 1858458 at *10 (claim that some indeterminate part of plaintiff's insurance premiums went to paying for promised data security was "too flimsy to support standing").[13] Because the challenged aarp.org Privacy Policy applies to all website users alike – paying members and non-paying registrants – no portion of Ms. Austin-Spearman's payment can may be attributed to this alleged benefit. *See* Brief in Support at 34.

---

[12] Footnote 25 of the Opposition Brief, at 33, seems calculated to confuse. According to the Amended Complaint at ¶¶ 46-55, AARP uses Adobe software and servers to collect and maintain information about its own members and visitors to its own aarp.org site, which is then used to generate targeted advertising to those same users at the aarp.org site. *See also* Opposition Brief at 8. Plaintiff cannot argue with a straight face that this is "testimony" that "contradicts" the Amended Complaint, when that pleading makes the same point and nothing more.

[13] Plaintiff states that the Amended Complaint is simply entitled to belief when pleading that plaintiff's membership dues conferred an unjust benefit upon AARP. Opposition Brief at 33 ("Defendants claim that they received no benefits…run contrary to the FAC's factual allegations, which must be accepted as true at the pleading stage."). It is well understood that conclusory allegations such as this are ***not*** accepted as true at the pleading stage. *See* AARP Brief in Support at 16-17 (under *Twombly* and *Iqbal*, a court confronted by "labels and conclusions, and a formulaic recitation of the elements" may not accept them as true on a motion to dismiss).

## VI. PLAINTIFF SUFFERED NO CONTRACT DAMAGES

In its motion, AARP demonstrated that aarp.org's Privacy Policy cannot be considered a part of the plaintiff's bargained-for Association membership contract since, according to the Amended Complaint, the Policy was not presented to the plaintiff as part of her membership agreement and she did not review its terms until after her membership was purchased. Brief in Support at 36 (citing cases that breach of privacy policies do not generally give rise to contract claims). This conclusion has particular force where non-paying registrants at the aarp.org website accept the same Privacy Policy terms as paying AARP members. Moreover, the aarp.org website operates exactly as disclosed, and therefore no breach arises on the facts alleged. *Id.* at 36-37.

In response, plaintiff introduces a coercion argument, claiming that AARP "made her accept" aarp.org's Privacy Policy to access its "online marketplace." Opposition Brief at 36. As demonstrated above, plaintiff's un-pled "online marketplace" concept is fictional and implausible – and not part of the consideration for plaintiff's AARP membership dues. This argument also continues to ignore the Amended Complaint's chronology. Both the Amended Complaint and the Opposition Brief try to avoid the chronology's consequences by introducing Ms. Austin-Steadman's subjective expectations at the time of contracting: she foresaw the privacy terms applying to her future online access. Opposition Brief at 3. Having thus ignored the chronology's consequences, plaintiff then denies any subjective expectations are at issue. Opposition Brief at 37 (arguing that plaintiff "did not make up the terms of her contract" and that "she only expected what Defendants promised."). This feigned umbrage neglects to acknowledge the Amended Complaint's chronology: plaintiff was promised nothing about aarp.org's Privacy Policy at the time of contracting, so Ms. Austin-Spearman's "expectations" can only be subjective. Her

subjective expectations are not actionable on a breach of contract claim.[14] And even if the AARP Privacy Policy was somehow part of Ms. Austin-Spearman's membership contract, her economic position did not change when AARP allegedly breached the aarp.org Privacy Policy. Plaintiff therefore has not been injured by the alleged breach of contract.

## VII. IMPERTINENT FACTS SHOULD BE STRICKEN IF ANY CLAIM SURVIVES

AARP also moves to strike plaintiff's references to a data brokerage industry that never touches her data under the facts alleged. Brief in Support at 39-41. Plaintiff argues the mere existence of a data brokerage industry "demonstrates the value of protective services the Defendants promised," but the Amended Complaint is unable to plead any causal link between plaintiff's claims about Facebook and Adobe and the brokerage industry at large. Opposition Brief at 40-42. Instead of this far-flung material, plaintiff needs to plead Facebook's disclosures of the challenged Facebook login and plugin features which are directly relevant and dictate the outcome of her claims. *See supra* at 3-4. Nor are the workings of House of Representative staffers probative to this plaintiff's claims. In the event any claims in the Amended Complaint survive dismissal with prejudice, these immaterial and scandalous matters should be stricken.

---

**14** Plaintiff cites to *Cain v. Redbox Automated Retail, LLC*, 981 F.Supp.2d 674 (E.D. Mich. 2013) for her argument that some indeterminate part of her membership dues went towards ensuring protection of her PII. *Cain* is inapplicable: the plaintiffs there (represented by the same lawyers as plaintiff here) did ***not*** argue that plaintiff suffered damages from an alleged breach of defendant's privacy policy. Instead, plaintiffs argued that they were injured as Michigan residents that paid for movie rentals because they were entitled to the level of privacy required by a Michigan-specific act, the Video Rental Privacy Act, M.C.L. §§445.1711-1715 ("VRPA"). The plaintiffs in *Cain* alleged that defendant's disclosure of plaintiffs' PII reduced the benefit of those statutorily-required privacy protections, incorporated into an unwritten agreement formed when plaintiff purchased a video. The allegations hinged on the VRPA's privacy requirements, which have no application here.

## CONCLUSION

For the foregoing reasons, Defendants AARP and ASI respectfully request that plaintiff's Amended Complaint be dismissed with prejudice.

Respectfully submitted,

January 6, 2015

/s/ Thomas E. Gilbertsen
**VENABLE, LLP**
Thomas E. Gilbertsen (DC Bar 432290)
Kelly A. DeMarchis (DC Bar 501966)
Michael P. Bracken (DC Bar 992525)
tgilbertsen@venable.com
kdemarchis@venable.com
mpbracken@venable.com
575 7th Street, N.W.
Washington, D.C. 20004
Tel: 202-344-4000
Fax: 202-344-8300

Of Counsel:
Daniel Koslofsky (DC Bar 994899)
Associate General Counsel
AARP
601 E Street, N.W.
Suite 800
Washington, D.C. 20049
Tel: 202-434-2378
Fax: 202-434-2339
*Attorneys for defendants*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on January 6, 2015, I electronically filed the foregoing Reply in Support of Motion to Dismiss with the Clerk of this Court using the CM/ECF system, which provides notification and effective service of such filings to the following counsel of record:

Maria Christina Simon
THE GELLER LAW GROUP, PLLC
4000 Legato Road
Suite 1100
Fairfax, VA 22033

Jay Edelson
Alicia E. Hwang
Benjamin S. Thomassen
Rafey S. Balabanian
EDELSON PC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654

This the 6th day of January, 2015.

/s/ Michael P. Bracken
Michael P. Bracken